UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:

HUBERT ARTURO ACEVEDO,

      Plaintiff,

v.

CITY OF MIAMI;
JOE CAROLLO, individually;
ALEX DIAZ DE LA PORTILLA, individually;
ARTHUR NORIEGA, individually; and
MANOLO REYES, individually,

      Defendants.

_____/

## **COMPLAINT**

Plaintiff Hubert Arturo Acevedo ("Chief Acevedo") sues Defendants, the City of Miami, City Manager Arthur Noriega ("City Manager Noriega" or "Noriega"), Joe Carollo ("Commissioner Carollo" or "Carollo"), Alex Diaz de la Portilla ("Commissioner Diaz de la Portilla" or "Diaz de la Portilla"), and Manolo Reyes ("Commissioner Reyes" or "Reyes") (collectively, the "Defendant Commissioners"), and alleges as follows.

## **INTRODUCTION**

1.     This is an action brought under the Florida Public Whistle-Blower's Act, Fla. Stat. § 112.3187 and the Civil Rights Act of 1866, 42 U.S.C. § 1983.

2.     On April 5, 2021, the City of Miami swore in Chief Acevedo as Chief of Police because "there was a need to reform the MPD and to change the culture of the agency."

3.       Chief Acevedo set out to do just that.  After he was appointed Chief of Police for the City of Miami Police Department (the "MPD"), he attempted to promote officers committed to reform, to investigate officer misconduct, and to push back on attempts by certain City of Miami Commissioners to use the men, women, and resources of the MPD to carry out their personal agendas and use the MPD as their puppet.

4.       In particular, Commissioners Carollo, Diaz de la Portilla, and Reyes targeted Chief Acevedo because of his resistance to their efforts to use the MPD to carry out their personal agendas and vendettas, his reform efforts, and his speaking out against corruption and abuse of power by the City of Miami Commission (the "Commission").

5.       When the Defendant Commissioners' efforts to intimidate Chief Acevedo failed— with Chief Acevedo reporting their misconduct to Mayor Francis Suarez ("Mayor Suarez" or "Suarez"), City Manager Noriega, the Miami-Dade County State Attorney's Office ("State Attorney's Office"), and the Federal Bureau of Investigation ("FBI")—the Defendant Commissioners retaliated against him.

6.       The Defendant Commissioners pressured Noriega to suspend Chief Acevedo, humiliated Chief Acevedo at public meetings, and ultimately voted to fire him.

7.       The Defendant Commissioners' and Noriega's actions violated the United States Constitution and Florida state law.

**PARTIES, JURISDICTION, AND VENUE**

8.       Plaintiff Hubert Arturo Acevedo is an individual and, at all material times, was a resident of Miami-Dade County, Florida.

9.       Defendant City of Miami was and is a public municipality organized and existing under and by virtue of the laws of the State of Florida and located in Miami-Dade County, Florida.

10. Defendant Noriega is the City Manager of the City of Miami and, at all material times, was a resident of Miami-Dade County, Florida. He is being sued in his individual capacity.

11. Defendant Carollo is a City of Miami Commissioner and, at all material times, was a resident of Miami-Dade County, Florida. He is being sued in his individual capacity.

12. Defendant Diaz de la Portilla is a City of Miami Commissioner and, at all material times, was a resident of Miami-Dade County. He is being sued in his individual capacity.

13. Defendant Reyes is a City of Miami Commissioner and, at all material times, was a resident of Miami-Dade County, Florida. He is being sued in his individual capacity.

14. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Chief Acevedo brings a claim pursuant to 42 U.S.C. § 1983. The Court's supplemental jurisdiction is invoked for Chief Acevedo's state law claim pursuant to 28 U.S.C. § 1367.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the City of Miami is located within this judicial district, City Manager Noriega and Commissioners Carollo, Diaz de la Portilla, and Reyes reside within this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## GENERAL ALLEGATIONS

16. Beginning in March of 2021, Mayor Suarez and City Manager Noriega recruited Chief Acevedo to be the Chief of the MPD.

17. When recruiting Chief Acevedo, Suarez and Noriega emphasized the need to reform the MPD and change the culture of the department.

18. On April 5, 2021, Chief Acevedo was sworn in as Chief of Police.

**The duties and responsibilities of the MPD and the Chief of Police**

19.     The City of Miami Charter sets forth the duties of the City of Miami's Chief of Police (the "Police Chief").

20.     Pursuant to Section 24 of the City of Miami Charter, the Police Chief has the "immediate direction and control of the police force" and, through the Police Chief, the Director of Public Safety shall "promulgate all orders, rules and regulations for the government of the police force."

21.     Pursuant to Section 25 of the City of Miami Charter, the Police Chief has "the right and power to suspend any of the officers and employees in their respective division who may be under their management and control for incompetence, neglect of duty, immorality, drunkenness, failure to obey orders given by proper authority, or for any other just and reasonable cause."

22.     Notably, the City of Miami Charter does not give the Police Chief the duty or powers to discipline the City of Miami Commissioners (the "City Commissioners").

**The relationship between the City Commissioners and the MPD**

23.     The City of Miami has five separate commissioners who represent five separate districts.

24.     Under the City of Miami Charter, the City Commissioners have no authority to manage the MPD or otherwise dictate MPD decisions.

25.     Specifically, Section 4(d) of the City of Miami Charter reads, in relevant part:

Neither the mayor nor the city commission, nor any committees nor members thereof shall give orders to any of the subordinates of the city manager, city attorney, city clerk and independent auditor general, either publicly or privately. Any such dictation, prevention, orders or other interference or violation of this section on the part of the mayor or a member of the city commission or committees shall be deemed to be violation of the Charter, and upon conviction before a court of competent jurisdiction any individual so convicted shall be subject to a fine not exceeding five hundred dollars ($500.00) or imprisonment for a term of not

4

exceeding sixty days or both, and in the discretion of the court shall forfeit his or her office.

26.     In short, the City of Miami Charter establishes that no City Commissioner can give direct orders to any department that is subordinate to the City Manager.

27.     In February of 2020, the Defendant Commissioners took steps to eliminate the power of the MPD to investigate City Commissioners.

28.     On February 13, 2020, the Commission passed resolution No. R-20-0034.

29.     This resolution directed the City Manager to develop a Memorandum of Understanding with the Florida Department of Law Enforcement ("FDLE") or the FBI to direct all criminal investigations, excluding those relating to misdemeanors or traffic offenses, of city of Miami elected officials and their present and former personnel to the FDLE and/or the FBI.

30.     The resolution further ordered that, until the Memorandum of Understanding was approved by the Commission, the City Manager was to forward any and all pending criminal investigations of City elected officials and their present and former personnel, excluding those relating to misdemeanors or traffic offenses, to the FDLE and/or the FBI.

31.     The stated rationale for Resolution No. R-20-0034 was to avoid the "perception of a conflict or impropriety" that may attach to the MPD criminally investigating elected officials of the City of Miami and their present and former personnel.

32.     Resolution No. R-20-0034 purportedly shifted the duty and responsibility of investigating City of Miami elected officials from the MPD to either the FDLE or the FBI.

33.     Resolution No. R-20-0034 was a transparent attempt by the Defendant Commissioners to prevent the MPD from investigating them.   The FBI and the FDLE independently decide whom and what to investigate and do not rely on "understandings" or

5

"memoranda" with city governments.  By passing the resolution, the Defendant Commissioners undercut the MPD's ability to investigate crimes committed by the City's elected officials.

34.     In this respect, Resolution No. R-20-0034 posed a dilemma for Chief Acevedo during his tenure as Chief of Police.

35.     Although Chief Acevedo was prohibited from investigating elected officials, he soon witnessed the Defendant Commissioners violate federal and state law as well as the City of Miami Charter.

36.     The Defendant Commissioners weaponized City resources against perceived enemies, impermissibly issued and/or dictated orders to Chief Acevedo and the MPD, and interfered with Chief Acevedo and MPD operations.  Each of these actions was beyond the allowable scope of the discretionary authority granted to City Commissioners.

**The Defendant Commissioners attempt to weaponize the MPD against perceived enemies**

37.     The Defendant Commissioners have sought to weaponize the MPD to persecute their perceived enemies and have engaged in a pattern and practice of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like.

38.     Each of the City Commissioners knew of the pattern and practice of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like. Each City Commissioner was present when such conduct was discussed and received written notice of the same, as stated herein. Each of the City Commissioners failed to object to the aforementioned pattern and practice and adopted the same.

39.     Back in 2019, a former City of Miami Chief of Police sent an email to the then-City Manager concerning the City of Miami Attorney's request "that Miami police personnel, and other departments, conduct new site inspections at the direction of a city commissioner."

40.     According to the former Chief, that email request "was aimed at one particular business owner in the city" (i.e., Bill Fuller).  Mr. Fuller had supported the political opponent of Commissioner Carollo.

