**UNITED STATES DISTRICTCOURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 22-CV-20224-KMW**

**HUBERT ARTURO ACEVEDO,**

> *Plaintiff,*

**vs.**

**CITY OF MIAMI;**
**JOE CAROLLO, individually;**
**ALEX DIAZ DE LA PORTILLA, individually;**
**MANOLO REYES, individually.**

> *Defendants.*

_____/

**DEFENDANT MANOLO REYES' MOTION TO DISMISS COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

JOSE M. QUIÑON, ESQ.
Florida Bar No. 201944

JOSE M. QUIÑON, P.A.
2333 Brickell Avenue, Suite A-1
Miami, Florida 33129
Telephone (305) 858-5700
Facsimile (305) 358-7848
Email: jquinon@quinonlaw.com
*Attorney for Manolo Reyes*

FRANK QUINTERO, Jr.
Florida Bar No.399167

QUINTERO BROCHE
75 Valencia Avenue, Suite 800
Coral Gables, Florida 33134
Telephone (305) 446-0303
Facsimile (305) 446-4503
Email: fquintero@quinterolaw.net
*Attorney for Manolo Reyes*

Defendant Manolo Reyes ("Commissioner Reyes"), through his undersigned attorneys, and pursuant to Federal Rule of Civil Procedure 12(b)(6), hereby files his Motion to Dismiss Complaint.

## I. The Complaint Allegations

The Plaintiff filed a Complaint alleging violation of 42 U.S.C. § 1983, based on First Amendment speech retaliation. D.E. #1. The Complaint, consisting of 334 paragraphs, alleges that Commissioners Carollo, Diaz de la Portilla, and Reyes "targeted" Plaintiff because he resisted their using the Miami Police Department ("MPD") for their personal agendas and vendettas, and because of his "reform efforts" and "speaking out" against corruption and abuse of power by the City of Miami Commission (the "Commission"). Compl. ¶ 4.

The Complaint sets forth several incidents alleging retaliation that purportedly took place prior to or during Plaintiff's brief tenure as Miami Police Chief but relies primarily on three alleged occurrences. Specifically, ¶ 36 describes them as follows: "The Defendant Commissioners [1] weaponized City resources against perceived enemies, [2] impermissibly issued and/or dictated orders to Chief Acevedo and the MPD, and [3] interfered with Chief Acevedo and MPD operations," *Id*. ¶ 36 (the numbered brackets have been added to aid the reader in the discussion that follows).

### [1] *The Allegations of Weaponizing the MPD Against Perceived Enemies*

The Complaint addresses allegations concerning occurrence **[1]**, above, go from ¶ 37 through ¶ 55. In 18 paragraphs, Plaintiff alleges that Commissioner Carollo manifested hostility towards businessman Bill Fuller, who owns businesses within the City

1

of Miami. The allegations recount past actions allegedly undertaken by Commissioner Carollo and directed at Bill Fuller that Plaintiff labels as an unlawful exercise of powers.

None of the 18 paragraphs include factual allegations attributing retaliatory conduct to Commissioner Reyes.

### [2]  The Alleged Issuing of Orders to Plaintiff and MPD

Next, the Complaint's occurrence **[2]**, above, alleges in conclusory – but not factual language -- that the commissioners "impermissibly issued and/or dictated orders to Chief Acevedo and the MPD." *Id*. ¶ 36.. The allegations begin at ¶ 56 and continue through ¶ 98. They discuss the April 22, 2021 Commission meeting, when a resolution was entertained by the Commission to "combat criminal activities pertaining to narcotics, prostitution, human trafficking, and illegal gambling." *Id*. ¶ 59. It's alleged that, at the meeting, Commissioners Carollo and Diaz de la Portilla pointed out bars that Plaintiff should investigate. Plaintiff was thus "concerned that Commissioners Carollo and Diaz de la Portilla were violating the City of Miami Charter by attempting to dictate his actions and the actions of the MPD." *Id*. ¶ 69. And Plaintiff alleges that the Commissioners' actions were beyond their discretionary authority." *Id*. ¶ 70.

The Complaint further alleges that Commissioner Carollo had demanded Plaintiff to arrest agitators attending public events, including events on Calle Ocho and Bayfront Park. *Id*. ¶¶ 85, 87-88, 91-97.

