**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 22-20224-CIV-WILLIAMS**

HUBERT ARTURO ACEVEDO,

    Plaintiff,

v.

CITY OF MIAMI, et al.,

    Defendants.

_____/

**DEFENDANT ALEX DIAZ DE LA PORTILLA'S MOTION TO DISMISS**
**AND INCORPORATED MEMORANDUM OF LAW**

    The Plaintiff, Hubert Acevedo ("Acevedo"), was fired from his job as chief of police for the City of Miami after six months. Acevedo's disastrous performance during those months, established in an evidentiary hearing before the Miami City Commission which unanimously voted to terminate him, included

- losing the confidence of the rank-and-file officers due to threats and verbal assaults;

- using offensive language with a civilian during a protest;

- making a "Cuban Mafia" comment to departmental staff;

- failing timely to report damage to his vehicle as required by protocols, while terminating subordinates for protocol violations;

- failing to report personal/vacation time;

- disobeying the city manager by making an unauthorized employment offer to a former colleague; and

- failing to provide an adequate action plan as requested by the city manager.

*See* Compl. ¶¶ 212-20, 226 & attached Exhibit A (Oct. 11, 2021 Suspension Memorandum (the "Suspension Memorandum")).[1] Ignoring his failures in his Complaint, Acevedo claims that three city commissioners really fired him because he complained about interference with his department, and whatever his shortcomings, they are simply "pretextual." Compl. ¶ 213.

The truth is that Acevedo recklessly ran the police department, denigrating the City of Miami while portraying himself, despite his own embarrassing misconduct, as its holier-than-thou savior. Scorning the authority of Miami's elected city commissioners, he wrote his September 24, 2021 Memorandum about "interference" because those commissioners dared to "meddle in the affairs of the MPD". [D.E. 17-3 at 4.] Now, through this Federal lawsuit, he continues his pattern of grandiosity, casting his employment dispute as a First Amendment civil rights violation, "constitutionaliz[ing] the employee grievance." *Connick v. Myers*, 461 U.S. 138, 154 (1983). Beyond that, he demands money damages not only from his former employer the City of Miami, but also from individual government officials, including City Commissioner Diaz de la Portilla.

Despite his tactical pleading, Acevedo cannot avoid four fundamental legal defects, each magnified by the qualified immunity defense that protects government officials sued individually. First, Acevedo's September 24, 2021 Memorandum complaining about interference with the police department is the writing of police chief, not a private citizen. Second, his memorandum is written as a personal grievance and not for public concern. Third, any First Amendment interest of Acevedo is outweighed by the government's interest in the oversight and efficient operation of the police department. Finally, Acevedo's termination was based on at least one legitimate motivation, as shown by the Suspension Memorandum and the unanimous decision of the City Commission, two of whose members Acevedo never challenges. Certainly, Acevedo's claims are not supported by clearly established law, so qualified immunity defeats them. Accordingly,

---

[1] Acevedo refers to the Suspension Memorandum, which resulted in the employment termination that forms the basis of his claims, in his Complaint at ¶¶ 212-16. The Suspension Memorandum is thus appropriate for consideration in this motion to dismiss based on the "incorporation by reference" doctrine. *See Horsley v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002) (permitting the court to consider a document attached to a motion to dismiss when that document is (1) central to the plaintiff's claim and (2) its authenticity is not challenged). Pursuant to Section 26 of the City Charter, the Suspension Memorandum provides the "charges" against Acevedo, is legally integral to the termination for which he seeks relief, and therefore is central to his claim. Also, Plaintiff's counsel has agreed that the attached Exhibit A is authentic.

Defendant Alex Diaz de la Portilla, pursuant to Federal Rule of Civil Procedure 12(b)(6), moves to dismiss the Complaint for failure to state a claim upon which relief can be granted.

## I. FACTS[2]

Acevedo's Complaint claims a civil rights violation under 42 U.S.C. § 1983, asserting one count (Count II) against not only the City of Miami, but also Defendant Diaz de la Portilla, two other city commissioners, and the city manager individually for retaliation based on the exercise of free speech under the First Amendment. *See* Compl. ¶¶ 251-312.[3] According to the Complaint, Acevedo's First Amendment rights were violated when he was terminated by all five members of the City Commission in retaliation for sending a memorandum accusing three city commissioners of engaging in conduct that interfered with police department operations.

### A. Acevedo's Six-Month Tenure as Police Chief

Acevedo was sworn in as the chief of police for the City of Miami on April 5, 2021. Compl. ¶ 18. Acevedo alleges he was appointed as the police chief because "there was a need to reform the [City of Miami Police Department] and to change the culture of the agency." *Id.* ¶ 2. The duties of the police chief are set forth in the City of Miami Charter. *Id.* ¶ 19. Section 24 of the City of Miami Charter states:

> *Division of police*. The police force shall be composed of a chief and such officers and other employees as the city manager may determine. The chief of police shall have the immediate direction and control of the police force, subject to the supervision of the director of public safety, and to such rules, regulations and orders as the said director may prescribe, and through the chief of police, the director of public safety shall promulgate all orders, rules and regulations for the government of the police force. The chief of police shall devote his or her entire time to the discharge of his or her official duties and shall not be absent from the city except in the performance of his or her official duties, unless granted a written leave of absence by the city manager. His or her office shall be kept open at all hours, day or night, and either the chief of police or a subordinate shall be in constant attendance.