41.     The former Chief said that the City's acts "may amount to an unsanctioned and unlawful exercise of powers beyond the limits of [Commissioner Carollo's] legislative power as a city commissioner to intentionally cause harm to a business owner" and  "may be in violation of the code of ethics ordinance."

42.     The "unsanctioned and unlawful exercise of powers beyond the limits of [Commissioner Carollo's] legislative power" was made with the full knowledge of and adoption by each of the City Commissioners and pursuant to the long-standing pattern and practice of the Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like.

43.     In approximately April of 2021, shortly after Chief Acevedo was sworn in as Chief of Police, numerous City of Miami officials made comments to Chief Acevedo about Mr. Fuller.

44.     City Manager Noriega informed Chief Acevedo that Commissioner Carollo did not like Mr. Fuller.

45.     At the time of this comment, Mr. Fuller was one of the owners of several business located within the City of Miami, including Mad Room, doing business as Ball & Chain, and Taquerias El Mexicano ("Taquerias").

46.     Noriega told Chief Acevedo that Carollo's dislike of Mr. Fuller stemmed from Mr. Fuller's public support of a Carollo political opponent.

47.     Noriega told Chief Acevedo that they—intimating City leadership and the MPD—would be "busy" with Fuller-owned businesses and warned Chief Acevedo to "stay away" from such businesses.

48.     Similarly, Commissioner Diaz de la Portilla told Chief Acevedo, in essence, to not "get caught going into any Fuller-owned businesses" because, if he did, Commissioner Carollo would "go crazy."

49.     Mayor Suarez also warned Chief Acevedo about Fuller-owned businesses, advising him to avoid patronizing such businesses to avoid incurring the wrath of Commissioner Carollo.

50.     Based on these statements related to Mr. Fuller, Chief Acevedo grew concerned that City political leadership, including City Manager Noriega and the Defendant Commissioners, were seeking to use the MPD to carry out political vendettas and to engage in a pattern and practice of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like.  This pattern and practice of retaliation was beyond the allowable scope of the discretionary authority granted to the City Commissioners.

51.     Chief Acevedo's concerns were soon confirmed.

52.     On April 3, 2021, Chief Acevedo was out on patrol when he received a call from City Manager Noriega to go to Taquerias.

53.     When Chief Acevedo arrived at Taquerias, he saw Noriega, who was wearing a baseball hat, personally looking into possible "violations" by Taquerias and conducting certain measurements of the property.

54.     Noriega was with then-Assistant Chief Manuel A. Morales ("Officer Morales").

55.     Noriega told Chief Acevedo that he was taking these actions at the direction of Commissioner Carollo who had an "absolute disdain" for Fuller.

56.     Not long thereafter, on April 22, 2021, the Commission held a meeting.

57.     All of the City Commissioners attended the meeting, as did City Manager Noriega.

58.     During the meeting, Commissioner Carollo introduced a "pocket item" with the goal of "tightening up" the procedures followed by the City of Miami Code Enforcement ("Code Enforcement") and the MPD in relation to alcohol enforcement.

59.     The pocket item was a "resolution of the Miami City Commission directing the City Manager to create and implement an operational task force to combat criminal activities pertaining to narcotics, prostitution, human trafficking, and illegal gambling."

60.     During this meeting, Chief Acevedo was called before the Commission.

61.     Commissioner Carollo asked Chief Acevedo to start investigating certain bars and other establishments in Carollo's district.

62.     Carollo then asked City Manager Noriega for permission to give Chief Acevedo a specific list of places for the police to investigate.  He said, "Mr. Manager, would you have any problems whatsoever if I could sit down with the police chief and give him a list of places that he should begin going to in my district.  Even if they want to invite me I'd be happy to go with him."

63.     Noriega responded by saying, "Of course not."

64.     Commissioner Diaz de la Portilla then spoke to this same issue, naming specific bars and other establishments that he wanted the police to investigate.

65.     That next day, on April 23, 2021, Diaz de la Portilla, through his assistant, provided the MPD with a list of specific businesses within the City of Miami that he claimed were engaging in criminal activity.

66.     Specifically, Karla Fortuny, Diaz de la Portilla's assistant, sent an email to City Manager Noriega, copying Chief Acevedo.

67.     In that email, Ms. Fortuny wrote: "Good afternoon Mr. Manager, I hope this message finds you well!  As per Commissioner Díaz de la Portilla's request yesterday when he passed his **pocket item** for the task force to combat criminal activities pertaining to Narcotics, prostitution, illegal gaming and human trafficking, I have included below the first 10 bars in our city that are allegedly engaging in illegal activity and he would like to see investigated."

68.     Chief Acevedo was unaware that any citizens had complained about these businesses to the MPD.  Neither Ms. Fortuny nor Diaz de la Portilla provided Chief Acevedo with evidence that these businesses had broken any laws.

69.     Chief Acevedo was concerned that Commissioners Carollo and Diaz de la Portilla were violating the City of Miami Charter by attempting to dictate his actions and the actions of the MPD.

70.     The Defendant Commissioners' actions were beyond the allowable scope of the discretionary authority granted to the City Commissioners.

71.     On May 1, 2021, pursuant to a certain "Operation Dry Hour," the MPD, Code Enforcement, the Division of Alcohol Beverages and Tobacco, Bureau of Law Enforcement ("ABT"), and City of Miami building inspectors entered Taquerias and gave a written warning for an alleged liquor law violation.  When the MPD and accompanying "task force" attempted to enter

the building, Mr. Fuller stated that Code Enforcement was not allowed to enter the venue without a warrant. The MPD entered and allowed Code Enforcement and others into the venue.

72.     Pursuant to its "Operation Dry Hour," the MPD is required to prepare a police report. After the inspection, a representative of Taquerias wrote to Chief Acevedo, informing him that the MPD police report did not match the ABT report, as the police report had erroneously stated that Taquerias was given a "written warning, liquor law violations" by ABT.

73.     Chief Acevedo directed Officer Morales to investigate this claim. Chief Acevedo later learned that, contrary to his direction, Officer Morales did not follow up with Taquerias regarding the May 1, 2021 inspection.

74.     Notably, when Chief Acevedo was ultimately fired, Officer Morales was selected by the Commission as the interim City of Miami Chief of Police.

75.     The Defendant Commissioners chose Officer Morales as interim Chief because he carries out their orders without question and allows the Defendant Commissioners to abuse MPD resources to carry out personal agendas and vendettas.

76.     When Officer Morales was sworn in as interim Chief on October 14, 2021, an event attended by Commissioners Carollo, Diaz de la Portilla, Reyes, Russell, and Watson, as well as City Manager Noriega, Carollo played the theme music from the film The Godfather.

77.     When Officer Morales heard the Godfather music, he pointed at Commissioner Carollo and laughed.

78.     After Officer Morales was sworn in, Commissioner Diaz de la Portilla hugged him.

79.     Following the May 1, 2021 incident, the MPD conducted two more unannounced inspections of Taquerias, one on June 19, 2021, and another on August 20, 2021. During the August 20, 2021 inspection, MPD officers arrested Taquerias' general manager for allegedly

operating a nightclub.  The State Attorney's Office ultimately dropped the charges against the general manager.

80.     On May 24, 2021, Chief Acevedo met with Commissioner Carollo, City Manager Noriega, and Officer Morales at Carollo's field office in Little Havana.

81.     Although the meeting was ostensibly about Operation Dry Hour and code enforcement generally, Carollo's focus remained almost exclusively on Fuller-owned businesses.

82.     During the meeting, Carollo emphasized the need to investigate Fuller-owned businesses and claimed that Fuller was bribing code enforcement officials and police officers.

83.     During his tenure as Chief of MPD, Chief Acevedo saw no evidence supporting Carollo's bribery allegations.  To the contrary, two high-ranking officers in the Internal Affairs Department, Officer Jose Fernandez and Officer Brandon Lanier, told Chief Acevedo that they had seen no evidence supporting Carollo's allegations.

84.     Nevertheless, Carollo continued to insist that Fuller was bribing officials and complained to City Manager Noriega that Chief Acevedo was not doing anything about it.

85.     Separately, on multiple occasions, Carollo demanded that Chief Acevedo arrest "agitators" attending public events in the City.

86.     Carollo's demands were beyond the allowable scope of the discretionary authority granted to the City Commissioners.

87.     For example, on June 25, 2021, Carollo called Chief Acevedo and told him that he (Carollo) was at a monthly Calle Ocho event.

88.     To paraphrase, Carollo told Chief Acevedo that there were "son of a bitches" at the event that were "agitating and we need to arrest them and get them out of here."

89.     Carollo demanded that Chief Acevedo send MPD officers to the event.  Chief Acevedo ultimately told MPD Major Thomas Carroll to investigate Carollo's claims.