In the 42 paragraphs devoted to occurrence [2], no factual allegations attribute retaliatory conduct to Commissioner Reyes.

### *[3]  The Alleged Interference with Plaintiff and MPD Operations*

The Complaint thereafter speaks to occurrence **[3]**, which starts at ¶ 99 and ends at ¶ 143. The allegations about this occurrence concern the June 24, 2021 Commission meeting, which was attended by all five commissioners. *Id*. ¶¶ 108-09.

During the meeting, the suspension of Officer Luis Camacho was brought up. Officer Camacho was part of the Sergeant-at-arms detail, which provides security to the commissioners. *Id*. ¶¶ 101-02, 107, 112. The Complaint alleges that, at the meeting, Commissioner Diaz de la Portilla aired opinions critical of how the Plaintiff handled Camacho's suspension: "Without going into all of the details," what happened was disgusting. "I think" it is a lack of due process; "I think" it is arbitrary in nature; "I think" it is important to be clear and honest, I am very direct; "I think" it was arbitrary; "I think" you pulled the trigger too quickly; "I think" before you tarnish somebody's reputation, you need to do due diligence and go through an investigation because once you tag someone as something, even if they are exonerated at the end, they are tarnished. *Id*. ¶ 113.

After Commissioner Diaz de la Portilla expressed his opinions, Commissioner Reyes allegedly said: "The only thing I have to add is 'Amen.'" "The only thing I have to add is I feel the same way and keep on sir." *Id*. ¶ 114.

The Complaint alleges that Commissioner Carollo expressed opinions that were critical as well. He voiced his opinion that one should not go on speculation. *Id*. ¶ 115. He suggested that at a personal meeting he could give the Plaintiff several other roads that were even more believable than the one the Plaintiff was looking at. *Id*. Commissioner Carollo at the meeting spoke highly of Officer Camacho as a professional *Id*. He also allegedly said, "I want real evidence. If you don't have that, I am going to expect that he

[Camacho] comes back to the position he has." *Id.* "You're the chief, you can do whatever you want, but I want you to know that from up here, we can do a heck of a lot more. I will leave it at that." *Id.* ¶ 116.

After Commissioner Carollo finished, Commissioner Reyes is alleged to have said, "I support what Commissioner Carollo says **about Sergeant Camacho**, and I am also not happy about it." (Emphasis added) *Id.*

### *The Elimination of MPD Positions*

The Complaint (in conclusory verbiage) also alleges that at the September 13, 2021 Commission meeting several MPD positions that Plaintiff intended to use in reforming MPD were eliminated. It alleges in conclusory language that the Commission voted on it and it was done as retaliation because he exercised his First Amendment rights. *Id.* ¶¶ 144-173.

### *The September 24, 2021 Memorandum*

The Complaint alleges that Plaintiff, acting outside of his employment, and as a private citizen, prepared and circulated a whistle-blowing memorandum on September 24, 2001, which is protected by the First Amendment to the U.S. Constitution. *Id.* ¶¶ 176-78, 183. A copy of the memorandum is attached and incorporated as Exhibit "A."[1] Plaintiff submitted the memorandum to (his immediate supervisor) the City Manager and Mayor Suarez. *Id.* ¶ 187.

---

[1]  The Eleventh Circuit has held that a court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim, and (2) undisputed. Undisputed in this context means the authenticity of the document is not challenged. The Plaintiff here does not dispute the authenticity of the memorandum attached. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). *See also Horsley v. Feldt*, 304 F.3d 1125 (11th Cir. 2002).

***The Commission Holds Meetings and Terminates the Plaintiff***

The Complaint alleges that at the October 1, 2021 Commission meeting, Commissioner Carollo made remarks concerning the inadequacy of police presence at the Patria y Vida event. *Id*. ¶ 204. And alleges that Commissioner Reyes stated that "the City Manager will have enough evidence to make a smart decision," when it comes to Plaintiff's employment. *Id*. ¶ 205.

The Complaint also alleges that the Plaintiff was suspended on October 11, 2021, and the City Manager allegedly provided him a suspension memorandum with pretextual reasons for the suspension. A copy of the City Manager's suspension memorandum is attached and incorporated as Exhibit "B."[2] Three days later, on October 14, 2021, at a public meeting, the Miami Commission, <u>unanimously</u> (all five commissioners) voted to terminate the Plaintiff. *Id*. ¶ 226.