According to the Complaint, during Acevedo's tenure, Diaz de la Portilla interfered with his police chief duties. Compl. ¶ 36. During an April 22, 2021 meeting of the City Commission,

---

[2] While often disputed, the Complaint's allegations are taken as true solely for the purpose of this Motion.

[3] The Complaint's remaining count (Count I) is a state-law statutory "whistleblower" claim asserted against the City of Miami only. *See* Compl. ¶¶ 23-50.

Diaz de la Portilla recommended that the City of Miami Police Department (the "MPD") investigate certain bars and establishments for alleged criminal activities. *Id*. ¶¶ 56, 64. The next day, Diaz de la Portilla's assistant emailed City Manager Noriega, copying Acevedo, a list of ten establishments that Diaz de la Portilla would like investigated for "allegedly engaging in illegal activity." *Id*. ¶¶ 65-67.

Diaz de la Portilla also allegedly interfered with an MPD investigation into an MPD officer, Luis Camacho, who served as security for City of Miami Mayor Francis Suarez. *Id*. ¶¶ 100-06. Based on the investigation, Officer Camacho was relieved of duty, with pay, on June 22, 2021. *Id*. ¶ 107. Two days later, the City Commission held a meeting where a pocket item proposed by Diaz de la Portilla concerning Officer Camacho was discussed. *Id*. ¶¶ 108-11. Diaz de la Portilla expressed concern that the MPD's investigation of Officer Camacho was deficient. *Id*. ¶ 113. Diaz de la Portilla commented on how the investigation tarnished Officer Camacho's reputation. *Id*. ¶ 118. Diaz de la Portilla also spoke privately with Acevedo on the matter. *Id*. ¶¶ 119-120. According to the Complaint, Diaz de la Portilla offered to support Acevedo running for Miami-Dade sheriff if he reinstated Officer Camacho. *Id*. ¶¶ 122-23.

The Complaint also alleges that Diaz de la Portilla interfered with Acevedo's duties by voting to eliminate funding for two positions in the MPD. On September 13, 2021, the City Commission voted in favor of eliminating funding for the deputy chief and deputy director of constitutional policing positions. *Id*. ¶¶ 152-63. During that same meeting, the City Commission passed a resolution scheduling a special meeting on September 27, 2021, "for the purposes of a discussion regarding the City of Miami's Chief of Police and the adoption of any pertinent resolutions." *See* City of Miami Resolution R-21-0380 [D.E. 17-1]; *see also* Public Notice of September 27, 2021 Special City Commission Meeting [D.E. 17-2].[4]

### B. Acevedo's September 24, 2021 Memorandum

Three days before the City Commission was scheduled to discuss the police chief, Acevedo sent a memorandum to his superiors, City Manager Noriega and Mayor Suarez, Compl. ¶ 187,

---

[4] *Universal Express, Inc. v. U.S. S.E.C.*, 177 Fed. Appx. 52, 53 (11th Cir. 2006) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss.") (citation omitted). The September 24, 2021 Memorandum is also central to Acevedo's claims and its authenticity is undisputed, and so subject to the Court's consideration. *See supra* n.1.

which he subsequently provided to the FBI and the State Attorney, *id.* ¶ 177.[5] The September 24, 2021 Memorandum was signed by Acevedo in his capacity as chief of police:

> With Great Respect and Heavy Heart,
>
> *[signature]*
>
> Art Acevedo
>
> Chief of Police
>
> Miami Police Department

*See* Sept. 24, 2021 Mem. at 8 [D.E. 17-3]. The memorandum sets forth three claims of "interference" by city commissioners, including Diaz de la Portilla: (1) "Interference with MPD Internal Affairs Division (IAD) investigation"; (2) "Interference with Reform Efforts and MPD Staffing"; and (3) "Interference with and Improper Use of MPD Resources." *Id*. at 1-8.

Much of Acevedo's allegations of "interference" describe conduct of the Defendant City Commissioners at their public hearings. *Id.* at 1-3 (describing statements at a June 24, 2021 hearing); 5-6 (describing statements at a Sept. 13, 2021 budget meeting). These allegations of "interference" must be read alongside the legal powers of the City of Miami Commission. The Commission is "the governing body" of the City, with the power to "exercise all powers conferred upon the city" except those specifically limited. City of Miami Charter § 4(a). The Commission specifically has the power to "investigate the financial transactions of any office or department of the city government and the official acts and conduct of any city official, and by similar investigations may secure information upon any matter." *Id.* § 14.

Beyond complaining about interference caused by conduct at public commission hearings, Acevedo points to occasions when commissioners asked the police to investigate potential criminality. His September 24, 2021 Memorandum alleges Commissioner Carrollo complained of "agitators" at a Calle Ocho event on June 25, 2021 and corruption by City Code Enforcement. [D.E. 17-3 at 4.]. He also wrote that "Carollo and Diaz de le Portilla provided the MPD with a target list of establishments which *they* claim are engaged in criminal activity and have pointed the finger at establishments in each other's districts, causing the MPD to investigate establishments

---

[5] Acevedo alleges that he "had only initially submitted the September 24, 2021 Memorandum to City Manager Noreiga and Mayor Suarez," but "within 48 hours the Memorandum was leaked to others, including the media." Compl. ¶ 187.

based on nothing more that the whims of Commissioners Carollo and Diaz de la Portilla." *Id.* at 7 (emphasis in original).