90.     Neither Major Carroll nor any MPD personnel identified any such agitators.

91.     Approximately one month later, on July 31, 2021, Carollo again ordered Chief Acevedo to arrest "agitators."

92.     Specifically, on that date, Chief Acevedo and MPD personnel were attending a "Patria y Vida" event held at Bayfront Park.

93.     Commissioner Carollo was at the event.

94.     At the event, there were demonstrators demonstrating against Donald Trump.

95.     These persons were not posing any threat to public safety and were simply exercising their First Amendment rights to free speech and assembly.

96.     Carollo identified the demonstrators as "agitators."

97.     He ordered Chief Acevedo to "arrest those communists and get them the hell out of here."

98.     Although Chief Acevedo directed MPD personnel to keep an eye on the demonstrators, he did not order any arrests and MPD personnel did not arrest the demonstrators because the demonstrators did not break any laws.

**The Defendant Commissioners attempt to influence a confidential MPD investigation**

99.     The Defendant Commissioners have repeatedly attempted to interfere with the operations of the MPD and use the MPD for their own personal benefit, to the point of intimidating and ultimately causing chiefs of police to be fired if they do not go along with the Commissioners' efforts.

100.    The Defendant Commissioners' interference and intimidation were known to each of the City Commissioners, were adopted by each of the City Commissioners, and were beyond the allowable scope of the discretionary authority granted to the City Commissioners.

101.    For example, the MPD has something known as a Sergeant-at-Arms Detail ("Detail").

102.    This Detail consists of police officers whose responsibilities involve, among other things, providing security to the City of Miami Mayor and the City Commissioners.

103.    Sometime before June 3, 2021, Chief Acevedo learned that a member of the Mayor's Detail had breached operational security.

104.    On June 3, 2021, Chief Acevedo ordered the MPD's Internal Affairs Department to investigate this alleged breach of operational security.

105.    An investigation determined that City of Miami Police Officer Luis Camacho was the officer who had breached security.

106.    The MPD's investigation of Officer Camacho was confidential at that time.

107.    On June 22, 2021, based on the MPD's investigation, Officer Camacho was relieved of duty, with pay.

108.    Two days later, on June 24, 2021, the Commission held a meeting.

109.    Commissioners Carollo, Diaz de la Portilla, and Reyes, as well as the other remaining City Commissioners, were present at the meeting.

110.    At that meeting, Diaz de la Portilla placed yet another "pocket item" on the agenda.

111.    The pocket item concerned Officer Camacho.

112.    Chief Acevedo was called before the City Commissioner and questioned about the pocket item.

113.    During the public meeting, Commissioner Diaz de la Portilla said,

Without going into all of the details of what has really happened here which to me is disgusting to be honest with you, I think it is lack of due process, I think it is arbitrary in nature, and I am not happy with it.  And I was clear with you when I spoke with you but I am very clear publicly because I think it is important to be clear and honest, I am very direct.  I think it was arbitrary, I think you pulled the trigger too quickly. . .I think before you tarnish somebody's reputation, you need to do due diligence and go through an investigation because once you tag someone as something, even if they are exonerated at the end, they are tarnished.  And to me that is not the right way to do things, my opinion, I am one commissioner. I am one commissioner, there's 5 here, there's the mayor, it is what it is.

114.    Following Diaz de la Portilla's statements, Commissioner Reyes said, in effect:

"The only thing I have to add is 'Amen.'  The only thing I have to add is I feel the same way and

keep on sir."

115.    Following those two statements, Commissioner Carollo said,

I would like to keep things in house, but I will say this to you publicly chief, and please understand where I am coming from. While I have been walking very softly, I carry a hell of a big stick, and it don't matter what time of the year it is, whether it is election time, or not election time.  And let that other character [unknown to whom he was referring] know too.

But if someone has breached a vow in their law enforcement position and you can prove it to me and show it to me, it is one thing, but if you are going to go on speculation and on the way something might look, that at the end might not be anywhere near what you thought it might look like, or what you were told it looked like, that's a different story.  And I don't want to see because of some of the end games of the MPD, any one officer be dealt with unjustly.  And I am telling you now chief, unless you show me something different, I am beginning to think this is what happened.  When we meet personally, I can give you several other roads that are even more believable than maybe something than the one you are looking at. I am not happy that this came by, because Officer Camacho has been a professional, just like Commissioner Reyes said, he never talked to anyone or got involved in anything, he did his job period. You have to show me, I have been around the block in this area for a long time and I think you know that.  I don't want to be told, no no, it looks this way or that I want real evidence.  If you don't have that I am going to expect that he comes back to the position he has.

116.     After Diaz de la Portilla spontaneously stated "absolutely," Carollo continued. Carollo said, in effect, "You're the chief, you can do whatever you want, but I want you to know that from up here, we can do a heck of a lot more. I will leave it at that."

117.     Reyes then stated, "I support what Commissioner Carollo says about Sergeant Camacho, and I am also not happy about it."

118.     Diaz de la Portilla then stated,

> I am going to ditto what Commissioners Carollo and Reyes, said, Luis Camacho is a man, a man's man, he is discreet, he has been on this force for 23 years, with all due respect chief, you just got here, his history in this town, our town, is very well known, and before you crucify somebody or tarnish somebody's reputation, the proof better be there.  And it has to be ironclad, and it can't be somebody made a phone call by coincidence.  It can't be circumstantial, because you are talking about somebody's livelihood, you're talking about somebody's reputation, and the three of us before we got here he has always been discrete . . . .

119.     In addition to those public comments at the June 24, 2021 Commission meeting, the three Defendant Commissioners—Carollo, Diaz de la Portilla, and Reyes—privately questioned Chief Acevedo about the investigation of Officer Camacho.

120.     Specifically, during Chief Acevedo's private meetings with the Defendant Commissioners, the Commissioners:

    a.   questioned Chief Acevedo regarding the investigation of Officer Camacho;

    b.   accused Chief Acevedo of having a private vendetta against Officer Camacho; and

    c.   demanded that Chief Acevedo reinstate Officer Camacho and re-appoint him to the Sergeant-at-Arms Detail.

121.     The other City Commissioners, Commissioners Watson and Russell, knew about Carollo, Diaz de la Portilla, and Reyes pressuring Chief Acevedo about Officer Camacho.  Both

Watson and Russell mentioned that the MPD's actions against Officer Camacho had managed to reunite the "three-headed monster."

122.     During Chief Acevedo's meeting with Commissioner Diaz de la Portilla, the Commissioner told Chief Acevedo that, if he reinstated Officer Camacho, that he (Commissioner Diaz de la Portilla) would support a run by Chief Acevedo for the Miami-Dade Sheriff's race.

123.     Chief Acevedo told Diaz de la Portilla that he was not interested in running for that office.  Diaz de la Portilla replied saying, in essence, "You are the most experienced and qualified candidate and would easily win.  I run campaigns and will get you in.  That's assuming you do the right thing on Camacho and get him back."

124.     Following the June 24, 2021 Commission meeting, Chief Acevedo told Mayor Suarez and City Manager Noriega that he was concerned about the Defendant Commissioners' attempts to interfere with the MPD's confidential investigation of Officer Camacho and that, during his (Chief Acevedo's) thirty-five years of law enforcement experience, he had never seen politicians interfere in such a manner with a confidential police investigation.

125.     When talking with City Manager Noriega, Chief Acevedo specifically mentioned Commissioner Diaz de la Portilla's comments about the Miami-Dade Sheriff's race.

126.     On December 9, 2021, after the City of Miami terminated Chief Acevedo, the Commission held a meeting.

127.     Commissioners Carollo, Diaz de la Portilla, and Reyes were present at the meeting, as were the other members of the Commission.

128.     City Manager Noriega was present at the meeting.

129.     Chief Morales was also present at the meeting.

130.     At the meeting, the Commission took up a "housekeeping pocket item" for police that would authorize "the City Manager to take any and all steps to add and fund three major positions."

131.     The Commission acknowledged that this was in response to "movements" that the previous Chief of Police (referring to Acevedo) had made.

132.     Commissioner Diaz de la Portilla proceeded to question Chief Morales about the status of the Camacho investigation and what his recommendation was going to be to the City Manager in terms of discipline.

133.     During this questioning, Diaz de la Portilla confirmed, through questioning, that Chief Morales would be recommending to the City Manager that Camacho not only be reinstated, but that he be reinstated at his prior rank.

134.     During the ensuing approximately twenty minutes, Diaz de la Portilla proceeded to pressure both the Chief of Police and City Manager Noriega about a timeline to expeditiously reinstate Camacho, at one point saying, referring to the Commission as a whole, "What we want is to reinstate him."

135.     Diaz de la Portilla's pressuring of City Manager Noriega was so incessant that, at one point, even Commissioner Carollo attempted to stop Diaz de la Portilla from so overtly abusing his position and improperly influencing Chief Morales and City Manager Noriega.