## II.  The Complaint Fails to State a Plausible Section 1983 Claim

Stripped of conclusory allegations, the Complaint's factual allegations as to Commissioner Reyes are thin, limited to his brief statements agreeing, *in part*, with what two other commissioners stated at the June 24, 2021 Commission meeting regarding Officer Camacho's suspension, *see Id*. ¶¶108-16; his vote – along with the vote of all other commissioners – during the October 1, 2021 Commission meeting to eliminate two MPD positions. *Id*. ¶¶157, 163; and his vote, along with all other commissioners, to unanimously terminate the Plaintiff at the October 14, 2021 Commission meeting. *Id*. ¶

---

[2]  *See* n. 1 (explaining the legal reasons that this memorandum may be attached and considered by the Court).

226. These are the operative allegations as to Commissioner Reyes and they fail to allege a plausible claim.

To survive a Rule 12(b)(6) motion to dismiss in a claim for First Amendment retaliation under Section 1983, the plaintiff must allege facts establishing that: (1) his speech or act was constitutionally protected by the First Amendment; (2) a state actor's retaliatory conduct adversely affected the protected speech; and (3) that there is an actual causal connection between retaliatory actions and the adverse speech. *Carruth v. Bentley*, 942 F.3d 1047, 1061 (11th Cir. 2019); *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

**(1)  *Plaintiff's Speech Is Not Protected by the First Amendment***

Did Plaintiff speak as a private citizen on a matter of public concern or as the Chief of Police? The answer to this question determines whether Plaintiff's speech is protected by the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 418-22 (2006). And the Court decides the question as a matter of law. *Alves v. Board of Regents of the University of Georgia*, 804 F.3d 1149, 1159 (11th Cir. 2015) (citations omitted). We submit that Plaintiff's September 24, 2021, private memorandum, the alleged protected speech in this case, was prepared and sent by Plaintiff to his supervisors in his capacity as Chief of Police, and as such it is not constitutionally protected speech. The reasons Plaintiff's memorandum is not protected speech were proficiently analyzed by Co-defendant City of Miami in its Motion to Dismiss and Incorporated Memorandum of Law, DE #17 at 13-19 (Argument II), which we hereby adopt and incorporate in its entirety into our motion as if fully set forth to avoid needless duplication and promote efficiency. In addition, we offer

an additional important case and analysis that may assist the Court in deciding this important and dispositive issue.

In *King v. Board of County Commissioners*, 916 F.3d 1339 (11th Cir. 2019), the plaintiff, Dr. Nancy King, for 15 years worked under contract for Polk County as the primary person responsible for determining if firefighter applicants were medically qualified. *Id*. at 1341. In 2014, a physician assistant that worked for King performed a preemployment screening on "J," an African American, a diversity initiative program applicant, and found several problems with his lungs. Id. 1342. The physician assistant recommended J see his personal physician for the lung issues. Thereafter, a misunderstanding ensued because the physician assistant did not think (and did not sign off) that J was medically qualified to become a firefighter; however, J thought he had been referred to his own physician for medical clearance. *Id*. In the following months, several medical professionals gave conflicting opinions about J's medical fitness, with King and her group of physicians maintaining he was not medically fit. Id.

King became personally involved in the matter because of her job duties. *Id*. at 1346. She reviewed the accuracy of [J's] medical records and rendered her opinion in her capacity as occupational health director. *Id*. The Eleventh Circuit's opinion pointed out that, "if the speech 'owes its existence to public employee's professional responsibilities,' that indicates the speech is not protected by the First Amendment." *Id*. In King's case, "the starting point of King's speech was her official duties, which suggests she was not speaking as private citizen." *Id*.