Acevedo alleges that, following his September 24, 2021 Memorandum during a September 27, 2021 special meeting, Diaz de la Portilla and two other city commissioners "launched a series of ad hominem character attacks on" him. Compl. ¶ 190. The Complaint does not directly attribute any attacks to Diaz de la Portilla, but instead focuses on statements made by Commissioner Carollo and videos played by the "Defendant Commissioners." *See id*. ¶¶ 190-98. Notwithstanding, the City Commission voted in favor of an independent investigation of the allegations in the September 24, 2021 Memorandum. *Id*. ¶¶ 199-200.

### C. The Suspension Memorandum & Acevedo's Termination

Following the September 27 special meeting of the City Commission, City Manager Noriega issued the Suspension Memorandum pursuant to Section 26 of the City of Miami Charter. Compl. ¶ 212 & Ex. A.   Section 26 requires the city manager to certify the fact and cause of the police chief's suspension to the commission, which must then hear the charges within five days and render their judgment:

> The city manager shall have the exclusive right to suspend the chief of police and fire chief for incompetence, neglect of duty, immorality, drunkenness, failure to obey orders given by proper authority, or for any other just and reasonable cause. If either of such chiefs be so suspended the city manager shall forthwith certify the fact, together with the cause of suspension, to the commission who within five (5) days from the date of receipt of such notice, shall proceed to hear such charges and render judgment thereon, which judgment shall be final.

City of Miami Charter § 26.

The Suspension Memorandum details eight different reasons supporting City Manager Noriega's suspension of Acevedo. *See supra* at 1 & Ex. A.  The city manager certified, among other reasons, that Acevedo lost the confidence and trust of the rank-and file and executive staff; there was a "vote of no confidence" by the Fraternal Order of Police;  Acevedo used offensive language to a citizen protestor; Acevedo offended the Miami community by commenting on the "Cuban Mafia" to departmental staff, alienating a large section; Acevedo announced city policy without authorization and violated department policy; and Acevedo failed to follow protocols and directives from City Manager Noriega.  *Id.*

Acevedo received notice of the Suspension Memorandum on October 11, 2021. Compl. ¶ 218. City Manager Noriega set Acevedo's termination hearing to occur on October 13, 2021. *Id*. Acevedo requested that the hearing be reset for October 18, 2021. *Id*. To accommodate Acevedo, the city manager rescheduled the termination hearing for October 14, 2021. *Id.*

The termination hearing then proceeded. *Id*. ¶ 219. All five members of the City Commission attended the hearing, *id.* ¶ 226, which Acevedo concedes was a quasi-judicial proceeding, *see id.* ¶ 221. During the hearing, counsel for City Manager Noriega presented evidence through four witnesses, including himself. *Id*. ¶ 220. Acevedo was represented by counsel at the hearing. *See id.* ¶ 223. At the conclusion of the hearing, all five members of the City Commission unanimously voted to terminate Acevedo. *Id*. ¶ 226.

Acevedo does not contest the evidence presented by the City at his termination hearing. Although he complains that Diaz de la Portilla and two other city commissioners exhibited bias against him, *id*. ¶ 221, he does not allege that he requested that those commissioners be recused. Acevedo alleges that after his counsel rested his case, Diaz de la Portilla "said, 'I rest mine.'" *Id*. ¶ 223. City Commissioner Ken Russell — who is not a defendant in this case or subject to Acevedo's allegations of bias — admonished Diaz de la Portilla for making that comment. *See id*. ¶ 224. Commissioner Russell nonetheless voted in favor of terminating Acevedo. *See id.* ¶ 226.

The City Commission's final judgment terminating Acevedo was memorialized in City of Miami Resolution R-21-0435. Acevedo never challenged this judgment in any state proceeding and proceeded with this federal court case.

## II. ARGUMENT

### THE COURT SHOULD DISMISS THE COMPLAINT BASED ON DEFENDANT DIAZ DE LA PORTILLA'S QUALIFIED IMMUNITY.

Acevedo has the burden of showing a plausible claim of First Amendment retaliation by Defendant Diaz de la Portilla using well-pleaded facts, not conclusory statements. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* In determining whether a complaint states a plausible claim for relief, "conclusory statements" and "bare assertions" are given no weight. *Id.* at 678, 681. "[W]here the *well-pleaded facts* do not permit the court to infer

7

more than the mere possibility of misconduct, the complaint has alleged – but has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (emphasis supplied; quoting Fed. R. Civ. P. 8(a)(2)).

Here, the Court must also analyze the Complaint through the lens of qualified immunity, which "protects government actors performing discretionary functions from being sued in their individual capacities." *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001). "Claims for money damages against government officials in their individual capacity involve substantial costs not only for the individual official – who incidentally may be innocent – but for society in general." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996). Accordingly, qualified immunity is both a defense to liability and an entitlement not to stand trial or even face the discovery process if the doctrine applies. *Iqbal*, 556 U.S. at 672; *Chesser*, 248 F.3d at 1122. The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To receive qualified immunity, a public official has the burden of showing he was acting within the scope of discretionary authority when the allegedly wrongful act occurred. *Carollo v. Boria*, 833 F.3d 1322, 1328 (11th Cir. 2016). The burden then shifts to the plaintiff to show qualified immunity is not appropriate. *Id.*; *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("Once an officer or official has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff.").