136.     Commissioner Carollo said, "I have no problem with you doing what you were elected to do.  Clearly, any of us have the right, in fact many times, the duty to ask questions.  The only thing I would like to suggest is that there are others that don't have the same warm and fuzzy feeling about us up here in the City of Miami.  And I don't want anyone trying to uh say that you

were trying to say or do something other than all you are trying to do to get information.  I'll leave it at.  You're on your own."

137.    Even after being cautioned by Carollo, Diaz de la Portilla continued to pressure Noriega about making the reinstatement decision.

138.    In response to a comment about the timing of Noriega's decision in connection with the upcoming Christmas holiday, Diaz de la Portilla remarked "I just want to make sure that Luis Camacho can enjoy his holiday as well.  That's all I care about."

139.    On January 12, 2022, the MPD reinstated Camacho to his position.

140.    On January 13, 2022, during a Commission meeting, Commissioner Diaz de la Portilla directed City personnel to play the theme song from "Welcome Back, Kotter."

141.    While the song was playing, Officer Camacho appeared and physically expressed thanks to Commissioner Diaz de la Portilla.

142.    Commissioner Reyes also appeared via video screen to welcome back Officer Camacho.

143.    In sum, when Chief Acevedo was Chief of the MPD, Commissioners Carollo, Diaz de la Portilla, and Reyes improperly sought to influence a confidential MPD investigation into Officer Camacho and dictate the results of that investigation.  The Commission as a whole knew of and adopted these attempts at improper influence. This pattern and practice of improper influence was beyond the allowable scope of the discretionary authority granted to the City Commissioners.  When Chief Acevedo refused to bow to the Defendant Commissioners' pressure, they ultimately voted to terminate him.   Just months after terminating Chief Acevedo, the Commission, led by Diaz de la Portilla, pressured their hand-picked interim Chief of Police and subservient City Manager Noriega to expeditiously reinstate Camacho. And, once Camacho was

reinstated, Commissioner Diaz de la Portilla musically celebrated the reinstatement during a Commission meeting.

### The Defendant Commissioners eliminate MPD positions that were necessary for reform

144.    One of Chief Acevedo's planned reform efforts as Chief of Police was to address the excessive use of force by police officers.

145.    After being sworn in as Chief, Chief Acevedo discovered a pattern of excessive use of force by City of Miami officers and learned that, in some instances, the MPD chain of command had covered up instances of excessive use of force.

146.    In one instance, after a woman in police custody spit on an officer, the officer punched her in the face and drove her to the ground, causing her to lose consciousness.

147.    To help reform the MPD, Chief Acevedo took two concrete steps.

148.    First, with approval from City Manager Noriega, Chief Acevedo hired officer Heather R. Morris ("Officer Morris") to the position of Deputy Chief.

149.    Officer Morris was sworn in on or about August 2, 2021.

150.    Officer Morris had worked with Chief Acevedo for four and half years at the Houston Department and, during her time in Houston, had served in various high-ranking positions, including as the Commander of the Internal Affairs Division.

151.    Second, Chief Acevedo planned to create a position titled Deputy Director of Constitutional Policing.  The plan was for the Deputy Director to ensure accountability for the excessive use of force.

152.    On September 13, 2021, a little over a month after the hiring of Deputy Chief Morris, the Commission held a meeting.

153.    Commissioners Carollo, Diaz de la Portilla, and Reyes were present at the meeting as were the remaining City Commissioners.

154.    At the September 13, 2021, meeting, Commissioner Carollo moved to eliminate funding for Officer Morris' Deputy Chief position, a longstanding position within the MPD.

155.    The Commission had never eliminated that position in the history of the MPD.

156.    Commissioner Diaz de la Portilla seconded the motion.

157.    The Commission, including Commissioners Carollo, Diaz de la Portilla, and Reyes voted to eliminate funding for Officer Morris's position.

158.    Notably, this meant that, as of October 1, 2021, Officer Morris would have no job with the MPD.

159.    Although they eliminated the longstanding Deputy Chief position, the Commission chose to keep the newly created position of Assistant Chief.

160.    The Assistant Chief position was held by Major Carroll, a longtime personal friend of Commissioner Reyes.

161.    Also at the September 13, 2021, meeting, Commissioner Reyes moved to eliminate funding for the position of the Deputy Director of Constitutional Policing.

162.    Commissioner Diaz de la Portilla seconded the motion.

163.    The Commission, including Commissioners Carollo, Diaz de la Portilla, and Reyes, voted to eliminate the position.

164.    Commissioners Carollo, Diaz de la Portilla, and Reyes voted to eliminate the positions of Deputy Chief and Deputy Direct of Constitutional Policing because Chief Acevedo had resisted their interference with the Sergeant-at-Arms investigation and their efforts to weaponize the MPD in the pursuit of personal vendettas and agendas.

165.    These actions of the Defendant Commissioners were in accordance with the long-standing pattern and practice of the Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like.

166.    These actions, taken in accordance with the long-standing pattern and practice of the Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like, were beyond the allowable scope of the discretionary authority granted to the City Commissioners.

167.    On September 13, 2021, following the Commission meeting, Chief Acevedo expressed concerns about the Defendant Commissioners' actions to both City Manager Noriega and Mayor Suarez.

168.    Specifically, Chief Acevedo told Noriega and Suarez that he was concerned that Commissioners Carollo, Diaz de La Portilla, and Reyes were attempting to intimidate Chief Acevedo and interfere with and influence the MPD, including the MPD's internal and external investigations and actions.  Chief Acevedo further noted that the Defendant Commissioners were attempting to pursue their own personal agendas through the MPD.

169.    Both Suarez and Noriega indicated that the Defendant Commissioners' behavior was part of doing business in the City of Miami.

170.    The Defendant Commissioners' actions were beyond the allowable scope of the discretionary authority granted to the City Commissioners.

171.    Later, on September 23, 2021, during the regular Commission hearing, City Manager Noriega met briefly with Chief Acevedo.

172.    Prior to that meeting, as part of a routine rotation of personnel, Chief Acevedo transferred Officer Ray Blanco from a field position to a position in Internal Affairs.

173.    During the September 23, 2021, meeting, Noriega disclosed that when Commissioner Carollo learned about the transfer, he "jumped" on Noriega and threatened that, if the transfer were to occur, Carollo would "blow up [Chief Acevedo's] budget further." Noriega then ordered Chief Acevedo not to transfer Officer Blanco.

**Chief Acevedo writes and sends the September 24, 2021, Memorandum**

174.    From nearly the beginning of Chief Acevedo's tenure through September of 2021, Chief Acevedo witnessed the Defendant Commissioners abusing their elected positions.

175.    Despite his concerns, however, Chief Acevedo was limited by the City of Miami Charter and Resolution No. R-20-0034 as far as being able to officially investigate or take disciplinary action against the City Commissioners.

176.    Consequently, Chief Acevedo, acting as a private citizen, prepared and circulated a whistle-blowing memorandum.

177.    Specifically, on September 24, 2021, Chief Acevedo sent a memorandum to City Manager Noriega, Mayor Suarez, the Miami-Dade State Attorney's Office, and the FBI (the "September 24, 2021 Memorandum").

178.    The statements made in the September 24, 2021 Memorandum were protected by the First Amendment to the Constitution of the United States, and specifically addressed topics of public corruption and abuse of power, which were and are matters of significant public concern.

179.     The September 24, 2021 Memorandum was titled, "RECENT ACTIVITIES BY CITY OFFICIALS."

180.     In the September 24, 2021 Memorandum, Chief Acevedo outlined how the Defendant Commissioners had attempted to weaponize the MPD, interfered with MPD internal and external investigations, and impeded reform at the MPD.

181.     Chief Acevedo signed the September 24, 2021 Memorandum.

182.     City Manager Noriega, Mayor Suarez, the State Attorney's Office, and the FBI received the September 24, 2021 Memorandum.

183.     The drafting and sending of the September 24, 2021 Memorandum were outside the scope of Chief Acevedo's employment as Chief of Police and said Memorandum was drafted and sent in Chief Acevedo's capacity as a private citizen concerned with public corruption and abuses of power.

184.     On September 25, 2021, Noriega called Chief Acevedo and asked him to correct his (Noriega's) name on the September 24, 2021 Memorandum.  Chief Acevedo had mistakenly used "Roger" Noriega instead of "Arthur" Noriega.

185.     On September 26, 2021, Noriega called Chief Acevedo.

186.     On that call, Noriega, referring to the Defendant Commissioners, said, in essence, "So you've gone after them, and better be sure you have a kill shot because if you don't, you better not take it.  Maybe it's because you're an outsider it's easier for you.  Trust me, I came from my last job where I had a hell of a lot more autonomy than I have here, but I realize and accept my limitations."