In due course, King met with the Deputy County Manager and aired her concerns about the matters in dispute. *Id*. at 1347. She "spoke about J's medical qualifications, the

process for hiring J and other firefighters, potential liability the county might face because of that process, and related concerns. In short, she spoke about precisely the types of things that one would expect given her role with the county." *Id*. She also "reported the public safety concerns [she] felt J represented, working as a firefighter without a medical clearance." *Id*. at 1343. She further advised "that other medically unqualified applicants were not hired and [King] felt that the county could face exposure for possible 'reverse' discrimination given the favoritism afforded to J and [the equal opportunity administrator's] unprecedented involvement in the medical clearance process." *Id*. Thereafter, in September 2015, King met with the County Manager. *Id*. at 1344. King's notes of the meeting reflected the purpose of the meeting was to discuss the public concern she had about J as well as the oddities of involvement of other administrators. *Id*. King remembered telling the County Manager that her "number one priority was the safety of not only Mr. J, but also his coworkers as well as the general public." She also brought up the issue of possible "reverse discrimination" lawsuits. *Id*.

Later that month King was informed that her contract was not being renewed and it would be put out for bids. *Id*. King did not receive a recommendation for renewal of her contract even though she had received the highest score out of all submitted bids. *Id.* She then filed suit against the County alleging retaliation in violation of her First Amendment rights and violations of Florida state law.

The issue in King's case, as in the instant case, was whether she spoke pursuant to her job duties or as a private citizen on a matter of public concern during her meetings with the County Manager, Deputy County Manager, and other County employees. *Id*. 1345. The District Court found that she spoke pursuant to her job duties, the purpose of

the speech was work related, and she never spoke publicly. Id. The Eleventh Circuit likewise concluded that King spoke pursuant to her job duties, not as a private citizen. Id. at 1346. King stressed that she had spoken on subjects "beyond her ordinary responsibilities" because in addition to commenting on J's fitness, she had spoken about "reverse discrimination" and "public safety." *Id*. 1347. The Eleventh Circuit found that those subjects were not the "main thrust" of her speech. Rather, the "main thrust" of her speech was "related to interference with her job duties." Id. at 1347. And the fact that "she mentioned, or alluded to, topics such as 'reverse discrimination' does not serve to convert her employee speech into a First Amendment-protected complaint. ***"At bottom, the impetus for her speech was frustration at work, not fear for public safety or the public purse."*** Id. 1349 (emphasis added). Thus, King's speech was held not to be First Amendment-protected speech. Id. 1350.

The Plaintiff's speech in the instant case, as in *King*, owes its existence to job duties. Plaintiff's September 24, 2021 private memorandum is not protected speech for the same reasons as in *King* – as well as *Garcetti v. Ceballos*, 547 U.S. 410 (1951) and *Alves v. Bd. Of Regents of the Univ. Sys. Of Ga*., 804 F.3d 1149 (11th Cir. 2015). Indeed, the Plaintiff here is in a worse position than the plaintiffs in *King*, *Garcetti*, and *Alves* to allege he submitted the memorandum as a private citizen rather than as an employee airing his frustration at work. As a starting point, Plaintiff's memorandum states it emanates "From: Chief Art Acevedo," and it's signed by him as "Chief of Police" of the "Miami Police Department." Exhibit "A" at 1, 8. So, there's no question that this memorandum was not coming from Art Acevedo the private citizen. Rather, it was submitted as "Chief of Police" of the "Miami Police Department." Further demonstrating it

was submitted pursuant to his job duties, Plaintiff wrote and delivered his memorandum to his immediate supervisor, the City Manager, and the Mayor. *Id*. This is a communication from an employee to his supervisors "in accordance with or in furtherance of the ordinary responsibilities of [his] employment. *Alves*, 804 F.3d at 1162.

The memorandum begins by revealing its purpose is to "confirm" prior complaints, and disclose new ones, of alleged misconduct that Plaintiff had reported to the City Manager and the Mayor. See Exhibit "A" at 1. It then proceeds to report how in attending to his duties as the Chief of Police, Plaintiff has encountered what he characterizes as interference or improper conduct by the commissioners/defendants. More specifically, the memorandum reports how at the June 24, 2021 Commission meeting, as Chief of Police, he was called to answer inquiries posed by the commissioners. Notably, the subject-matter of all the inquiries posed, and the comments made by the commissioners which appear in the memorandum relate to Plaintiff's job duties as Chief of Police. The inquiries and comments bear upon the fairness of the procedure used to suspend Officer Camacho, all matters squarely within the scope of Plaintiff's job duties.