The face of the Complaint establishes that Defendant Diaz de la Portilla was acting within his discretionary authority as a city commissioner when he voted — with the entire City Commission, unanimously — to terminate Acevedo's employment. Following suspension of the chief of police by the city manager, the City of Miami Charter requires the City Commission to hold a termination hearing and render judgment. *See* City of Miami Charter § 26. That is precisely what occurred here. *See* Compl. ¶¶ 212-26.

Acevedo thus has the burden to defeat qualified immunity by establishing that "(1) his complaint pleads a plausible claim that the defendant violated his federal rights (the 'merits' prong), and that (2) precedent in this Circuit at the time of the alleged violation 'clearly established'

8

those rights (the 'immunity' prong)." *Carollo*, 833 F.3d at 1328. *See also Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Stanley v. City of Dalton*, 219 F.3d 1280, 1285 (11th Cir. 2000). "This burden is not easily discharged: 'That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their *individual capacities.*'" *Foy*, 94 F.3d at 1532 (emphasis in original; quoting *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994) (*en banc*)). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who would knowingly violate the law.'" *Hunter*, 502 U.S. at 229 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)). *See also Chesser*, 248 F.3d at 1122 (quoting *Malley*).

Acevedo cannot defeat qualified immunity. His pleadings do not establish a plausible claim for retaliation based on the exercise of the First Amendment, much less the violation of clearly established law, for four reasons: first, Acevedo wrote his September 24, 2021 Memorandum as a chief of police, not as a citizen; second, the September 24, 2021 Memorandum is primarily about employment grievances, not public concerns; third, the City's interest in governing its police department outweighs Acevedo's speech interests; and fourth, Acevedo does not have a plausible claim that protected speech caused his termination. Defendant Diaz de la Portilla is accordingly entitled to dismissal from Acevedo's Complaint.

### A.     Acevedo's Memorandum Is Not Constitutionally Protected.

The Supreme Court has provided a two-step inquiry regarding whether a government employee's speech is constitutionally protected, and "[b]oth steps are questions of law for the court to decide." *Alves v. Bd. of Regents*, 804 F.3d 1149, 1159 (11th Cir. 2015) (discussing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)); *see also Moss v. City of Pembroke Pines*, 782 F.2d 613, 618 (11th Cir. 2005).

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Garcetti*, 547 U.S. at 418 (citing *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968)).

Acevedo cannot establish either step, that he even has a possible claim, much less show that his position is supported by the clearly established law necessary to defeat qualified immunity.

9

### 1. Acevedo Did Not Speak as a Citizen on a Matter of Public Concern.

For a government employee's speech to be protected, he "must have spoken (1) as a citizen and (2) on a matter of public concern." *Alves*, 804 F.3d at 1160. As established below and in the City of Miami's Motion to Dismiss and Incorporated Memorandum of Law [D.E. 17], which Defendant Diaz de la Portilla adopts and incorporates, Acevedo cannot satisfy either prong.

a. <u>Acevedo wrote his memorandum as a police chief, not as a citizen</u>.

A government employee does not speak as a citizen when, like Acevedo, he complains about interference with the operation of his department. *Batz v. City of Sebring*, 794 Fed. Appx. 889, 899-900 (11th Cir. Dec. 12, 2019); *King v. Board of County Commissioners*, 916 F.3d 1339, 1347 (11th Cir. 2019); *Alves*, 804 F.3d at 1165 ("reporting conduct that interfered with their ordinary job duties" constitutes speaking as an employee, not protected by the First Amendment); *Boyce v. Andrew*, 510 F.3d 1333, 1345-46 (11th Cir. 2007) (similar; discussed in *Alves*).

In *Batz*, the Eleventh Circuit, affirming Judge Marra, rejected a city fire chief's claim of First Amendment retaliation involving allegations that are strikingly similar to the ones here. The fire chief, like Acevedo, had complained about interference with his operation of his department, objecting to "attempts to undermine and delay his efforts to enforce the Safety Code . . .." *Batz*, 794 Fed. Appx. at 898. In the course of his termination, the fire chief was told "people are complaining about you and the fire codes," and that he was recommended for termination because of "numerous times he verbally proclaimed his distrust of council and administration and that they did not have his back". *Id.* at 896. But both this Court and the Eleventh Circuit determined that the fire chief was not acting a citizen, but instead as an employee, in making his objections. The Eleventh Circuit applied the principles provided by the Supreme Court in *Garcetti*: "The proper inquiry is a practical one" that should focus on "whether the employee's speech at issue 'owes its existence' to the employee's professional responsibilities." *Id.* at 898 (quoting *Moss*, 782 F.3d at 618 and *Garcetti*, 547 U.S. at 421, 424). The court likened the case to that of *King*, because both cases involved complaints expressing "frustration related to interference with … job duties." *Id.* at 900.