187.     Although Chief Acevedo had only initially submitted the September 24, 2021 Memorandum to City Manager Noriega and Mayor Suarez, within 48 hours the Memorandum was leaked to others, including the media.

**The Commission holds a special meeting regarding Chief Acevedo**

188.     After Chief Acevedo sent the September 24, 2021 Memorandum, the Commission held a special meeting on September 27, 2021.

189.     With the exception of Commissioner Russell, all of the City Commissioners attended the meeting.

190.     At the meeting, Commissioners Carollo, Diaz de la Portilla, and Reyes launched a series of ad hominem character attacks on Chief Acevedo.

191.     These attacks were part of the long-standing pattern and practice of the Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like, and were made in retaliation for Chief Acevedo engaging in speech protected by the First Amendment.

192.     Commissioner Carollo repeated false allegations that others had made about Chief Acevedo.

193.     These allegations pre-dated Chief Acevedo's time at the MPD.

194.     The repeating of false allegations predating Chief Acevedo's tenure was part of the long-standing pattern and practice of the Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like, was made in retaliation for Chief Acevedo engaging in speech protected by the First

Amendment, and was beyond the allowable scope of the discretionary authority granted to the City Commissioners.

195.    The Defendant Commissioners also played videos from a fundraiser that Chief Acevedo attended in which he wore an Elvis costume, pointing out his "tight" pants and otherwise attempted to humiliate him.

196.    The playing of said videos in a public forum was part of the long-standing pattern and practice of the Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like, was made in retaliation for Chief Acevedo engaging in speech protected by the First Amendment, and was beyond the allowable scope of the discretionary authority granted to the City Commissioners.

197.    Commissioner Carollo compared Chief Acevedo to former Chief of Police Don Warshaw, a convicted felon.

198.    Comparing Chief Acevedo to a convicted felon was part of the long-standing pattern and practice of the Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like, was made in retaliation for Chief Acevedo engaging in speech protected by the First Amendment, and was beyond the allowable scope of the discretionary authority granted to the City Commissioners.

199.    At the end of the meeting, the Commission passed a resolution to investigate itself with respect to the allegations in the September 24, 2021 Memorandum.

200.     This purported investigation is now being led by Ricardo Gomez, former City of Doral Police Chief who previously lost his job during a 2012 corruption scandal.

**The Commission holds a second special meeting regarding Chief Acevedo**

201.     On October 1, 2021, the Commission held a special meeting to discuss and continue its attacks on Chief Acevedo.

202.     At the meeting, Commissioners Carollo, Diaz de la Portilla, and Reyes again attacked Chief Acevedo.  The attacks against Chief Acevedo were part of the long-standing pattern and practice of the Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like, were made in retaliation for Chief Acevedo engaging in speech protected by the First Amendment, and were beyond the allowable scope of the discretionary authority granted to the City Commissioners.

203.     Among other things, Carollo said, "Hubert, I've taken on much smarter guys than you and one who thought he could hide behind the badge went to jail."

204.     Carollo, referring to the Patria y Vida event referenced above, complained that Chief Acevedo did not shut down the bullhorns or have enough of a police presence at the event.

205.     Referring to Chief Acevedo's continuing employment, Commissioner Reyes stated that the City Manager "will have enough evidence to make a smart decision."

206.     Commissioner Diaz de la Portilla said that Chief Acevedo is "no reformer" and that he (Diaz de la Portilla) was going to put out his own memorandum.  As of this date, Diaz de la Portilla has yet to publicly publish any such memorandum.

207.     Diaz de la Portilla further said that Chief Acevedo was "not a Cuban-American from Miami."

208.     During the October 1, 2021 meeting, Commissioners Carollo, Diaz de la Portilla, and Reyes also voted to eliminate funding for vacant executive positions within the MPD.

209.     The Defendant Commissioners did so because they had learned that Chief Acevedo intended to "re-hire" Officer Morris—who had lost her Deputy Chief position because of the prior act of the Commission—to one of these executive positions.

210.     Again, the Commissioners voted to eliminate funding for those positions to retaliate against Chief Acevedo because he had resisted their interference with the Sergeant-at-Arms investigation and their efforts to weaponize the MPD in the pursuit of personal vendettas and agendas.

211.     The City Commissioners' vote to eliminate funding for those positions was part of the long-standing pattern and practice of the Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like.

**City Manager Noriega suspends Chief Acevedo and the Commission votes to terminate him**

212.     On October 11, 2021, City Manager Noriega suspended Chief Acevedo.   In connection with the suspension, Noriega provided Chief Acevedo with a memorandum purporting to outline the reasons for his suspension (the "Suspension Memorandum").

213.     The reasons asserted in the Suspension Memorandum were pretextual.

214.     In fact, Noriega suspended Chief Acevedo because Chief Acevedo had sent the September 24, 2021 Memorandum outlining misconduct by Defendant Commissioners.

215.     Noriega also suspended Chief Acevedo because of pressure from the Defendant Commissioners.

216.     When providing Chief Acevedo with the Suspension Memorandum, City Manager Noriega, referring to Chief Acevedo's September 24, 2021 Memorandum, told Chief Acevedo that he had "gone too far" and that he (the City Manager) needed to "stop the bleeding."

217.     Chief Acevedo's suspension by Noriega was part of the long-standing pattern and practice of the City Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like, was made in retaliation for Chief Acevedo engaging in speech protected by the First Amendment, and was beyond the allowable scope of the discretionary authority granted to the City Commissioners.

218.     Although Chief Acevedo was informed of his suspension on the evening of October 11, 2021, which was the Columbus Day holiday, City Manager Noriega set the termination hearing for just two days later on October 13, 2021.  Because Chief Acevedo's primary lawyers were out of town, he asked that the hearing be moved to October 18, 2021.  The City Manager refused, rescheduling the hearing to October 14, 2021, a time when Chief Acevedo's primary lawyers were still unavailable.

### The Commission terminates Chief Acevedo

219.     On October 14, 2021, the Commission held a termination hearing.

220.     Counsel for City Manager Noriega called four witnesses at the hearing, including City Manager Noriega.

221.     During the hearing, the Defendant Commissioners, who were supposed to act as impartial judges, took active roles in questioning witnesses and Chief Acevedo's counsel. Questioning in this manner was beyond the allowable scope of the discretionary authority granted to the City Commissioners.

222.    The Defendant Commissioners also made numerous comments throughout the proceeding that demonstrated their bias against Chief Acevedo.

223.    Commissioner Diaz de la Portilla, after Chief Acevedo's counsel noted that Chief Acevedo was resting his case, said, "I rest mine."

224.    In response, Commissioner Ken Russell pointed out that Commissioner Diaz de la Portilla was not presenting any case and that he and the other Commissioners were "simply taking the bait to show your bias."

225.    Commissioner Carollo then attacked Commissioner Russell, saying "Chairman Russell, I really resent statements that you're making.  You know, you want to be like my mother used to say when she was younger and in better health, you know, 'you want to be in church with the rosary in hand and kneeling down with the devil.'  You know, you can't be in both places."

226.    The Commission voted to terminate Chief Acevedo.  The vote was a unanimous vote by all of the City Commissioners.

227.    The Defendant Commissioners terminated Chief Acevedo because he had reported their misconduct to City Manager Noriega, Mayor Suarez, the State Attorney's Office, and the FBI.

228.    The Commission's termination of Chief Acevedo was pursuant to the long-standing pattern and practice of the Commission, and certain members individually thereof, of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like, and in retaliation for Chief Acevedo engaging in speech protected by the First Amendment.

229.    In late October of 2021, Chief Acevedo's counsel submitted a public records request to the City of Miami seeking certain records that may be relevant to his case. Several

months later, after several back-and-forths with the City, the City informed Chief Acevedo's counsel that they would have to pay the City $2.3 million dollars to review the documents responsive to his public records requests.

## COUNT I

### Violation of the Florida Whistleblower Act
### Fla. Stat. § 112.3187
### (Against the City of Miami)

230.    Plaintiff re-alleges paragraphs 1 through 229 as if fully set forth herein and further alleges the following.

231.    This count is brought pursuant to the Florida Whistle-Blower Act.

232.    On September 24, 2021, Chief Acevedo sent a memorandum to, among others, City Manager Noriega and Mayor Suarez.

233.    At all material times, Noriega was a chief executive officer as defined by Fla. Stat. § 447.203(9).

234.    Specifically, Noriega was an appointed person who was responsible to the legislative body of the public employer for the administration of the governmental affairs of the public employer.

235.    At all material times, Mayor Suarez was an appropriate local official within the meaning of Fla. Stat. § 112.3187(6).

236.    Specifically, Suarez was the mayor of the City of Miami, affiliated with the City of Miami, and had the authority to investigate, police, manage, or otherwise remedy acts taken by the City of Miami and its agents.