The memorandum also reports how at the September 13, 3021 Commission meeting, the Commission voted to eliminate positions that he "needed to help [him] reform MPD." This is yet another job-related grievance that Plaintiff reports to his supervisor. Next, Plaintiff in the memorandum relates his encounters with Commissioner Carollo regarding alleged requests to arrest individuals at different public functions, which Plaintiff labels as interference and improper use of MPD resources. Thus, the subject-matter of this grievance also clearly relates to his job duties, and this is but more of Plaintiff's venting. In sum, "the thrust" of the memorandum is work-related. The Plaintiff is reporting

10

to his supervisor matters that, in his opinion, present obstacles to discharging his duties and achieve his intention to reform the MPD. In addition, Plaintiff in his Complaint alleges that on September 24, 2021, he also forwarded the memorandum to the State Attorney's Office and the FBI. *See* Compl. ¶¶ 5, 177. And this is something he had to do as part of his job duties, if he suspected criminal activity may have taken place, because City of Miami Resolution No. R-20-0034, previously approved by the Commission, required him to do just that. *Id.* at ¶¶ 29-35. Therefore, Plaintiff's did nothing more than the fulfillment of his job duties by complying with the Resolution and reporting the matter to his supervisor.

Plaintiff's memorandum is not that of a private citizen addressing a matter of public concern. He never published the memorandum outside of the workplace, which is a factor to consider. *See King,* 916 F.3d at 1349 (citing *Morgan v. Ford*, 6 F.3d 750 (11th Cir. 1993). Moreover, Plaintiff's memorandum, like King's speech, "was made privately and precisely to the appropriate persons in [his] chain of command." *Id.* at 1350. The memorandum's "main thrust" was Plaintiff's frustration with what he viewed as "interference with [his] job duties." *Id.* at 1347. For these reasons, Plaintiff's speech is not constitutionally protected, and the Complaint must be dismissed with prejudice.

### (2)  The Complaint Fails to Allege Cognizable Retaliatory Actions

As concerns Commissioner Reyes, the Complaint alleges two occurrences purportedly showing examples of retaliation and interference. They are: (a) Commissioner Reyes' comments at a Commission meeting agreeing, in part, with Commissioners Diaz de la Portilla and Carollo, and Commissioner Reyes' vote to eliminate some positions

11

within the MPD. For the reasons explained below, as a matter of law, Plaintiff's allegations are meritless.

### A.  Commissioner Reyes' Comments at the June 24, 2021 Commission Meeting Did Not Constitute Retaliation or Interference with Plaintiff

- During the June 24, 2021 Commission meeting, Commissioner Diaz de la Portilla expressed opinions critical of how Plaintiff handled Officer Luis Camacho's suspension. Compl. ¶¶ 113,116,118. After he finished, Commissioner Reyes allegedly said. "The only thing I have to add is 'Amen.'' "The only thing I have to add is I feel the same way and keep on sir." Id. ¶ 114.

- Commission Carrollo, during the same meeting, also aired critical opinions. *Id*. ¶ 115. And after he finished, Commissioner Reyes is alleged to have said, "I support what Commissioner Carollo says **about Sergeant Camacho**, and I am also not happy about it." *Id*. ¶ 116 (emphasis added).

As a matter of law, Commissioner Reyes remarks at the meeting do not constitute retaliation or interference, nor do they violate Plaintiff's First Amendment's rights. For starters, context is important. Commissioner Reyes' remarks were made in a Miami Commission meeting, where as a commissioner he is expected to participate in the discussion of agenda items. Officer Camacho's suspension came up as part of the agenda. Accordingly, as a commissioner, Commissioner Reyes was within his zone of duty and responsibility in discussing and "securing information" regarding an agenda item. That sort of activity is within his "discretionary duties" as a Miami City commissioner. Indeed, that's the job of a commissioner.

The Miami Charter, specifically Part 1.A, Section 4(d), allows commissioners to make "inquiry" under the circumstances alleged in the Complaint. That's because Section

4(d) allows the commissioners to engage with "subordinates of the city manager" (*e.g.*, the Chief of Police), **"for the purpose of inquiry and as maybe necessary as provided in section 14."** *See* Miami City Charter, Section 4(d) (emphasis added). Thus, the Charter gives Commissioner Reyes, and other commissioners, the authority to engage in "inquiry" about the processes or methods used by City officials, which include the Chief of Police. Put differently, the act of "inquiry" in the present context is allowed by Section 4(d) and it is squarely within the ambit of Commissioner Reyes' discretionary duties.