Acevedo's speech is practically the same — a series of complaints about interference with his operation of the police department. The introduction section of his memorandum claims "certain City commissioners have interfered with the reform efforts and have interfered with a confidential internal investigation." Sept. 24, 2021 Mem. at 1 [D.E. 17-3]. Acevedo's

memorandum then provides three sections, and each section is about purported "interference." The first section is entitled "Interference with MPD Internal Affairs Division (IAD) investigation". *Id.* Acevedo says he "never personally experienced such interference in a confidential law enforcement investigation," *id.* at 4, and ends the section by claiming "the Commissioners' interference in the confidential IAD investigation is not their only misconduct," *id*. The second section is entitled "Interference with Reform Efforts and MPD Staffing". *Id.* He complains about how commissioners "hampered my reform" and "hampered my given mission to reform the MDP," and "the actions of these three Commissioners are part of a pattern of interference and intimidation . . .." *Id.* at 6. His final section is also about interference, entitled, "Interference With and Improper Use of MPD Resources." *Id.* at 7. All of this is written in a memo sent to his bosses, the city manager and mayor, *id.* at 1, signed by him as "Chief of Police," *id.* at 8, and prepared because his "sworn duty is to uphold the rule of law and follow the evidence wherever it may lead, and work for the wellbeing of the men and women of the MPD, the lawful independence of MPD, and the people of the City of Miami," *id.*

By any reasonable reading, this is a police chief's complaint about interference with the operations of the police department. Acevedo's September 24, 2021 Memorandum owes its existence to his professional responsibilities as police chief. Acevedo's allegation to the contrary, that he wrote it as a "citizen," relies on his own conclusion, not the facts. Such a conclusory statement is worthless in supporting his claim. *See Ashcroft*, 556 U.S. at 678-79, 680-81; *Twombly*, 550 U.S. at 555-56; *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010) ("A district court considering a motion to dismiss shall begin by identifying conclusory allegations that are not entitled to an assumption of truth — legal conclusions must be supported by factual allegations."). Thus, based on cases like *Batz* and *King* alone, Acevedo cannot show that Diaz de la Portilla violated clearly established law. *See Lane v. Frank*, 573 U.S. 228, 243-46 (2014) (holding that even where First Amendment protection applied, qualified immunity prevented individual liability where Eleventh Circuit law was mixed regarding the issues).

Acevedo may argue that he has a plausible claim that he acted as a citizen, relying on *Carollo*. In that case, the Eleventh Circuit held that a city manager may have a plausible claim he acted as a citizen, and qualified immunity would not apply, where he notified law enforcement

that city commissioners violated Florida's campaign finance laws.[6] *Carollo*, 833 F.3d at 1330-31. But, in *Carollo*, the plaintiff's "ordinary job responsibilities as City Manager did not include anything to do with enforcing Florida's campaign finance laws . . .." *Id.* at 1331. Where, on the other hand, speech has some relation to an employee's core job functions, that speech is not made as a citizen. *See King*, 916 F.3d at 1350 (distinguishing *Carollo* on this basis); *Phillips v. City of Dawsonville,* 499 F.3d 1239,1241-42 (11th Cir. 2007) (holding that city treasurer and clerk's speech about a mayor's misconduct "relate to" and "touch on" matters involving official duties and therefore were not made as a private citizen; "[A] public employee's duties are not limited to those tasks that are specifically designated.").

*Carollo* is clearly distinguishable.[7] In contrast with *Carollo*, and like *King* and *Phillips*, the speech here involved Acevedo's official duties. Acevedo objected to interference with the operation of the police department he was charged with directing. His objections went to the core of his ordinary job responsibilities — the "immediate direction and control of the police force," as stated in Section 24 of the City of Miami Charter, and his "sworn duty," as he put it in his September 24, 2021 Memorandum's conclusion. Acevedo alleges he could not personally investigate the commissioners, *see* Compl. ¶¶ 28-33, so he sent his memorandum to governmental entities who could. Acevedo's memorandum was the act of a police chief, not a private citizen. Certainly, clearly established law does not support his position as qualified immunity requires. His claim of First Amendment retaliation must therefore be dismissed.

      b. <u>Acevedo wrote for his employment grievance, not a matter of public concern</u>.

The second prong of *Garcetti*, that the speech be directed to a matter of public concern, "concerns the context of the speech and asks whether the employee spoke on a matter of public concern or on matters of only personal interest." *Alves*, 804 F.3d at 1162. The inquiry turns on "the content, form, and context of a given statement . . .." *Connick*, 461 U.S. at 147-48. "[A]n

---

[6] At the same time, the Eleventh Circuit held that the city manager's alleged reports about "corruption" and other violations did *not* state plausible claims that he spoke as a citizen and not pursuant to ordinary job responsibilities. *Carollo*, 833 F.3d at 1331.

[7] Besides the "citizen" issue, the *Carollo* case did not address any of the other arguments Defendant Diaz de la Portilla raises here. *See id.* at 1329 ("Our focus on this interlocutory appeal is entirely on the first inquiry because appellants acknowledge that Carollo spoke on a matter of public concern and do not argue that they had an adequate justification for terminating him other than his speech.").

employee's speech will rarely be entirely private or public." *Akins v. Fulton Cty.*, 420 F.3d 1293, 1304 (11th Cir. 2005). Accordingly, the Court must examine whether the "main thrust" of the speech is directed to a public or private concern. *Alves*, 804 F.3d at 1162; *Morgan v. Ford*, 6 F.3d 750, 754-55 (11th Cir. 1993) (analyzing whether the employee "primarily spoke as an employee in order to improve her work environment").