237.    In the September 24, 2021 Memorandum, Chief Acevedo reported that Commissioners Carollo, Diaz de la Portilla, and Reyes had improperly used their governmental

offices and abused their powers as City Commissioners.  Specifically, Chief Acevedo reported that:

      a.   The City Commissioners, specifically, Commissioners Carollo and Diaz de la Portilla, had attempted to use the MPD to carry out personal vendettas and agendas.

      b.   Commissioners Carollo, Diaz de la Portilla, and Reyes attempted to influence the MPD's confidential investigation of Officer Camacho, publicly criticized the investigation, expressed their support for Officer Camacho, and threatened Chief Acevedo with consequences if he did not take actions that favored Officer Camacho.

      c.    The City Commissioners cut funding for positions necessary to reform the MPD's culture, including the department's problems with excessive use of force, because Chief Acevedo resisted their interference with MPD operations.

238.    Also in the September 24, 2021 Memorandum, Chief Acevedo reported violations of law by the City of Miami, acting through Commissioners Carollo and Diaz de la Portilla. Specifically, Chief Acevedo reported that the Commissioners had (i) attempted to dictate the actions of Chief Acevedo and the MPD; (ii) issued orders to him; and (iii) interfered with Chief Acevedo and the MPD's operations.

239.    Chief Acevedo signed the September 24, 2021 Memorandum.

240.    In sending the September 24, 2021 Memorandum, Chief Acevedo engaged in protected activity.

241.    As a result of Chief Acevedo sending the September 24, 2021 Memorandum, he was suspended and eventually terminated.

242.     Specifically, on October 11, 2021, City Manager Noriega suspended Chief Acevedo.

243.     And on October 14, 2021, the City Commissioners—including Commissioners Carollo, Diaz de la Portilla, and Reyes—voted to terminate Chief Acevedo.

244.     The City of Miami's suspension and termination of Chief Acevedo constituted adverse personnel actions, as defined by Fla. Stat. § 112.3187(3)(c) and prohibited by Fla. Stat. § 112.3187(4).

245.     At all material times, Chief Acevedo was qualified for his job and was performing in a satisfactory manner.

246.     The actions of the City of Miami violated the Chief Acevedo's statutory rights, as codified in Fla. Stat. §§ 112.3187 *et seq*.

247.     Chief Acevedo did not file a written grievance with the executive secretary of the City of Miami stating the nature of his grievance or requesting a hearing with the City of Miami's civil service board.

248.     Filing such a grievance or requesting such a hearing would have been futile for numerous reasons, including:

  a. The civil service board presents its findings and recommendations to the City of Miami's City Manager, who is Noriega.

  b. Noriega is biased against Chief Acevedo because Chief Acevedo reported misconduct of the City Commissioners that he (Noriega) helped carry out and refused to act against.

  c. At an October 14, 2021 hearing to decide whether to terminate Chief Acevedo, Noriega falsely testified that the City of Miami's suspension of Chief

33

Acevedo—and the reasons for his ultimate termination—had nothing to do with Chief Acevedo sending the September 24, 2021 Memorandum.

d.  Ultimately, under the City of Miami's Charter, the City Manager recommends courses of action to the City Commissioners.

e.  Commissioners Carollo, Diaz de la Portilla, and Reyes are biased against Chief Acevedo and have demonstrated this bias on numerous occasions.  Among other things:

    i.  At the September 27 and October 1, 2021 Commission Meetings, Commissioners Carollo, Diaz de la Portilla, and Reyes demonstrated their biases against Chief Acevedo, launching personal attacks on him that were irrelevant to his performance as police chief.

    ii.  At the October 14, 2021 termination hearing, Commissioner Russell expressly noted that, during the termination hearing itself, multiple City Commissioners, including Commissioners Carollo and Diaz de le Portilla, had demonstrated bias against Chief Acevedo.

f.  The decision to terminate Chief Acevedo was informally made by Commissioners Carollo, Diaz de la Portilla, and Reyes before Chief Acevedo's October 14, 2021 hearing.  Among other things:

    i.  The paperwork necessary to make Assistant Chief Morales the Interim Chief of Police was prepared before the October 14, 2021 hearing.

    ii.  On October 14, 2021, directly after the Commission voted to terminate Chief Acevedo, Assistant Chief Morales was sworn in as interim police chief.

      iii.   The swearing-in ceremony was attended by City Manager Noriega and the City Commissioners.

      iv.   During the event, Commissioner Carollo played the theme song from the movie The Godfather and no City Commissioners intervened.

249.    As a direct, natural, and proximate cause of the actions of the City of Miami, Chief Acevedo has suffered loss of professional standing and position; emotional distress; embarrassment; humiliation; and damage to his good name and reputation, all of which are injuries that are continuing and permanent.

250.    Chief Acevedo is entitled to recover for reasonable attorneys' fees and costs pursuant to Fla. Stat. § 112.3187(9)(d).

WHEREFORE, Chief Acevedo demands judgment against the City of Miami for the remedies envisioned by Florida Statutes § 112.3187, as follows:

      a.   An injunction restraining the City of Miami from continued violation of the Whistle-Blower Act;

      b.   Reinstatement to his former position, rank, and seniority;

      c.   Compensation for any lost wages, benefits, and other renumeration;

      d.   Any and all other compensatory damages available under the Whistle-Blower Act;

      e.   An award of reasonable attorneys' fees and costs incurred in this action; and

      f.   Such other and further relief as this court deems to be just and equitable.

## <u>COUNT II</u>
### Retaliation in violation of the First Amendment
### 42 U.S.C. § 1983
### (Against All Defendants)

251.    Plaintiff re-alleges paragraphs 1 through 229 as if fully set forth herein and further alleges the following.

252.    The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

253.    The First Amendment rights to freedom of speech and association protect not only the affirmative rights to free speech and association but also the right to be free from retaliation perpetrated by the government upon the exercise of that right.

254.    42 U.S.C. § 1983 provides a private cause of action with respect to the violation of federal constitutional rights.

255.    The Act provides, in pertinent part, as follows:  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

256.    The aim of Section 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.

257.     The First Amendment to the United States Constitution applies to local and state governments through the Fourteenth Amendment, as well as through decisions of the United States Supreme Court.

258.     At all times pertinent hereto, it was clearly established federal law that Chief Acevedo had a right to freedom of speech guaranteed by the First Amendment to the United States Constitution.

259.     This right encompasses the right of all workers, both in public and private sectors, to discuss, make statements regarding, and express opinions on matters of public policy, including "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government."

260.     At all times pertinent hereto, it was clearly established federal law that Chief Acevedo had a right to be free from government retaliation taken against him for speech that touched matters of public concern.

261.     This right to be free of retaliation includes the right to be free from adverse employment action substantially motivated by protected speech.

262.     At all times pertinent hereto, it was clearly established federal law that the United States Constitution's First Amendment guarantee to free speech and free association applied to local and state governments through the Fourteenth Amendment and decisions of the United States Supreme Court.

263.     At all times pertinent hereto, it was clearly established federal law that the public's interest in exposing governmental corruption and/or abuse of power far outweighs a governmental entities' interest in suppressing speech intended to expose governmental corruption and abuse of power.

264.     At all times pertinent hereto, each Defendant knew, or should have known, of the aforementioned constitutional rights clearly established under federal law.

## Retaliation and Individual Liability

265.     Chief Acevedo exercised his right to free speech by reporting public corruption and abuses of power.

266.     Among other things, on September 24, 2021, Chief Acevedo sent a memorandum to City Manager Noriega and Mayor Suarez.

267.     In this memo, Chief Acevedo reported that Commissioners Carollo, Diaz de la Portilla, and Reyes had improperly used their governmental offices and abused their powers as commissioners.  Specifically, Chief Acevedo reported that:

a.  The Commissioners, specifically, Commissioners Carollo and Diaz de la Portilla, had attempted to use the MPD to carry out personal vendettas and agendas, and to retaliate against their perceived enemies.

b.  Commissioners Carollo, Diaz de la Portilla, and Reyes attempted to influence the MPD's confidential investigation of Officer Camacho, publicly criticized the investigation, expressed their support for Officer Camacho, and threatened Chief Acevedo with consequences if he did not take actions that favored Officer Camacho.

c.   The City Commissioners cut funding for positions necessary to reform the MPD's problems with excessive use of force, doing so because Chief Acevedo resisted their interference with MPD operations.

268.     The statements made in the September 24, 2021 Memorandum and Chief Acevedo's right to make such statements are protected by the First Amendment to the United States Constitution.

269.     In authoring and sending the September 24, 2021 Memorandum, Chief Acevedo engaged in protected activity.

270.     Chief Acevedo's protected activity concerns public corruption and abuse of power, which are significant matters of public concern.