Moreover, the "inquiry" of Plaintiff during the Miami Commission meeting is also authorized by Section 14 of the Miami Charter, which provides:

> **Sec. 14 – Commission may investigate official transactions, acts and conduct**
>
> The mayor, city commission, or any committee thereof **may investigate** the financial transactions of any office or department of the city government and **the official acts and conduct of any city official, and by similar investigations may secure information upon any matter**…

City of Miami Charter, Section 14 (emphasis added). This provision gives the commissioners ample authority to investigate "official acts and conduct of any city official" (e.g., the Chief of Police), and "secure information upon any matter." And the suspension of Officer Luis Camacho was an "official act," and thus the process employed by the Plaintiff to suspend him was within the discretionary authority of the commissioners to investigate. The commissioners could, and did, "secure information regarding the process (while not dictating a decision), in an open meeting and in the presence of the City Manager, which is authorize by Section 14 (same as under Section 4(d)).

At the Commission meeting, the commissioners voiced their opinions regarding Plaintiff's handling of Camacho's suspension. They inquired about, and requested,

fairness in the process. That is not prohibited by the Charter. Indeed, it's allowed. As the legislative or policy-making body, the Charter endows the commissioners with authority to pursue lines of inquiries and freely express opinions at commission meetings, thus facilitating the gathering of information that may assist in formulating policy-making goals. What they cannot do, and what they did not do, is to order the Plaintiff to terminate the investigation and reinstate Officer Camacho.

In the final analysis, Commissioner Reyes expressed agreement with the opinions of other commissioners, which is within his discretionary authority and permitted by the Charter, and Plaintiff's effort to disregard the context in which his remarks were made and conveniently attempt to label them as retaliation fails as a matter of law.

### B.  Commissioner Reyes' Vote to Terminate MPD Positions Was Not Retaliatory or Interference with The Plaintiff

The second example alleged in the Complaint of past retaliation or interference relevant to Commissioner Reyes involves the October 1, 2021 Miami Commission meeting. Compl. ¶¶ 208-10. At that meeting, Miami commissioners, including Commissioner Reyes, voted to terminate certain MPD positions. *Id*. Plaintiff asserts in conclusory language that this was done in retaliation against him. *Id*. However, Commissioner Reyes' actions are protected by legislative and qualified immunity and, thus, Plaintiff cannot present, transform, or disguise such conduct as retaliation or interference.

*Bogan v. Scott-Harris*, 523 U.S. 44 (1998) is strikingly similar to the instant case and conclusively demonstrates that Commissioner Reyes' conduct is protected by legislative immunity. In *Bogan*, a city employee sued the mayor and vice-president of the city council alleging the elimination of her position was motivated by racial animus and a

14

desire to retaliate against her in violation of her First Amendment rights. *Id*. at 47. The Supreme Court in that case held that local legislators also enjoy "absolutely immunity from suit under § 1983 for their legislative activities." *Id*. at 49. Further, the opinion held that the motives of the legislators was not a consideration. *Id*. at 54-55. And more relevant and important for purposes of this case, that the elimination of an employee's position was "quintessentially legislative" in that it "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents." *Id*. 55-56. Accordingly, those principles apply here and the elimination of MPD positions – which Commissioner Reyes voted for – is protected by absolute immunity.

Eleventh Circuit cases also consistently have held that public officials enjoy absolute immunity when sued under § 1983 alleging violation of First Amendment rights for the elimination of positions, failure to reappoint to a position, or failure to discharge budgetary responsibilities. *See, e.g*., *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999); *Holley v. City of Roanoke, Alabama*, 162 F.Supp. 1335 (M.D. Ala. 2001); *Woods v. Gamel*, 132 F.3d 1417 (11th Cir. 1998). To summarize, Commissioner Reyes' conduct is protected by absolute immunity, and Plaintiff's attempt to label the elimination of positions within MPD as retaliation or interference is meritless.