Acevedo cannot toss out terms like "corruption" and "abuse of power," Compl. ¶ 183, to sustain his claim. The Complaint's characterizations and conclusory statements must be disregarded. *See Iqbal*, 556 U.S. at 678, 681. Beyond that, "the relevant inquiry is not whether the public would be *interested* in the topic of the speech at issue," it is "whether the *purpose* of [the employee's] speech was to raise issues of public concern." *Alves*, 804 F.3d at 1167 (quoting *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000) (emphasis added; internal quotations omitted)); *see also Boyce v. Andrew,* 510 F.3d 1333 (11th Cir. 2007); *Morgan*, 6 F.3d at 754 ("[W]e must determine whether the purpose of [the employee's] speech was to raise issues of public concern, on the one hand, or to further her own private interest, on the other."). It is not enough for speech to involve issues "worthy of a public forum" or to "touch up against matters of public concern" where the speech "is not directed to such concerns." *Alves*, 804 F.3d at 1167.

These principles show Acevedo has not alleged a plausible claim that his speech went to public concern. The facts amply establish that the main thrust of Acevedo's memorandum was to report his employment grievances, not to provide a public statement. The content of Acevedo's September 24, 2021 Memorandum, as discussed above, was a report about the interference in the internal workings of his department. *See supra* at 10. In his initial paragraph, Acevedo states his purpose: "This memorandum is to confirm my recent reports . . . ." Sept. 24, 2021 Mem. at 1 [D.E. 17-3]. Such reports to superiors are not intended as public statements. In the penultimate paragraph of his memorandum, Acevedo repeats that purpose: "I have no choice but to memorialize and report the above series of improper acts . . . ." *Id.* at 8. The form of the speech, a memorandum using his official title and sent to his superiors "in [their] leadership capacities with the City of Miami," *id*. at 1 — betrays no intention of a public statement.

After sending the memorandum to his City superiors, Acevedo sent it only to the Miami-Dade State Attorney's Office and the FBI. Compl. ¶¶ 177, 187. But Acevedo did not announce his memorandum to the general public. Instead, he alleges his memorandum was "*leaked* to others, including the media." *Id*. ¶ 187 (emphasis added). Acevedo's limited and focused delivery of the

13

memorandum shows its main thrust was not a public concern.  *See Batz*, 794 Fed. Appx. at 900 (explaining that plaintiff's lack of effort to communicate outside of other government officials is a factor showing speech was private); *King*, 916 F.3d at 1349 (similar; discussed in *Batz*); *Alves*, 804 F.3d at 1168 (similar).  Beyond all of this, no clearly established law shows Acevedo's speech went to public concern, and so qualified immunity applies.  His claim must therefore be dismissed.

> **B.    The City Commission Had Adequate Justification for Treating Acevedo Differently from Members of the General Public under the *Pickering* Balancing Test.**

Acevedo wrote his September 24, 2021 Memorandum as a backlash to the Defendant Commissioners questioning his operation of the police department, cutting its budget, and asking him to look into potential criminal conduct.  *See* Compl. ¶¶ 108-118 (describing June 24, 2021 commission meeting questioning the treatment of Luis Camacho); *id.* ¶¶ 152-64 (describing Sept. 13, 2021 commission meeting eliminating police positions); Ex. A, *passim* (complaining about commissioners' "interference" with police operations and management).  What Acevedo views as interference is, in fact, the commissioners performing their duties as they are empowered by law.  Acevedo's claim thus fails under the "adequate justification" balancing test of *Pickering v. Board of Education*, 391 U.S. 563 (1968).  Certainly, he cannot show through clearly established law that the *Pickering* test inevitably resolves in his favor, so qualified immunity applies.

The *Pickering* balancing test requires the Court to weigh the plaintiff's First Amendment interests against the government's interests in efficient operation.  *Moss*, 782 F.3d at 618; *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989); *Morales v. Stierheim,* 848 F.2d 1145, 1149 (11th Cir. 1988).  The Court must examine: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Morales*, 848 F.2d at 1149.  Evaluating that context calls for the Court to look beyond the employee's speech at issue.  *Bryson*, 888 F.2d at 1567.  In determining whether Acevedo's speech impeded the City's ability to perform its duties efficiently, the Court should also examine "whether the statement impairs discipline by superiors or harmony among co-workers."  *Rankin v. McPherson*, 483 U.S. 378, 388 (1987), *quoted in Bryson*, 888 F.2d at 1567.  *See also Autrey v. Davis*, 355 Fed. Appx. 253, 255 (11th Cir. 2009) (holding complaints by sheriff deputies, including to the state attorney, that "undermined the morale and disrupted the efficiency of the department" justified their termination under *Pickering* balancing).

Based on qualified immunity, Defendant Diaz de la Portilla is entitled to dismissal "unless the *Pickering* balance 'would lead to the inevitable conclusion that the discharge of the employee was unlawful.'" *Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir. 1991) (quoting *Dartland v. Metro. Dade Cty.*, 866 F.2d 1321, 1323 (11th Cir. 1989)). *See also Stanley v. City of Dalton*, 219 F.3d 1280, 1298 (11th Cir. 2000). "In the context of a First Amendment retaliation claim, we have recognized that a defendant 'will only rarely be on notice that his actions are unlawful' because applying the *Pickering* balancing 'involves legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules." *Brannon v. Finkelstein*, 754 F.3d 1269, 1278 (11th Cir. 2014) (quoting *Maggio v. Sipple*, 211 F.3d 1346, 1354 (11th Cir. 2000)).