271.     The manner in which the September 24, 2021 Memorandum was published (to a limited group of persons) and the content of the Memorandum was such that, in and of itself, it did not disrupt the functioning of the MPD or the City of Miami. In fact, while the September 24, 2021 Memorandum was intended to trigger a needed investigation and bring to the public's attention the corruption and abuse of power on the part of the Commission, the MPD and the City of Miami continued to function after its publication.

272.     Chief Acevedo's protected activity is not ordinarily within the scope of his duties as Chief of the MPD.

273.     Sections 24 through 26 of the City of Miami Charter, together with the City of Miami's February 13, 2020 resolution, govern the Police Chief's authority and notable lack of authority in relation to the Commission and the members thereof.

274.     Chief Acevedo had no administrative, disciplinary, or investigative authority over the Commission or its members.

275.     Pursuant to Section 24 of the City of Miami Charter, Chief Acevedo's supervisory and administrative scope of employment was limited to "the immediate direction and control of the police force" and the authority to "promulgate all orders, rules and regulations for the

government of the police force." Supervisory and administrative authority over the Commission or its members was not within the scope of the duties of the Chief of the MPD.

276.     Pursuant to Section 25 of the City of Miami Charter, Chief Acevedo's disciplinary scope of authority was limited to "the right and power to suspend any of the officers and employees in their respective division who may be under their management and control for incompetence, neglect of duty, immorality, drunkenness, failure to obey orders given by proper authority, or for any other just and reasonable cause." Disciplinary authority over the Commission or its members was not within the scope of the duties of the Chief of the MPD.

277.     On February 13, 2020, the Commission passed a resolution prohibiting the MPD from investigating elected officials of the City of Miami, including the Commission.  Pursuant to this resolution investigation of city officials was not within the scope of the duties of the Chief of the MPD.

278.     Chief Acevedo's interest in commenting upon matters of significant public concern far outweighs the government's interest in promoting the efficiency of the public service it performs through its employees.

279.     Specifically, Chief Acevedo's interest in commenting on matters of public corruption and abuse of power by members of the Commission far outweighs any interest on the part of the City of Miami or the City Commissioners to keep that corruption and abuse of power secret.

280.     As a result of Chief Acevedo's protected speech, including but not limited to his reports of corruption and abuse of power by members of the Commission, made in his September 24, 2021 Memorandum and in other forums, he was suspended, subjected to public humiliation, and eventually terminated.

281.    On October 11, 2021, City Manager Noriega suspended Chief Acevedo.

282.    Chief Acevedo's protected speech, including but not limited to his September 24, 2021 Memorandum reporting corruption and abuse of power by members of the Commission, played a substantial or motivating factor in the decision of City Manager Noriega and the City of Miami to suspend Chief Acevedo.

283.    City Manager Noriega's suspension of Chief Acevedo constituted an adverse personnel action.

284.    The reasons given for said suspension were pretextual in nature and were untrue.

285.    Noriega's suspension of Chief Acevedo was in retaliation for Chief Acevedo engaging in speech and activity protected by the First Amendment to the United States Constitution, was pursuant to a pattern and practice of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like, and was beyond the allowable scope of the discretionary authority granted to the City Manager.

286.    Noriega's suspension of Chief Acevedo was intended to, and in fact did, chill Chief Acevedo and others from engaging in speech and activity protected by the First Amendment to the United States Constitution, including reporting acts of corruption and abuse of power on the part of members of the Commission.

287.    Chief Acevedo suffered injuries, damages, and losses as a result of Noriega's suspension of him.

288.    Noriega's suspension of Chief Acevedo constituted a violation of Chief Acevedo's clearly established rights protected by the First Amendment to the United States Constitution and is actionable pursuant to 42 U.S.C. § 1983.

289.     Pursuant to 42 U.S.C. § 1983, Noriega is liable in his individual capacity for violating Chief Acevedo's rights protected by the First Amendment to the Constitution as alleged herein.

290.     Chief Acevedo seeks an award of damages pursuant to 42 U.S.C. § 1983 against Noriega in his individual capacity for the constitutionally impermissible retaliatory conduct alleged herein.

291.     During public meetings held on September 27, 2021, October 1, 2021, and October 14, 2021, Commissioners Carollo, Diaz de la Portilla, and Reyes engaged in conduct, which was intended to, and which in fact did, publicly humiliate Chief Acevedo.

292.     Chief Acevedo's protected speech, including but not limited to his reports of corruption and abuse of power by members of the Commission, made in his September 24, 2021 Memorandum and in other forums, played a substantial or motivating factor in Commissioners Carollo's, Diaz de la Portilla's, and Reyes's conduct, which was intended to, and which in fact did, publicly humiliate Chief Acevedo at public meetings held on September 27, 2021, October 1, 2021, and October 14, 2021.

293.     Commissioners Carollo's, Diaz de la Portilla's, and Reyes's conduct, which was intended to, and which in fact did, publicly humiliate Chief Acevedo at public meetings held on September 27, 2021, October 1, 2021, and October 14, 2021, constituted adverse personnel actions.

294.     Commissioners Carollo's, Diaz de la Portilla's, and Reyes's conduct, which was intended to, and which in fact did, publicly humiliate Chief Acevedo at public meetings held on September 27, 2021, October 1, 2021, and October 14, 2021, was in retaliation for Chief Acevedo engaging in speech and activity protected by the First Amendment to the United States

Constitution, was pursuant to a pattern and practice of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like, and was beyond the allowable scope of the discretionary authority granted to the City Commissioners.

295.    Commissioners Carollo's, Diaz de la Portilla's, and Reyes's conduct, which was intended to, and which in fact did, publicly humiliate Chief Acevedo at public meetings held on September 27, 2021, October 1, 2021, and October 14, 2021, was intended to, and in fact did, chill Chief Acevedo and others from engaging in speech and activity protected by the First Amendment to the United States Constitution, including reporting acts of corruption and abuse of power on the part of members of the Commission.

296.    Chief Acevedo suffered injuries, damages and losses as a result of Commissioners Carollo's, Diaz de la Portilla's, and Reyes's conduct, which was intended to, and which in fact did, publicly humiliate Chief Acevedo at public meetings held on September 27, 2021, October 1, 2021, and October 14, 2021.

297.    Commissioners Carollo's, Diaz de la Portilla's, and Reyes's conduct, which was intended to, and which in fact did, publicly humiliate Chief Acevedo at public meetings held on September 27, 2021, October 1, 2021, and October 14, 2021, constituted violations of Chief Acevedo's clearly established rights protected by the First Amendment to the United States Constitution and is actionable pursuant to 42 U.S.C. § 1983.

298.    Pursuant to 42 U.S.C. § 1983, Commissioners Carollo, Diaz de la Portilla, and Reyes are liable in their individual capacities for violating Chief Acevedo's rights protected by the First Amendment to the United States Constitution as alleged herein.

299.     Chief Acevedo seeks an award of damages pursuant to 42 U.S.C. § 1983 against Commissioners Carollo, Diaz de la Portilla, and Reyes in their individual capacity for the constitutionally impermissible retaliatory conduct alleged herein.

300.     On October 14, 2021, the Commission—including Commissioners Carollo, Diaz de la Portilla, and Reyes—voted to terminate Chief Acevedo as Chief of the MPD.

301.     Chief Acevedo's protected speech, including but not limited to his reports of corruption and abuse of power by members of the Commission, made in his September 24, 2021 Memorandum and in other forums, played a substantial or motivating factor in the decision of the City Commissioners—including Commissioners Carollo, Diaz de la Portilla, and Reyes—to terminate Chief Acevedo.

302.     The Commission's termination of Chief Acevedo constituted an adverse personnel action.

303.     The reasons given for said termination were pretextual in nature and were untrue.

304.     The Commission's termination of Chief Acevedo was in retaliation for Chief Acevedo engaging in speech and activity protected by the First Amendment to the United States Constitution and was pursuant to a pattern and practice of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like.

305.     The Commission's termination of Chief Acevedo was intended to, and in fact did, chill Chief Acevedo and others from engaging in speech and activity protected by the First Amendment to the United States Constitution, including reporting acts of corruption and abuse of power on the part of members of the Commission.

306.    Chief Acevedo suffered injuries, damages, and losses as a result of the Commission's termination of his employment.

307.    The Commission's termination of Chief Acevedo constituted a violation of Chief Acevedo's clearly established rights protected by the First Amendment to the United States Constitution and is actionable pursuant to 42 U.S.C. § 1983.

308.    Pursuant to 42 U.S.C. § 1983, Commissioners Carollo, Diaz de la Portilla, and Reyes are liable in their individual capacities for violating Chief Acevedo's rights protected by the First Amendment to the United States Constitution as alleged herein.

309.    Chief Acevedo seeks an award of damages pursuant to 42 U.S.C. § 1983 against Commissioners Carollo, Diaz de la Portilla, and Reyes in their individual capacity for the constitutionally impermissible retaliatory conduct alleged herein.