### C.  No Actual Causal Connection Between the Alleged Retaliatory Actions and the Alleged Adverse Speech

The Complaint must include sufficient factual (as opposed to conclusory) allegations of an actual causal connection between retaliatory actions and adverse speech. *Carruth,* 942 F.3d at 1061. The instant Complaint fails to plead sufficient factual allegations of an actual causal connection. Instead, it pleads conclusory allegations and

15

legal conclusions. However, conclusory allegations and legal conclusions must be disregarded because they carry no presumption of truth. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018). And stripped of conclusory allegations, the Complaint fails to allege sufficient facts to state a claim for relief that is plausible on its face. For those reasons, the Complaint must be dismissed.

### III.  COMMISSIONER REYES IS PROTECTED BY QUALIFIED IMMUNITY

Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities. *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997). The doctrine shields government officials from liability to the extent their conduct is not in violation of clearly established constitutional rights of which a reasonable person would have known. *Chesser v. Sparks*, 248 F.3d 1117, 1122 (11th Cir. 2001) (citing *Harlow v. Fitzgerald*, 457 800, 817-18 (1982). Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 525-26. First Amendment retaliation cases are particularly difficult for plaintiffs:

> It is particularly difficult to overcome the qualified immunity defense in the First Amendment context. *See, e.g., Maggio v. Sipple*, 211 F.3d 1346, 1354 (11th Cir. 2000) ("'a defendant in a First Amendment suit will only rarely be on notice that his actions are unlawful'") (citation omitted); *Martin v. Baugh*, 141 F.3d 1417, 1420 (11th Cir. 1998) ("[O]nly in exceptional cases will government actors have no shield against claims made against them in their individual capacities.' Martin's case is especially difficult to maintain because he bases his claim against Baugh on the First Amendment.") *Hansen v. Soldenwagner*, 19 F.3d 573, 576 (11th Cir. 1994) (observing that decisions in the First Amendment context "tilt strongly in favor immunity" and only in the rarest of cases will it be found that reasonable official should have known that he violated "clearly established" law; *Dartland v. Metropolitan Dade Cty.*, 866 F.2d 1321, 1323 (11th Cir. 1989) (noting that only "the extraordinary case" will survive qualified immunity in the First Amendment context).

*Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir. 2017).

To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when allegedly wrongful acts occurred, and if the official makes the showing, the burden shifts to the plaintiff to show that qualified immunity is inappropriate. *Carruth v. Bentley*, 942 F.3d 1047, 1054 (11th Cir. 2019) (citations omitted). To defeat qualified immunity, (1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct. *Id.* (citing *Taylor v. Hughes*, 920 F.3d 729, 732 (11th Cir. 2019. This court must look only to decisions from the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court for clearly established law. *Snider v. Jefferson State Cmty Cll.*, 344 F.3d 1325, 1328 (11th Cir. 2003).

In the instant case, Commissioner Reyes acted within the scope of his discretionary authority. *See supra* at 11-14. As a commissioner, it's within his discretionary authority to, among other things, make inquiries, discuss agenda matters, and vote on resolutions and ordinances at Commission meetings. *Id*. All allegations of retaliation and interference, as to Commissioner Reyes, allege conduct or votes that occurred during Commissions meetings. All such conduct falls within Commissioner Reyes' discretionary authority. As previously discussed, the sources of discretionary authority for his conduct and votes during Commission meetings are found within the Miami Charter, specifically §§ 4(d) and 14. *Id*. Thus, the burden shifts to the Plaintiff to show qualified immunity is inappropriate, which we submit he cannot do for the reasons explained below.

First, to prevail, Plaintiff would have to prove that the relevant facts set forth a violation of his First Amendment rights. However, he cannot do that because, as previously discussed, Plaintiff's speech at issue in this case is not protected by the First Amendment. *See supra* 6-11. Because his speech is not protected by the First Amendment, his lawsuit must be dismissed with prejudice.