Acevedo's claim fails the *Pickering* test and falls far short of defeating qualified immunity. His September 24, 2021 Memorandum contends that functions of Miami commissioners are illegal because they "interfere" with his vision and operation of the police department. *See* Sept. 24, 2021 Mem. at 2 [D.E. 17-3] ("[A]s commissioners they have no authority under the City charter or under the law to direct the MPD or interfere with its actions."). In writing this, he ignores that the City Commission is legally responsible for the City's budget and empowered to investigate all official actions. *See* City of Miami Charter §§ 4(a), 14. Acevedo wrote and delivered his memorandum after the Commission questioned his management and held a budget hearing eliminating a position for one of his subordinates on a prior job, as well as another position he proposed. *See* Compl. ¶¶ 108-18, 152-64. He characterizes this budget decision as part of commissioners' "efforts to meddle in the affairs of the MDP". Sept. 24, 2021 Mem. at 4 [D.E. 17-3]. Acevedo's memorandum is thus a challenge to the authority of the Commission to investigate the operation of the police department and regulate the police department's finances, weighing against him in the *Pickering* balance. *See Connick*, 461 U.S. at 153 ("When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional

15

weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office.").[8]

The balance also weighs heavily against Acevedo because his disputes with the City Commission involved the management of the City's police department. Acevedo admits in his September 24, 2021 Memorandum he "expressed [his] concerns" about the City Commission "interference" to his staff. Sept. 24, 2021 Mem. at 4 [D.E. 17-3]. "In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers." *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000). As a matter of law, the City Commission is the ultimate authority over the police department, with the power to determine the department's budget and rule upon the discipline or firing the police chief. *See* City of Miami Charter §§ 4(a), 26. Acevedo's challenge to that authority once again fails the *Pickering* balancing test.

Acevedo's pleadings, like his September 24, 2021 Memorandum, rely on a theory that as police chief, the police department became his exclusive domain. In his view, questions from the City Commission or its modification of the police budget constitute "interference," and the Commission's refusal to back down to his claims of interference violates the Constitution. The legal reality is that the City Commission, whose commissioners who must answer to the voters, is the ultimate authority over the City's unelected police chief and its police department, with power to decide its budget, legislate regarding its policies, and pass judgment on its police chief. The *Pickering* balancing test weighs in favor of the Commission's power and against the interests of Acevedo. Certainly, no case leads inevitably to the conclusion that Acevedo could not be fired for

---

[8] Although the City Commission is not the direct supervisor of the chief of police, as the governing authority of the city, it has oversight powers. Acevedo points out in his Complaint that the City Commission and its members cannot give him orders under Section 4(d) of the City of Miami Charter (though the Complaint misquotes, failing to account for the prefatory language preceding the quote, which refers to the investigatory power of the City Commission: "Except for the purpose of inquiry and as may be necessary as provided in section 14, . . .."). *Compare* Compl. ¶ 25 *with* City of Miami Charter § 4(d). The chief of police answers to the city manager, *see* City of Miami Charter § 24, but the city manager answers ultimately to the City Commission, *id.* § 4(g)(6). That chain of command does not render the City Commission, the "governing body" of the City, *id.* § 4, powerless over the chief of police or the police department.

usurping the governance of the City's highest elected officials. Defendant Diaz de la Portilla is therefore entitled to qualified immunity.

### C. The Complaint Fails to Plausibly Establish Causation Under the Doctrine of Qualified Immunity.

Beyond its other defects, the Complaint must be dismissed because it does not plausibly show that Diaz de la Portilla — one member of a five-member commission presented with four witnesses about Acevedo's failures — caused Acevedo's termination. In the context of qualified immunity, a defendant cannot be held liable for First Amendment retaliation where he is motivated at least in part by a single lawful consideration. *Stanley*, 219 F.3d at 1295-96; *Foy*, 94 F.3d at 1535. *See also Brannon*, 754 F.3d at 1278-79 (qualified immunity applies where "there exists evidence of both lawful and unlawful motivations" for the defendant's conduct).

Beyond that, if *any* of the Defendant Commissioners had a lawful motivation, Acevedo's claim fails for all of them, because Acevedo was fired by the City Commission as a whole. To establish causation based, as here, on the decision of a multi-member board, a plaintiff must show that a majority of the board all had an illegal motive in making the board's employment decision. *See Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 284-87 (1977); *Stimpson v City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999) ("When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee.") *Coogan v. Smyers*, 134 F.3d 470, 485 (2d Cir. 1998) ("[I]f a majority . . . prove that their individual votes against the plaintiff would have been the same irrespective of the plaintiff's protected conduct, then the defendants as a group cannot be held liable, and no individual defendant, even one whose proof falls short, can be so held because causation is absent.").

Acevedo has not presented a plausible theory to defeat qualified immunity as required by these legal standards. The Miami City Commission consists of five members, and Acevedo admits the decision to terminate him "was a unanimous vote by all of the City Commissioners." Compl. ¶ 226. He further admits that at his termination hearing, "Counsel for City Manager Noriega called four witnesses at the hearing, including City Manager Noriega." *Id.* ¶ 220. The city manager's Suspension Memorandum outlines eight independent reasons for terminating him. *See* Ex. A &

*supra* at 1. *All five commissioners voted to fire Acevedo, and Acevedo does not allege any facts showing improper motivation regarding two of the members.* If Defendant Diaz de la Portilla — or any of the other Defendant Commissioners — has a single, legal motivation, qualified immunity defeats Acevedo's claim. Any reasonable reading of the facts Acevedo alleges, with two unbiased commissioners voting for his termination after an evidentiary presentation including four witnesses, establishes he cannot defeat qualified immunity.