310.    As a legal and proximate result of the actions of Commissioners Carollo, Diaz de la Portilla, and Reyes in their individual capacities, Chief Acevedo has sustained general damages consisting of pain, suffering, anxiety, and other physical and emotional damages in such sum as shall be determined.

311.    As a further legal and proximate result of the actions of Commissioners Carollo, Diaz de la Portilla, and Reyes in their individual capacities, Chief Acevedo has sustained economic damages consisting of loss of past and future earnings, past and future earning capacity, promotions, promotional opportunities, benefits, and other career advancement opportunities, in such nature and sums as shall be determined.

312.    Pursuant to 42 U.S.C. §1988, and other applicable law, Chief Acevedo is entitled to an award of costs and expenses incurred in bringing this action, including his reasonable attorneys' fees.

**Liability pursuant to *Monell v. Department of Social Services of the City of New York***

313.     The acts of the individually named Defendants, as stated herein, occurred under color of law and constituted deprivations of Chief Acevedo's rights secured by the First and Fourteenth Amendments to the United States Constitution.

314.     Chief Acevedo was subjected to public humiliation, suspended, and terminated pursuant to an officially promulgated policy of retaliation against Chief Acevedo and against other perceived enemies of certain members of the Commission.

315.     City Manager Noriega knew of this retaliation, and the Commission adopted and ratified it.

316.     The acts of the individually named Defendants herein were undertaken pursuant to policies established and instituted by Defendant Noriega acting in his official capacity as City Manager of the City of Miami, City Commissioners, including Defendants Carollo, Diaz de la Portilla, and Reyes, acting in their official capacity as City Commissioners, and Defendant City of Miami.

317.     Specifically, Defendants, as stated herein, instituted as a policy of the City of Miami a policy of retaliating against those who had exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like.

318.     At the time Chief Acevedo was suspended as Chief of the MPD, Defendant City Manager Noriega, pursuant to Section 26 of the City of Miami Charter, had the sole authority and responsibility to make policy determinations regarding the suspension of the Chief of the MPD, including Chief Acevedo.

319.    Pursuant to Section 26 of the City of Miami Charter, Defendant Manager Noriega was the final decision maker as to policy determinations regarding the suspension of the Chief of the MPD, including the suspension of Chief Acevedo.

320.    Section 26 of the City of Miami Charter is vague, vesting unbridled authority in Defendant Manager Noriega to suspend the Chief of Police, including the authority to suspend the Chief "for any other just and reasonable cause," such that his policy decisions regarding suspension of the Chief of Police become the controlling law and official policy of the City of Miami.

321.    Under pressure from Commissioners Carollo, Diaz de la Portilla, and Reyes, City Manager Noriega, who had final authority to make policy decisions relating to suspension of the Chief of Police on behalf of the city of Miami, suspended Chief Acevedo.

322.    This suspension was retaliatory, unconstitutional, and was an official policy of the City of Miami.

323.    The retaliatory and unconstitutional suspension of Chief Acevedo was taken pursuant to the decision of City Manager Noriega (under pressure from Commissioners Carollo, Diaz de la Portilla, and Reyes).

324.    At the time Chief Acevedo was intentionally and purposefully humiliated at public meetings held on September 27, 2021, October 1, 2021, and October 14, 2021, the Commissioners, including Commissioners Carollo, Diaz de la Portilla, and Reyes, had the sole authority and responsibility to hold, set the agenda for, manage, and make comment during public meetings of the Commission, and were the final decision makers as to policy determinations regarding the content and conduct of said public meetings.

325.    The retaliatory and unconstitutional humiliation of Chief Acevedo at public meetings held on September 27, 2021, October 1, 2021, and October 14, 2021 was taken pursuant

to the decision of the City Commissioners, including Commissioners Carollo, Diaz de la Portilla, and Reyes, who had final authority to make policy regarding the content and conduct of said public meetings, and constituted official policy of the City of Miami.

326.    At the time Chief Acevedo was terminated as Chief of the MPD, the Commission, pursuant to Section 26 of the City of Miami Charter, had the sole authority and responsibility to make policy determinations regarding the termination of the Chief of the MPD, including Chief Acevedo.

327.    Pursuant to Section 26 of the City of Miami Charter the Commission was the final decision maker as to policy determinations regarding the termination of the Chief of the MPD, including Chief Acevedo.

328.    Section 26 of the City of Miami Charter is vague, vesting unbridled authority in the Commission, including Commissioners Carollo, Diaz de la Portilla, and Reyes, to terminate the Chief of Police, including the unbridled authority to "hear such charges [advanced by the City Manager] and render judgment thereon, which judgment shall be final…" such that their final judgements become the controlling law and official policy of the City of Miami.

329.    The retaliatory and unconstitutional termination of Chief Acevedo as Chief of Police was taken pursuant to the decision of the City Commissioners, including Commissioners Carollo, Diaz de la Portilla, and Reyes, who had final authority to make policy decisions relating to the termination of the Chief of Police on behalf of the City of Miami, and constituted official policy of the City of Miami.

330.    Chief Acevedo was terminated as Chief of Police of the MPD as a result of a custom or practice of the City of Miami, acting through the City Commissioners, to retaliate against those who had exercised their First Amendment rights to either speak out against the Defendant

Commissioners or take public positions that the Defendant Commissioners did not like.  Among other things:

    a.  The City of Miami has a custom or practice of permitting the retaliation against persons opposing the interests of the Defendant Commissioners, and the City's custom or practice is the moving force behind the constitutional violation.

    b.  This custom or practice is shown by the conduct alleged herein, including but not limited to:

        i.  What the former Chief of the MPD described in his 2019 email as acts by the City which "may amount to an unsanctioned and unlawful exercise of powers beyond the limits of [the Commissioner's] legislative power as a city commissioner to intentionally cause harm to a business owner" and "may be in violation of the code of ethics ordinance."

        ii.  Retaliatory conduct "aimed at one particular business owner in the city" (i.e., Mr. Fuller) because Mr. Fuller had supported the political opponent of Commissioner Carollo.  This conduct has been described in publicly filed complaints, *William O. Fuller and Martine Pinilla, II v. Joe Carollo*, Case No. 18-24190-CV-RS (S.D. Fla. 2019) and *The Mad Room LLC d/b/a Ball and Chain, Altos Mexicano, LLC d/b/a Taquerias El Mexicano, Little Havana Arts Building, LLC, and La Gran Fiesta, LLC v. the City of Miami*, Case No. 21-23485-CV-RKA (S.D. Fla. 2021).

iii. The conduct alleged in Chief Acevedo's September 24, 2021 Memorandum.

iv. The retaliatory conduct against Chief Acevedo as alleged herein.

v. Such other retaliatory conduct known to Defendants, and which will be subject to discovery.

c. The custom or practice of retaliation as alleged herein is so widespread and permanent that it has the effect of a written policy and is so well settled as to constitute a custom or usage with the force of law.

331.   Chief Acevedo suffered injuries, damages, and losses proximately caused by the policies and practices of the City of Miami as alleged herein.

332.   As a legal and proximate result of the policies and practices of the City of Miami as alleged herein, Chief Acevedo has sustained general damages consisting of pain, suffering, anxiety, and other physical and emotional damages in such sum as shall be determined.

333.   As a further legal and proximate result of the policies and practices of the City of Miami as alleged herein Chief Acevedo has sustained economic damages consisting of loss of past and future earnings, past and future earning capacity, promotions, promotional opportunities, benefits, and other career advancement opportunities, in such nature and sums as shall be determined.

334.   Pursuant to 42 U.S.C. §1988, and other applicable law, Chief Acevedo is entitled to an award of costs and expenses incurred in bringing this action, including his reasonable attorneys' fees.

WHEREFORE, Chief Acevedo demands judgment against City Manager Noriega individually, Commissioners Carollo, Diaz de la Portilla, and Reyes, individually, and the City of

Miami for the remedies envisioned by 42 U.S.C. § 1983 and 42 U.S.C. § 1988, including, but not limited to:

a.  Any and all other compensatory damages available pursuant to 42 U.S.C. § 1983;

b.  An award of reasonable attorneys' fees and costs incurred in this action, including an award of costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

c.  Such other and further relief as this court deems to be just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff Hubert Arturo Acevedo hereby demands a trial by jury as to all claims

cognizable at law.

Dated: January 19, 2022                    Respectfully submitted,

**Marcos Daniel Jiménez**
Marcos Daniel Jiménez
  Florida Bar No. 441503
MARCOS D. JIMÉNEZ, P.A.
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Tel: 305.740.1975
Email: mdj@mdjlegal.com

**John R. Byrne**
John R. Byrne
  Florida Bar No. 126294
LEÓN COSGROVE, LLP
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: (305) 740-1975
Email: jbyrne@leoncosgrove.com