Second, in addition of having to prove that the relevant facts prove a violation of his First Amendment rights (which he cannot do), Plaintiff would have to prove that the constitutional right violated was clearly established at the time of the challenged conduct. *Echols v. Lawton*, 913 F.3d 1313, 1323 (11th Cir. 2019) (citations omitted). An official's conduct is not a violation of established law unless "the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id*. And the court must "consider the official's conduct in 'the specific context of the case,' not as 'broad general propositions.'" *Id*. at 1323-24. Thus, the court should ask the "salient question … whether the state of law at the time of [an official's conduct] provided 'fair warning,' to every reasonable official that the conduct clearly violates the Constitution." *Id*. at 1324 (citing *Mikko v. City of Atlanta*, 857 F.3d 1136, 1146 (11th Cir. 2017). In determining whether the "contours of the right" are clearly established "in the specific context of the case," one must "look for a case based on materially similar facts." *Randall v. Scott*, 610 F.3d 701, 715 (11th Cir. 2010). And the "similar cases" must be decisions of the U.S. Supreme Court, the Eleventh Circuit, or the Florida Supreme Court. *See Snider,* 344 F.3d at 1328.

In the instant case, Plaintiff has not shown, nor can he show, that Commissioner Reyes' conduct violated his First Amendment rights because, as previously discussed,

18

his speech was the product of his job duties as Chief of Police and thus is not protected by the First Amendment. Moreover, we have found no U.S. Supreme Court, Eleventh Circuit, or Florida Supreme Court cases similar to the instant case, or cases that show the "contours of the right" asserted by Plaintiff in his Complaint "are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Echols*, 913 F.3d 1323. Thus, Commissioner Reyes is protected by qualified immunity because he was not presented with "fair warning" that his conduct "clearly violate[d] the Constitution." Id. at 1324 (citing *Mikko v. City of Atlanta*, 857 F.3d 1136, 1146 (11th Cir. 2017). In sum, Plaintiff has failed to establish that the constitutional right he asserts was clearly established at the time of the challenged conduct, and thus his claim fails for this reason as well.

Because Commissioner Reyes has shown that his conduct was within his discretionary authority, and Plaintiff has failed to show that his speech was constitutionally protected and that the constitutional right supporting his claim was clearly established at the time of the challenged conduct, Commissioner Reyes is protected by Qualified Immunity and the Complaint must be dismissed with prejudice.

## IV.  COMMISSIONER REYES IS PROTECTED BY LEGISLATIVE IMMUNITY

Local officials are entitled to absolute immunity – the same as federal, state, and regional legislators – from civil liability for their legislative activities. *Bogan*, 523 U.S. at 46. The absolute immunity extends to "all actions taken 'in the sphere of legitimate legislative activity.'" *Id*. at 54 (citing *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951). And the subjective motivations of the official are irrelevant to absolute legislative immunity. *Ellis v. Coffee Cnty. Bd. Of Registrars*, 981 F.2d 1185, 1192 (11th Cir. 1993).

All factual (as opposed to conclusory) allegations in the Complaint ascribing misconduct to Commissioner Reyes involve his actions and participation in Commission meetings. As previously discussed, his voting at the October 1, 2021 meeting to eliminate some MPD positions is protected by absolute immunity. *See supra* at 14-15. And his participation and comments at the June 24, 2001 Commission meeting likewise are "in the sphere of legitimate legislative activity," and thus protect Commissioner Reyes with absolute immunity. *See Tenney*, 341 U.S. at 376.

In sum, the operative allegations of the Complaint reveal Commissioner Reyes is protected by absolute immunity, thus the Complaint should be dismissed with prejudice.

## V.  CONCLUSION

Based on the foregoing, Commissioner Reyes respectfully requests that this Court dismiss Counts I of the Complaint, with prejudice.

Respectfully submitted,

JOSE M. QUIÑON, P.A.
*Attorney for the Plaintiff*
2333 Brickell Ave, Suite A-1
Miami, FL 33129
Tel: (305) 858-5700
Fax: (305) 358-7848

By:  /s/ Jose Quinon
JOSE QUINON
Fla. Bar No.: 201944

QUINTERO BROCHE, P.A.
*Attorneys for the Plaintiff*
75 Valencia Avenue, Suite 800
Coral Gables, Florida 33134
Tel: (305) 446-0303
Fax: (305) 446-4503

By: /s/ Frank Quintero, Jr.
FRANK QUINTERO, JR.
Fla. Bar No.: 399167

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Motion to Dismiss Complaint was filed on March 14, 2022 via PACER, which will serve a copy on all concerned parties.

s/Jose M. Quinon
Jose M. Quinon