It is not enough for Acevedo to allege the reasons for his termination were "pretextual," *see* Compl. ¶ 213, his sole and unadorned response to the charges arrayed against him. Conclusory statements are insufficient to satisfy pleading requirements. *Ashcroft*, 556 U.S. at 678-79, 680-81; *Twombly*, 550 U.S. at 555-56; *Randall*, 610 F.3d at 709-10. Acevedo has not provided any facts to show the Commission's reasons for his dismissal are false. Instead, his pleadings reveal the City Commission was disgusted with his performance before he sent his memorandum, criticizing his management and questioning police operations and its budget. *See* Compl. ¶¶ 108-118 (June 24, 2021 meeting, questioning treatment of Officer Camacho); 152-64 (Sept. 13, 2021 meeting, questioning and revising the police budget). Most important, two independent commissioners ruled against him based on an evidentiary presentation from four witnesses. *Id.* ¶¶ 220, 226. Under those circumstances, it is not plausible that neither Diaz de la Portilla nor any other Defendant Commissioner had a single legitimate basis to terminate Acevedo's employment. The claim against Defendant Diaz de la Portilla should therefore be dismissed.

### III. CONCLUSION

Acevedo cannot show through clearly established law that he spoke as a citizen or that his speech was directed to public concerns. Neither can he show that the law inevitably leads to the conclusion that his speech interests outweigh the City Commission's interest in the governance of the police department. Beyond that, his Complaint does not plausibly show his speech resulted in his termination, which was decided following an evidentiary hearing including commissioners whose motivations he does not challenge. Accordingly, for all the foregoing reasons, and in harmony with the Supreme Court's instruction to rule upon qualified immunity "at the earliest possible stage in litigation," *Hunter*, 502 U.S. at 227, Defendant Diaz de la Portilla respectfully requests that the Court dismiss the claim against him.

By:  /s/ *Thomas A. Tucker Ronzetti, Esq.*

Thomas A. Tucker Ronzetti, Esq.  
tr@tuckrlaw.com  
**TUCKER RONZETTI, P.A.**  
5760 SW 46th Terrace  
Miami, Florida 33155  
(305) 546-4638 (Telephone)

Javier A. Lopez, Esq.  
jal@kttlaw.com  
Michael R. Lorigas, Esq.  
mlorigas@kttlaw.com  
**KOZYAK TROPIN & THROCKMORTON LLP**  
2525 Ponce de Leon Blvd., 9th Floor  
Coral Gables, FL 33134  
Telephone: (305) 372-1800  
Facsimile: (305) 372-3508

Robert W. Rodriguez, Esq.  
robertwrodriguez@gmail.com  
**ROBERT W. RODRIGUEZ, P.A.**  
4909 S. W. 74 Court, 1st Floor  
Miami, FL  33155  
(305) 444-1446

*Counsel for Defendant, Alex Diaz de la Portilla*

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:  /s/ *Thomas A. Tucker Ronzetti*  
Thomas A. Tucker Ronzetti, Esq.

**SERVICE LIST**

Marcos Daniel Jiménez
MARCOS D. JIMÉNEZ, P.A.
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Tel.: (305) 740-1975
Email: mdj@mdjlegal.com
*Counsel for the Plaintiff*

John R. Byrne
LEÓN COSGROVE, LLP
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Tel.: (305) 740-1975
Email: jbyrne@leoncosgrove.com
*Counsel for the Plaintiff*

Frank Quintero, Jr.
QUINTERO BROCHE, P.A.
75 Valencia Ave, Ste. #800
Coral Gables, FL 33134
Tel.: (305) 446-0303
Email: fquintero@quinterolaw.net
*Counsel for Commissioner Manolo Reyes*

Jose M. Quinon
JOSE M. QUINON, P.A.
2333 Brickell Ave, Suite A1
Miami, FL 33129
Tel.: (305) 858-5700
Email: jquinon@quinonlaw.com
*Counsel for Commissioner Manolo Reyes*

Mason A. Pertnoy
KRINSMAN, HUSS, LUBETSKY, FELDMAN & HOTTE
Alfred I Dupont Building
169 E. Flagler Street, Suite 500
Miami, FL 33131
Tel.: (305) 854-9700
Email: mp@khllaw.com
*Counsel for City Manager Arthur Noriega, V*

Benedict P. Kuehne
KUEHNE DAVIS LAW, P.A.
Miami Tower, Suite 3550
100 S.E. 2 St.
Miami, FL 33131-2154
Tel.: (305) 789-5989
e-mail: ben.kuehne@kuehnelaw.com;
efiling@kuehnelaw.com
*Counsel for Commissioner Joe Carollo*

Victoria Méndez, City Attorney
Kevin R. Jones
Kerri L. McNulty
Stephanie K. Panoff
444 SW 2nd Avenue, Suite 945
Miami, FL 33130
Tel.: (305) 416-1800
Email: krjones@miamigov.com
    klmcnulty@miamigov.com
    skpanoff@miamigov.com
Second Email: smfernandez@miamigov.com
    csantos@miamigov.com
*Counsel for City of Miami*