**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 22-20224-CV-WILLIAMS**

HUBERT ARTURO ACEVEDO,

      Plaintiff,

v.

CITY OF MIAMI, *et al*.,

      Defendants.

_____/

<u>**ORDER**</u>

## I.   BACKGROUND

Plaintiff Hubert "Art" Acevedo ("***Plaintiff***"), the former City of Miami Chief of Police, has sued the City of Miami, City Manager Arthur Noriega, and three current or former City of Miami Commissioners, Joe Carollo, Alex Diaz de la Portilla, and Manolo Reyes, ("***Defendant Commissioners***") for retaliation in violation of the First Amendment, pursuant to 42 U.S.C. § 1983.  Plaintiff has also sued the City of Miami for violation of the Florida Whistleblower Act.  All Defendants have filed motions to dismiss the complaint for failure to state a claim.  (DE 17; DE 23; DE 24; DE 25; DE 27.)  For the reasons set forth below, Defendants' motions to dismiss are **DENIED**.

## II.   FACTUAL ALLEGATIONS

As alleged in the Complaint, Plaintiff was sworn in as the City of Miami Chief of Police on April 5, 2021.  Plaintiff claims that he was hired because "there was a need to reform the MPD and to change the culture of the agency."  (Compl. at 1.)  After he was

sworn in, Plaintiff sought to address those needs: he attempted to promote officers committed to reform, to investigate officer misconduct, and to push back on attempts by the Defendant Commissioners to use the resources of the Miami Police Department ("**MPD**") to carry out their personal agendas.  (Compl. at 2.)  When the Defendant Commissioners' efforts to intimidate Plaintiff failed, and once Plaintiff had reported their misconduct to the City Mayor, the City Manager, the Miami-Dade County State Attorney's Office, and the Federal Bureau of Investigation ("**FBI**"), the Defendant Commissioners retaliated against him.  (Compl. at 2.)  They pressured Defendant City Manager Noriega to suspend him, humiliated him at public meetings, and ultimately voted to terminate him. (*Id.*)

As Chief of Police, Plaintiff had the "immediate direction and control of the police force."  (Compl. at 4; City of Miami Charter § 24).  However, the City of Miami Charter does not give the Chief of Police the duty or power to discipline the City of Miami Commissioners.  (Compl. at 4.)  Prior to Plaintiff's swearing in as Chief of Police, in February 2020, the City Commission passed Resolution No. R-20-0034.  (Compl. at 5.)[1] This resolution directed the City Manager to develop a Memorandum of Understanding with the Florida Department of Law Enforcement ("**FDLE**") and/or the FBI to direct all criminal investigations of City of Miami elected officials and their present and former personnel to the FDLE and/or the FBI.  (*Id.*)  According to Plaintiff, Resolution No. R-20-0034 purportedly shifted the duty and responsibility of investigating City of Miami elected

---

[1] On April 22, 2022, the Court granted Defendant Diaz de la Portilla's unopposed motion to take judicial notice of Resolution No. R-20-0034.  (DE 47.)

officials from the MPD to either the FDLE or the FBI, and therefore undercut the MPD's ability to investigate crimes committed by the City's elected officials.  (*Id.*)

Although Plaintiff was prohibited from investigating elected officials, he witnessed the Defendant Commissioners violate federal and state law as well as the City of Miami Charter.  (Compl. at 6.)  Plaintiff alleges that the Defendant Commissioners: "[1] weaponized City resources against perceived enemies, [2] impermissibly issued and/or dictated orders to Chief Acevedo and the MPD, and [3] interfered with Chief Acevedo and MPD operations."  (*Id.*)

First, Plaintiff alleges that the Defendant Commissioners sought to weaponize the MPD to persecute their perceived enemies and engage in a pattern or practice of retaliating against those who exercised their First Amendment rights to either speak out against the Defendant Commissioners or take public positions that the Defendant Commissioners did not like.  (*Id.*)

Specifically, in April 2021, shortly after Plaintiff was sworn in as Chief of Police, numerous City of Miami officials, including Mayor Suarez, City Manager Noriega, and Commissioner Diaz de la Portilla, made comments to Plaintiff that Commissioner Carollo did not like a Mr. William Fuller, one of the owners of several businesses in the City of Miami; that Commissioner Carollo's dislike was due to Mr. Fuller's support of his political opponent; and that Plaintiff should "stay away" from Mr. Fuller's businesses.  (Compl. at 7–8.)  On April 3, 2021, two days before Plaintiff was sworn in as Chief of Police, he was summoned by City Manager Noriega to Taquerias, a business owned by Mr. Fuller, where Mr. Noriega was looking into possible "violations" by Taquerias.  (Compl. at 8.)  Mr.

Noriega told Plaintiff that he was taking this action at the direction of Commissioner Carollo, who had an "absolute disdain" for Mr. Fuller.  (Compl. at 9.)

Plaintiff also alleges that at an April 22, 2021 City Commission meeting, City Manager Noriega approved a proposal by Commissioner Carollo to give Plaintiff a list of places for the police to investigate.  (*Id*.)  Commissioner Diaz de la Portilla then named specific establishments that he wanted the MPD to investigate, and his assistant provided MPD with a written list the next day.  (Compl. at 9–10.)  None of these requests were supported by evidence of criminal activity.  (Compl. at 10.)

Separately, Commissioner Carollo demanded on multiple occasions that Plaintiff arrest "agitators" attending public events in the City.  (Compl. at 12.)  Plaintiff cites two specific instances in June and July 2021 where Commissioner Carollo made such demands and where MPD personnel did not make any arrests because the demonstrators did not break any laws.  (Compl. at 12–13.)

Second, Plaintiff alleges that the Defendant Commissioners impermissibly issued and/or dictated orders to Chief Acevedo and the MPD.  In particular, the Defendant Commissioners sought to influence a June 2021 confidential MPD investigation ordered by Plaintiff into the City Mayor's security detail and dictate the results of that investigation.  (Compl. at 19.)  The investigation determined that Officer Luis Camacho had breached security and Officer Camacho was relieved of duty with pay.  (Compl. at 14.)  Two days later, on June 24, 2021, the City Commission held a meeting at which the Defendant Commissioners chastised Plaintiff in connection with the investigation.  (Compl. at 15–16.)  The Defendant Commissioners also met with Plaintiff in private and questioned Plaintiff regarding the investigation and demanded that Plaintiff reinstate Officer

Camacho.  (Compl. at 16.) Following these events, Plaintiff told Mayor Suarez and City Manager Noriega that he was concerned about the Defendant Commissioners' attempts to interfere with the MPD's confidential investigation.  (Compl. at 17.)

Third, Plaintiff alleges that the Defendant Commissioners interfered with his and MPD's operations.  At a September 13, 2021 City Commission meeting, the Commission approved Commissioner Carollo's motion to eliminate funding for the Deputy Chief position, which was held by Plaintiff's longtime colleague.  (Compl. at 21.)  At the same meeting, the Commission also approved Commissioner Reyes' motion to eliminate funding for a position titled Deputy Director of Constitutional Policing, which Plaintiff had planned to create after discovering a pattern of excessive use of force by City officers. (Compl. at 20–21.)  Plaintiff alleges that these actions were taken because of his resistance to the Defendant Commissioners' interference with the confidential MPD investigation and their efforts to weaponize the MPD for their personal agendas.  (Compl. at 21.)  The day after the City Commission meeting, Plaintiff expressed concerns about the Defendant Commissioners' actions to City Manager Noriega and Mayor Suarez. (Compl. at 22.)  Lastly, on September 23, 2021, during a regular City Commission hearing, City Manager Noriega met with Plaintiff and told him not to transfer a particular officer who Plaintiff had transferred from a field position to an internal affairs position, or else Commissioner Carollo would "blow up [Plaintiff's] budget further."  (Compl. at 23.)

On September 24, 2021, Plaintiff sent a memorandum to City Manager Noriega, Mayor Suarez, the Miami-Dade State Attorney's Office, and the FBI which outlined how the Defendant Commissioners had attempted to weaponize the MPD and interfered with MPD investigations and operations.  (Compl. at 23–24.)  Following distribution of the

memorandum, two special City Commission meetings were held, on September 27, 2021 and October 1, 2021, during which the Defendant Commissioners personally attacked Plaintiff.  (Compl. at 23–28.)  On October 11, 2021, City Manager Noriega suspended Plaintiff.  (Compl. at 28.)  When providing Plaintiff with the termination memorandum, City Manager Noriega told Plaintiff that he had "gone too far" with the September 24, 2021 Memorandum.  (Compl. at 29.)  On October 14, 2021, the City Commission held a termination hearing.  At the hearing, the Defendant Commissioners took active roles in questioning and made biased comments, including one by Commissioner Diaz de la Portilla that he "rested his case," even though the commissioners were supposed to be impartial.  (Compl. at 29–30.)  At the conclusion of the hearing, the commissioners unanimously voted to terminate Plaintiff.  (Compl. at 30.)

## III.   LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure states that a defendant may move to dismiss a complaint that "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A complaint survives a Rule 12(b)(6) motion to dismiss if it pleads sufficient facts to state a claim that is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  At this stage, all factual allegations are accepted as true and all reasonable inferences are drawn in the plaintiff's favor.  *See Speaker v. U.S. Dep't of Health & Hum. Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379–80 (11th Cir. 2010); *Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1307 (11th Cir. 1998).  Therefore, while a plaintiff need not provide "detailed factual allegations," their complaint must offer "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555 (internal citations and quotations omitted).  Further, "the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

## IV.  ANALYSIS

### A.  Count I

In Count I of the Complaint, Plaintiff alleges that Defendant City of Miami's suspension and termination in response to his sending the September 24, 2021 Memorandum constituted adverse personnel actions prohibited by the Florida Whistleblower Act, Fla. Stat. § 112.3187.  Defendant City of Miami argues that Count I should be dismissed because Plaintiff failed to exhaust available administrative remedies, which is a statutory prerequisite to filing suit under the Florida Whistleblower Act.  The City argues that the appropriate administrative remedy here would have been for Plaintiff to file a grievance with the City of Miami's Civil Service Review Board to appeal or otherwise challenge his termination.[2]  Plaintiff argues that the City has not established an administrative procedure for terminated police chiefs.  (DE 35 at 4–6.)  Even if the

---

[2] The City of Miami Charter creates the Civil Service Board.  City of Miami Charter § 36(a). The City of Miami Code details the processes by which a city employee can bring an issue before the Civil Service Board.  Once an employee brings an issue before the Civil Service Board, a hearing is scheduled.  The Civil Service Board may make a preliminary investigation before the hearing.  The employee may present pertinent information to the Civil Service Board at the hearing, and the Civil Service Board then presents its findings and recommendations to the City Manager for his "consideration of a proper remedy, if a remedy is necessary."  City of Miami Code of Ordinances § 40-128(b).  The City Charter, in turn, provides that the City Manager has the power to "[r]ecommend to the mayor and the city commission for adoption such measures as the city manager may deem necessary or expedient."  City of Miami Charter § 16(e).

administrative procedure set forth by the City—the Civil Service Review Board appeal—was available, Plaintiff argues that pursuing it would have been futile.  (DE 35 at 7–9.)

The Court need not delve into the intricacies of the interplay between the City Charter and the City Code to determine whether an administrative remedy was available to Plaintiff.  Even if the Civil Service Review Board appeal was available to Plaintiff, exhausting it would have been futile for Plaintiff.  "A trial court may excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate."  *Igwe v. City of Miami*, 300 So. 3d 279, 282 (Fla. 3d DCA 2019) (internal quotations omitted) (citation omitted).  "To substantiate a claim of futility as an excuse for not exhausting administrative remedies, a claimant must make a clear and positive showing of futility."  *Id.*

Plaintiff has made a clear showing of futility.  Plaintiff alleges that City Manager Noriega suspended him and the City Commission voted to terminate him because he sent the September 24, 2021 Memorandum outlining abuses by the Defendant Commissioners.  According to the City, if Plaintiff had filed a grievance, City Manager Noriega would have been the final decisionmaker because he could have unilaterally reinstated Plaintiff as police chief.  However, Plaintiff alleges that City Manager Noriega retaliated against him and is biased against him because Plaintiff reported misconduct against the Defendant Commissioners that City Manager Noriega helped carry out and refused to address.  (Compl. at 33.)  For example, City Manager Noriega:

- Summoned Plaintiff to Taquerias—owned by Mr. Fuller—in early April 2021 as he was taking measurements and looking into possible "violations" at the direction of Commissioner Carollo, who disdained Mr. Fuller.  (Compl. at 8–9.)

- Approved a proposal by Commissioner Carollo at an April 22, 2021 City Commission meeting to give Plaintiff a list of establishments for the police to investigate, none of which had any evidence of criminal activity. (Compl. at 9–10.)

- Took no action after Plaintiff reported his concerns about the Defendant Commissioners' attempts to interfere with the MPD's June 2021 confidential investigation. (Compl. at 17.)

- Told Plaintiff not to transfer a particular officer who Plaintiff had transferred from a field position to an internal affairs position, or else Commissioner Carollo would "blow up" Plaintiff's budget. (Compl. at 23.)

Moreover, City Manager Noriega testified at Plaintiff's termination hearing that Plaintiff's suspension and ultimate termination "had nothing to do with [Plaintiff] sending the September 24, 2021 Memorandum" (Compl. at 33–34). In other words, the person who Defendant acknowledges could reinstate Plaintiff as police chief had already decided that the adverse actions against Plaintiff were for appropriate, non-retaliatory reasons.

None of the cases cited by Defendant City of Miami support its position that filing an administrative appeal would provide an adequate remedy. In *Igwe v. City of Miami*, the state appellate court opined that "[a] mere allegation from an employee that participation in the administrative process would be futile does not relieve the employee of their obligation to exhaust the remedies provided." *Igwe*, 300 So. 3d at 282 (citing *City of Miami v. Fraternal Ord. of Police Lodge No. 20 of City of Miami*, 378 So. 2d 20, 25 (Fla. 3d DCA 1979) (finding that an employee cannot "relieve himself of engaging in the grievance process merely by supinely accepting an adverse decision of his employer as

unchallengeable until the filing of an action in court")).[3]   Here, Plaintiff has done more then merely allege futility or supinely accept the adverse decision of the City Commission. As set forth in the Complaint, Plaintiff has alleged that, had he filed an appeal with the Civil Service Board, the ultimate decisionmakers would have been the same people he blew the whistle on, and he alleged that those same people are demonstrably biased against him.

In *Springer v. Wal-Mart Associates' Grp. Health Plan*, an ERISA coverage dispute, the Eleventh Circuit held that "[i]f futility were established by the mere fact that the plan administrator who makes initial benefits decisions and the trustees who review appeals share common interests or affiliations, the exhaustion of internal administrative remedies would be excused in virtually every case." *Springer v. Wal-Mart Associates' Grp. Health Plan*, 908 F.2d 897, 901 (11th Cir. 1990).  Here, Plaintiff has advanced more than a mere allegation that the ultimate decisionmakers in his termination shared common interests or affiliations with those who review appeals.  He has alleged that those people are all the same, those people are the officials he blew the whistle against, and those people are demonstrably biased against him.

---

[3] The *Igwe* court upheld the trial court's conclusion that it would not have been futile for Igwe to appeal his allegedly retaliatory termination by the City of Miami to the City's Civil Service Board.  Igwe was an Independent Auditor General who cooperated with an SEC investigation of the City.  Nothing in the ruling indicated that Igwe provided more than a "mere allegation" to establish futility, and the court did not expound on the "mere allegation" standard further.

**B. Count II**

In Count II, Plaintiff alleges that Defendants retaliated against him for his protected speech in violation of the First Amendment.  To establish a First Amendment retaliation claim, an employee (Plaintiff) must make three showings.  "First, the employee must show that the speech was made as a citizen on a matter of public concern.  Second, the employee's free speech interest must outweigh the employer's interest in effective and efficient fulfillment of its responsibilities.  And third, the speech must have played a substantial part in the adverse employment action."  *Green v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023) (citations omitted).  "If an employee satisfies [his] burden on the first three steps, the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech."  *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005).[4]

1. Private Citizen

"To decide whether a public employee speaks as a citizen, courts ask whether the employee's speech 'owes its existence to [the] employee's professional responsibilities.'"  *Austin v. Univ. of Fla. Bd. or Trustees*, 580 F. Supp. 3d 1137, 1168 (N.D. Fla. 2022) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).  The Supreme Court has explained that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."  *Lane v. Franks*, 573 U.S. 228, 240 (2014).  Instead, the "critical

---

[4] The first two parts are questions of law, and the last two parts are questions of fact. *Boyce v. Andrew*, 510 F.3d 1333, 1342 n. 12 (11th Cir. 2007).

question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Id*. After *Lane*, the Eleventh Circuit explained that the phrase "owes its existence to . . . must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of [his] employment, not merely speech that concerns the ordinary responsibilities of [his] employment." *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1162 (11th Cir. 2015).

Plaintiff argues that his speech could not have fallen within the scope of his duties because the City Commission had passed Resolution No. R-20-0034, which precluded him from investigating and reporting malfeasance by City officials. Plaintiff alleges that because of R-20-0034, his job duties did not include investigating such conduct by City officials: any investigation was to be done by the FDLE or the FBI and any reporting of criminal activity to the FDLE or the FBI was to be done by the City Manager. However, Plaintiff alleges, both the FDLE and the FBI independently decide what and whom to investigate and do not rely on "memoranda" or "understandings" with city governments. Plaintiff argues that R-20-0034 therefore put City elected officials beyond the jurisdiction of the MPD and gave Plaintiff no choice but to speak out as a citizen, which he did when he sent the September 24, 2021 Memorandum to City Manager Noriega, Mayor Suarez, the Miami-Dade State Attorney's Office, and the FBI.

The City of Miami's arguments mischaracterize Plaintiff's pleading and are unconvincing. Plaintiff's pleading does not reflect that he wrote a private memorandum to his immediate boss, the City Manager, as Defendant City contends, or "solely up his chain of command to his superiors," as Defendant Noriega contends (DE 25 at 13). Instead, Plaintiff addressed the Memorandum to both Mayor Suarez and the City

Manager, and he previewed in the Memorandum that he had circulated it to the Miami-Dade State Attorney's Office and the FBI.  Plaintiff's complaint does not reflect that the City Commission directed him to "report all criminal investigations of City officials to the FDLE and/or the FBI," as Defendant City contends.  (DE 17 at 16.)  To the contrary, Plaintiff alleged that R-20-0034 precisely precluded this reporting, and because Plaintiff was barred from investigating or reporting commissioner misconduct, he was speaking as a private citizen when he reported that misconduct to law enforcement agencies. Defendant Noriega notes that Plaintiff never alleges that "reporting" commissioner misconduct is outside his ordinary job duties, and the Memorandum states that Plaintiff is "reporting" misconduct.  However, this studiously ignores Plaintiff's pleading, which alleges that R-20-0034 required the City Manager to forward pending investigations of City Officials to the FDLE or FBI.  It was City Manager Noriega's duty to report commissioner misconduct, not Plaintiff's, which is why Plaintiff's Memorandum reporting misconduct was outside of his ordinary duties.

The individual Defendants filed separate motions to dismiss.  Those motions incorporate the City's arguments and add additional arguments that Plaintiff did not speak as a private citizen, all of which the Court finds unavailing.  Defendant Reyes cites *King v. Bd. of Cnty. Commissioners*, 916 F.3d 1339 (11th Cir. 2019) as "an additional important case . . . that may assist . . . in deciding this . . . issue."  (DE 23 at 6–7.)  It does not.  In *King*, the Eleventh Circuit held that a contractor employee who evaluated medical aspects of firefighters' fitness to serve was not entitled to First Amendment retaliation protection when her bid to renew her contract was not accepted after she complained about a specific candidate and refused to certify that candidate.  The Court focused on the fact

that the plaintiff's speech was made "pursuant to her job duties" and "in accordance with or in furtherance of the ordinary responsibilities of her employment."  *King*, 916 F.3d at 1346 (citation omitted).  One of her most important responsibilities was to determine whether firefighters were medically fit for duty, and that job responsibility was the fulcrum of the matter.  *Id.*  Here, Plaintiff's job duties did not include blowing the whistle on city commissioners for corruption and abuse of power.  Indeed, as discussed, R-20-0034 precluded Plaintiff from investigating and reporting malfeasance by city commissioners.

Defendants Diaz de la Portilla and Noriega argue that Plaintiff did not speak as a private citizen because he complained about interference with the operation of the police department.  The Eleventh Circuit has held that an employee's complaint about conduct that interferes with his ordinary job duties might not warrant First Amendment protection, but this is when the complaints about mismanagement or interference can be traced back to the ordinary job duties of the specific complaining employee.  *See, e.g., Alves*, 804 F.3d at 1164–65 (tracing each complaint in a memorandum sent by university psychologists to university officials about a supervisor's leadership and management to the complainants' ordinary duties.)  Here, Plaintiff's speech was more than a complaint about interference with his ordinary job duties.  The September 24, 2021 Memorandum alleges that the Defendant Commissioners were corrupt and abused their power by weaponizing City resources against perceived enemies, impermissibly dictating orders to the MPD and interfering with legitimate MPD operations.  And again, as discussed previously, R-20-0034 precluded Plaintiff from investigating and reporting malfeasance by city commissioners.

Defendant Carollo argues that Plaintiff did not speak as a citizen because he possessed information as police chief that was unavailable to the regular citizen. However, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Instead, the focus "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

In sum, Plaintiff's ordinary job duties as police chief did not include investigating or reporting corruption or abuse of power by city commissioners. Therefore, Plaintiff has plausibly pled that he spoke as a citizen and not pursuant to his ordinary job duties as police chief when he sent the September 24, 2021 Memorandum to City Manager Noriega, Mayor Suarez, the Miami-Dade State Attorney's Office, and the FBI.

### 2. Matter of Public Concern

Speech addresses a matter of public concern when the speech can "'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). The Eleventh Circuit has noted that the "most important factor" is the content of the speech. *Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1284 (11th Cir. 2006). Plaintiff argues that he sufficiently pled that he spoke on a matter of public concern because his speech

focused on corruption in City government and excessive force by police officers, both of which are matters of political, social, or other concern to the community.

With respect to content, "[e]xposing governmental . . . misconduct is a matter of considerable significance." *Garcetti*, 547 U.S. at 425. "[A] core concern of the first amendment is the protection of the 'whistleblower' attempting to expose government corruption." *Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989); *Lane*, 573 U.S. at 241 (noting that "corruption in a public program and misuse of state funds . . . obviously involves a matter of significant public concern."); *see also Gomez v. City of Doral*, No. 21-11093, 2022 WL 19201, at *6 (11th Cir. Jan. 3, 2022) (holding that former detective plaintiff who provided information in connection with an "investigation into the 'impropriety and criminal activity' of a local police chief" regarded a matter of public concern, noting that "'[t]here can be no doubt that corruption in a police department is an issue of public concern'") (quoting *Cooper v. Smith*, 89 F.3d 761, 765 (11th Cir. 1996)).

Plaintiff's September 24, 2021 Memorandum, which outlined how the Defendant Commissioners attempted to weaponize the MPD in pursuit of their personal vendettas and interfere with MPD investigations (Compl. at 24), revealed multiple instances of alleged public corruption and abuse of power by the Defendant Commissioners. The Memorandum, which several Defendants attached to their motions to dismiss, contains specific instances of alleged corruption by the Defendant Commissioners, of which Plaintiff cites a few illustrative instances:

- "[Commissioner Carollo] and Commissioner Diaz de la Portilla have provided the MPD with a target list of establishments they insist are engaged in criminal activity

. . . causing the MPD to investigate business establishments based on the whims of Commissioners Carollo and Diaz de la Portilla." (DE 25-1 at 8.)

- "The MPD SIS/Vice Division has wasted untold hours investigating business establishments due to the improper political influence of, and intimidation by, these two commissioners." (DE 25-1 at 8.)

- "[Commissioners Carollo, Diaz de la Portilla, and Reyes have] questioned me about the ongoing [confidential Internal Affairs] investigation in their offices, have falsely accused me in private of carrying out a vendetta against [Luis] Camacho, and have demanded that I bring Camacho back to work and reappoint him to the [Sergeant-at-Arms Detail]." (DE 25-1 at 4.)

Secondly with respect to content, the Eleventh Circuit has found that "the question of whether police officers are properly performing their duties, as a public safety issue, must be considered an issue of political and social concern." *Fikes v. City of Daphne*, 79 F.3d 1079, 1084 (11th Cir. 1996). Plaintiff's speech addressed excessive force by police officers and the Defendant Commissioners' efforts to impede the reform of such misconduct. Plaintiff's Memorandum noted that he was hired because there was a need to reform and change the culture of the MPD. During his tenure at MPD he "uncovered a pattern of unlawful use of force by officers, and in some instances the chain of command has covered up the unlawful use of force by some officers," and Defendant Commissioners impeded reform by eliminating funding for two positions designed to address MPD's issue with excessive force. (DE 25-1 at 5–7.) Moreover, as Plaintiff points out, his speech occurred during a time when there was notable and significant public interest in excessive force and police reform. *See Fuller v. Warren Cnty. Educ. Serv. Ctr.*,

No. 21-cv-451, 2022 WL 445815, at *5 (S.D. Ohio Feb. 14, 2022) ("[T]he Court notes that there is little doubt that the issues raised as part of the 'Black Lives Matter' movement or the widespread protests of the killing of George Floyd are matters of significant public concern.")

As to the context and form of Plaintiff's speech, the Court finds persuasive the Eleventh Circuit's analysis in *Gomez v. City of Doral*, No. 21-11093, 2022 WL 19201 (11th Cir. Jan. 3, 2022).  In *Gomez*, the Court held that a police officer spoke as a private citizen on a matter of public concern when she provided a sworn statement to the FDLE during its investigation into the criminal activity of the local police chief and his command staff. *Id.*  "The form and context of the speech—a sworn statement to the FDLE that could help produce criminal charges—fortif[ied the Court's] conclusion that Gomez . . . plausibly alleged that she was speaking on a matter of public concern." *Id.* at *6.  "Moreover, the '*point* of the speech in question' was to help 'bring [this] wrongdoing to light.'" *Id.* (quoting *Alves*, 804 F.3d at 1167 (citation omitted)).  Here, Plaintiff, a police chief, provided his allegations of Commission corruption and abuse of power to two law enforcement agencies, the FBI and the State Attorney's Office, and Plaintiff alleges that he did so to bring the wrongdoing to light.

The City of Miami's arguments that Plaintiff did not speak on a matter of public concern are unavailing.  The City highlights the fact that Plaintiff did not publicly distribute his speech, instead sending it to City officials and multiple law enforcement agencies.  "A court may also consider the employee's attempt to make her concerns public along with the employee's motivation in speaking.  However, 'a court cannot determine that an utterance is not a matter of public concern *solely* because the employee does not air the

concerns to the public.'" *Alves*, 804 F.3d at 1162 (citations omitted); *see also Kurtz v. Vickery*, 855 F.2d 723, 727 (11th Cir. 1988) ("[F]ocusing solely on [an employee's efforts to communicate her concerns to the public], or on the employee's motivation, does not fully reflect the Supreme Court's directive that the content, form, and context of the speech must all be considered."). "Thus, whether the speech at issue was communicated to the public or privately to an individual is relevant—but not dispositive." *Alves*, 804 F.3d at 1162. Again, the *Gomez* case, where the form and context of plaintiff's speech—a statement to the FDLE, the point of which was to bring wrongdoing to light—fortified the Court's conclusion that the plaintiff was speaking on a matter of public concern, is apposite. Similarly, in this case, the form of Plaintiff's speech was a statement that was delivered to law enforcement agencies. And as Plaintiff points out, he states at the end of the Memorandum that he was compelled to speak "because the men and women of the MPD, and the wonderful community we serve, deserve leadership that is committed to the rule of law." (DE 15-1 at 9.)

The City does not dispute that government corruption and excessive use of force by police officers are matters of public concern, but it argues that the main thrust of Plaintiff's speech was to complain about Commission interference with the police department and, therefore, with Plaintiff's job duties. *See King*, 916 F.3d at 1347 ("In reviewing the whole record, [w]e ask whether the main thrust of the speech in question is essentially public in nature or private") (citation omitted). The Court finds that Plaintiff has plausibly pled that the main thrust of his speech concerned government corruption and excessive use of force by police and was made with the purpose of bringing the misconduct to light. As the Court has already noted, Plaintiff's speech was more than a

complaint about interference with his ordinary job duties.  The Memorandum alleges that the Defendant Commissioners were corrupt and abused their power by weaponizing City resources against perceived enemies, impermissibly dictating orders to the MPD and interfering with MPD operations.  And again, in any case, R-20-0034 precluded Plaintiff from investigating and reporting malfeasance by city commissioners.

Lastly, Defendant cites several cases where courts found that the plaintiff did not speak on a matter of public concern.  *See Boyce v. Andrew*, 510 F.3d 1333, 1337–1340 (11th Cir. 2007) (case managers' speech addressed personal grievances and frustrations with high caseloads); *Morgan v. Ford*, 6 F.3d 750, 754–755 (11th Cir. 1993) (former department of corrections employee complained of sexual harassment by supervisors); *Wilbourne v. Fortsyth Cnty. Sch. Dist.*, 306 F. App'x 473, 477 (11th Cir. 2009) (teacher complained about a fellow teacher abusing her son); *Alves v. Bd. of Regents of Univ. Sys. of Georgia*, 804 F.3d 1149, 1163 (11th Cir. 2015) (university psychologists complained about new supervisor's incompetence in managing mental health center).  The Court does not find the content of those complaints analogous to this case.  As the Court has explained, Plaintiff has sufficiently pled that his speech was not about interference with his job duties but rather about government corruption and abuse of power.

The individual Defendants make additional arguments that Plaintiff did not speak on a matter of public concern, all of which the Court finds unpersuasive.  Defendant Diaz de la Portilla contends that Plaintiff's characterizations of "corruption" and "abuse of power" in the Complaint are conclusory.  But, as the Court has described, Plaintiff supported these characterizations with numerous specific factual allegations.  Defendant

Noriega's arguments in this regard are likewise unavailing.  In sum, the Court finds that Plaintiff has sufficiently pled that his speech was on a matter of public concern.

      3.  <u>Pickering Balancing</u>

Because Plaintiff has sufficiently pled that he spoke as a citizen on a matter of public concern, the Court moves on to "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [City], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  Factors the court considers when conducting the *Pickering* balancing test are: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Belyeu v. Coosa Cty. Bd. of Educ.*, 998 F.2d 925, 928 (11th Cir. 1993) (citations omitted). A court may also consider: "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  *Stough v. Gallagher*, 967 F.2d 1523, 1528 (11th Cir. 1992) (citations omitted).

The Court finds that Plaintiff has sufficiently pled that his interest in speaking as a citizen on a matter of public concern outweighs the City's interest in effective and efficient fulfillment of its responsibilities.  Plaintiff's September 24, 2021 Memorandum was designed to blow the whistle on multiple instances of public corruption and abuse of power by Defendant Commissioners.  Plaintiff's free speech interest in whistleblowing on public corruption is substantial.  The Eleventh Circuit has stated that "a core concern of the first

amendment is the protection of the 'whistle-blower' attempting to expose government corruption." *Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989).

Plaintiff argues and the Court agrees that Plaintiff's speech did not undermine the City's interest in effective and efficient fulfillment of its responsibilities. Plaintiff alleges that the Memorandum "did not disrupt the functioning of the MPD or the City of Miami" and "the MPD and the City of Miami continued to function after its publication." (Compl. at 39.) There are no allegations otherwise and Defendants make no discernible argument to the contrary. Plaintiff's speech, therefore, did not impede the government's ability to perform its duties efficiently. Plaintiff's Memorandum was published to a limited group of people, specifically City Manager Noriega, Mayor Suarez, the Miami-Dade State Attorney's Office, and the FBI, and was therefore made in an appropriate manner, time and place. Plaintiff's Memorandum also was made in an appropriate context: Plaintiff's discovery of corruption and abuse of power that, under R-20-0034, he was allegedly precluded from investigating or reporting. There have been no allegations that the Memorandum impaired discipline by superiors or harmony among co-workers, had a detrimental impact on working relationships, impeded the performance of the speaker's duties, or interfered with the regular operation of the enterprise. *Stough*, 967 F.2d at 1528.

Defendant Noriega minimizes the whistleblowing nature of Plaintiff's speech and argues that the *Pickering* balancing should tip in Defendants' favor because Plaintiff's complaints relating to his "administrative job functions" warrant little weight. As already explained, the Court disagrees with Defendant Noriega's characterization of Plaintiff's speech. Defendant Noriega also cites a "heightened need for order, loyalty, and harmony in a quasi-military organization such as a police or fire department," *Moss v. City of*

*Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015) (citation omitted), and notes that the *Pickering* balance is "affected" by the special concerns of quasi-military organizations such as police departments, such as discipline and mutual respect.  *See Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994).  However, to the contrary, Plaintiff asserts that his speech did not disrupt the functioning of the MPD or the City of Miami and that the MPD and the City continued to function after his speech.  Although Defendant cites the heightened need for order and loyalty in a police department, Defendant fails to go further and proffer any explanation for why it would be reasonable to conclude that Plaintiff's particular speech created a "reasonable possibility of adverse harm" to the police department.  *See Moss*, 782 F.3d at 622.

Defendant Diaz de la Portilla similarly minimizes the whistleblowing nature of Plaintiff's speech and argues that the *Pickering* balance weighs against Plaintiff because his Memorandum challenged the authority of the Commission "to investigate the operation of the police department and regulate the police department's finances" (DE 24 at 15.)  Defendant Diaz de la Portilla also minimizes the misconduct that Plaintiff alleged he observed by Defendants as being merely "questions from the City Commission or its modification of the police budget."  (DE 24 at 16.)  But Defendant Diaz de la Portilla mischaracterizes the Plaintiff's allegations and, thus, does not address the *Pickering* balance.

First, Plaintiff's speech set forth multiple instances of government corruption and abuse of power by Defendants which cannot plausibly be described as challenging the lawful authority of the City Commission.  For example, Plaintiff's Memorandum noted that Defendant Diaz de la Portilla used "improper political influence" and "intimidation" to have

the MPD investigate certain business establishments based on his personal whims.  (DE 25-1 at 8.)  Second, Plaintiff's Memorandum challenged the attempt by the Commission to influence the outcome of the confidential investigation into Officer Camacho by intimidating him in public and private.  Plaintiff alleged Defendant Diaz de la Portilla attempted to improperly influence the investigation when he urged Plaintiff to run for Miami-Dade Sheriff and said that he would "get [Plaintiff] in" assuming Plaintiff "[did] the right thing on Camacho and get him back."  (DE 25-1 at 4–5.)  These allegations are not directed to lawful governance and inquiry and Defendants' interpretation as such in unfounded.

### 4.  Adverse Action and Causation

Finding that Plaintiff has plausibly pled that he spoke as a citizen on a matter of public concern and that the *Pickering* balance is in his favor at this stage, the Court now addresses Defendants' arguments regarding adverse action and causation.  To establish a First Amendment retaliation claim, Plaintiff also must show that his speech played a substantial part in the adverse employment action.  *See Green v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023).

"To be considered an adverse employment action in a First Amendment retaliation case, the complained-of action must involve an important condition of employment." *Akins v. Fulton Cnty., Georgia*., 420 F.3d 1293, 1300 (11th Cir. 2005) (internal quotations omitted) (citation omitted).  "[A]s a matter of law, important conditions of employment include discharges, demotions, refusals to hire or promote, and reprimands." *Id*.[5]  Plaintiff

---

[5] The Eleventh Circuit's caselaw on the adverse action of a First Amendment retaliation claim brought by a public employee "is a bit muddled."  *Bell v. Sheriff of Broward Cnty.*, 6

alleged multiple adverse actions that pass this test, including suspension and termination. Defendant Reyes argues the Plaintiff failed to allege retaliatory actions. He claims that his statements at the June 24, 2021 Commission meeting and his vote to eliminate MPD positions at the October 1, 2021 Commission meeting were not adverse actions. Whether or not Defendant is correct, these are not the adverse actions that Plaintiff has pled.

A plaintiff's burden regarding causation "is not a heavy one." *Purvines v. City of Crestview*, No. 15-cv-326, 2016 WL 5844868, at *4 (N.D. Fla. Sept. 30, 2016). "[T]he 'substantial part' standard can be satisfied by close temporal proximity between the protected speech and the adverse employment action." *Speak v. Whidden*, No. 18-cv-826, 2021 WL 765467, at *14 (M.D. Fla. Feb 26, 2021) (citation omitted). A proximity of ten months has constituted "close temporal proximity" in the Eleventh Circuit. *Akins*, 420 F.3d at 1305.

Plaintiff has sufficiently alleged that his speech played a substantial part in the adverse employment action. Plaintiff has alleged close temporal proximity between the protected speech and the adverse employment action. He circulated his Memorandum

---

F.4th 1374, 1377 (11th Cir. 2021). In *Bell*, the Eleventh Circuit observed that in the 2016 case *Bailey v. Wheeler*, 843 F.3d 473, 477, 480-81 (11th Cir. 2016)), involving the First Amendment retaliation claim of a police officer, it applied the adverse action standard for First Amendment retaliation claims brought by private citizens. *See Bennett v. Hendrix*, 423 F.3d 1247, 1253 (11th Cir. 2005) (to state a retaliation claim, a private citizen plaintiff need only plead that "the defendant's retaliatory acts are such as would chill a person of ordinary firmness."). When the Eleventh Circuit set forth the "ordinary firmness" standard for adverse action in First Amendment retaliation claims brought by private citizens in *Bennett*, it reasoned that "[t]he balance of interests is different when the plaintiff is a private citizen, and those interests require at least as much protection against retaliation for a private citizen as they would for a public employee." *Bennett*, 423 F.3d at 1252. Therefore, the Court understands that a public employee has at least the equivalent or greater burden than a private citizen to allege an adverse action. Consequently, the Court will evaluate Plaintiff's claims based on the standard set forth in *Akins*.

on September 24, 2021 and he was terminated on October 14, 2021, 20 days after his speech.  The individual Defendants were aware of Plaintiff's speech because they passed a resolution on September 27, 2021 to investigate the allegations set forth in the Memorandum.  And Plaintiff pled other facts to show causation; that Commissioner Russell noted that Defendant Diaz de la Portilla was showing his bias at Plaintiff's termination hearing (Compl. at 30); that when Defendant Noriega provided Plaintiff with the suspension memorandum, he said Plaintiff had "gone too far"; and that Defendant Noriega needed to "stop the bleeding."  (Compl. at 29.)

Defendant Reyes' sole argument that Plaintiff's causation allegations are conclusory is baseless.  Defendant Diaz de la Portilla's argument that if he can establish that he had a lawful motivation for the adverse action, he is entitled to qualified immunity is also without merit.  The cases Defendant Diaz de la Portilla cites to support this contention were decided at the summary judgment stage.  Moreover, Defendant Diaz de la Portilla fails to point out complaint allegations from which it could reasonably be inferred that Defendant had a lawful motivation for the adverse action; the allegedly pretextual suspension memorandum by Defendant Noriega fails to establish a lawful motivation on Defendant Diaz de la Portilla's part.[6]

Lastly, Defendant Diaz de la Portilla argues that Plaintiff needs to show that a majority of the board had an illegal motive in making its employment decision, citing *Mt. Healthy City Sch. Dist. Bd. of Educ. V. Doyle*, 429 U.S. 274 (1977), *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999), and *Coogan v. Smyers*, 134 F.3d 479,

---

[6] The votes of the two non-defendant city commissioners also fail to substantiate claims as to Defendant Diaz de la Portilla's motivation.

485 (2d Cir. 1998) ("[I]f a majority . . . prove that their individual votes against the plaintiff would have been the same irrespective of the plaintiff's protected conduct, then the defendants as a group cannot be held liable . . .") (citation omitted).   These cases are procedurally and factually inapposite.   Relying on *Coogan*, Defendant appears to jump ahead to the fourth prong of the First Amendment retaliation test: if Plaintiff establishes a First Amendment retaliation claim by satisfying the first three steps, "the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of protected speech."   *Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005).   Here, Defendant has moved to dismiss the case for failure to state a claim upon which relief can be granted, so there is no "preponderance of the evidence" in the record at this stage that would allow Defendant to fulfill his burden to show that he would have made the same decision in the absence of Plaintiff's protected speech.   In any case, Plaintiff has sued a majority of the Commission and alleged that they retaliated against him because of his speech.

### C. Qualified Immunity

Although Plaintiff has stated a claim for First Amendment retaliation and his case will proceed against the City, the individual Defendants raise the defense of qualified immunity.   Qualified immunity protects government officials sued in their individual capacities from liability if their conduct violates no clearly established constitutional right. *Walker v. Schwalbe*, 112 F.3d 1127, 1132 (11th Cir. 1997).   In order to prevail on a claim of qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority.   *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006).   If Defendant establishes the first step, the burden shifts to plaintiff

to plead facts showing that defendant "violated a statutory or constitutional rights" and that "the right was clearly established at the time of the challenged conduct." *Garcia v. Riley*, No. 21-cv-10439, 2021 WL 4127070, at *2 (11th Cir. Sept. 10, 2021) (internal quotations omitted).

Since Plaintiff does not dispute that the individual Defendants were acting within their discretionary authority, and the Court has found that Plaintiff has stated a claim for First Amendment retaliation, the remaining question is whether Plaintiff has pled facts showing that the violated right was clearly established. "A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is 'apparent.'" *Akins v. Fulton Cnty, Georgia*, 420 F.3d 1293, 1305 (11th Cir. 2005) (citation omitted). "To demonstrate that the law is clearly established, a party is not required to cite cases with materially similar facts." *Id.* (citation omitted). "Rather, the state of the law of the time of the unconstitutional act must be established sufficiently to give 'fair warning' to the official that his conduct is unlawful." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). "To demonstrate that the law at the time clearly established that Defendants' conduct would violate the Constitution, Plaintiffs might point to either (1) earlier case law from the Supreme Court, [the Eleventh Circuit], or the highest court of the pertinent state that is materially similar to the current case and therefore provided clear notice of the violation or (2) general rules of law from a federal constitutional or statutory provision or earlier case law that applied with obvious clarity to the circumstances, establishing clearly the unlawfulness of Defendants' conduct." *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007) (quotations omitted) (citations omitted).

The Court finds that there was case law materially similar to the current case that provided fair warning to the individual Defendants that their conduct was unlawful.  The Eleventh Circuit has held multiple times that where a government employee blows the whistle on government corruption, it is unlawful to retaliate against the employee.  In *Carollo v. Boria*, Defendant Carollo[7] received First Amendment whistleblower protection under similar circumstances.  During Carollo's tenure as City Manager of Doral, Carollo reported violations of state and federal law by city officials—who were voting members of the City Council—to local and federal agencies, specifically, violations of Florida's campaign finance laws.  *See Carollo v. Boria*, 833 F.3d 1322, 1326 (11th Cir. 2016) (internal quotations and punctuation omitted).  The violations were personally communicated to him, and he made public disclosures at City Council meetings about those violations.  *See id*.  The City Council, with the votes of the individual defendant council members, voted to terminate Carollo.  *See id*.  The Eleventh Circuit affirmed the district court's denial of the individual defendant's motion to dismiss on qualified immunity grounds.  The Court concluded that reasonable public officials would have known that "it violated the First Amendment to terminate a colleague for speaking about matters of public concern that are outside the scope of his ordinary job responsibilities" and stated that "[a] robust consensus of our precedent confirms that the district court was correct to rely upon *Pickering* and *Garcetti* as a basis for fair warning to appellants."  *Id*. at 1334.  Similarly, Plaintiff here reported violations of state a federal law to local and federal

---

[7] Indeed, the plaintiff in *Carollo v. Boria* is Defendant Carollo in this case.  Consequently, the Court is unconvinced by his argument that he did not have notice that his conduct violated a clearly established right.

agencies, including the use of MPD resources to carry out personal vendettas against constituents for exercising their constitutional rights, and Plaintiff has sufficiently pled that he was terminated in retaliation.

The Eleventh's Circuit's decisions in *Akins v. Fulton Cnty., Georgia* and *Walker v. Schwalbe* are part of the robust consensus referred to in *Carollo v. Boria*. In *Akins*, plaintiffs, who were former public employees of the purchasing department of a Georgia county noticed irregularities in the purchasing department's process for bidding and contracting and were able to arrange a meeting with the county commissioner. *See Akins v. Fulton Cnty., Georgia*, 420 F.3d 1293, 1298 (11th Cir. 2005). In reversing the district court's order granting summary judgment for the defendant based on qualified immunity, the Eleventh Circuit held that the defendant had fair warning that speech whose main thrust was to report bidding irregularities to a public official in a meeting requested for that purpose is protected by the First Amendment. *See id.* at 1308.

In *Walker*, the Eleventh Circuit affirmed the district court's denial of qualified immunity. The plaintiff was an employee of the state-sponsored Vista Community Programs. He expressed concerns to supervisors and subsequently met with state representatives and senators about possible improprieties in Vista's budget practices, which led to an investigation of Vista. *See Walker*, 112 F.3d at 1129. After the release of the investigation, the plaintiff suffered adverse employment actions. *See id*. The Eleventh Circuit held that at the time the defendants (plaintiff's superiors at Vista) acted, clearly established law informed reasonable government officials that the plaintiff could not be punished for his First Amendment speech. *Id.* at 1133.

### D. Legislative Immunity

Defendants Reyes and Carollo argue that they are entitled to legislative immunity. "[S]tate and regional legislators are entitled to absolute immunity from liability under [section] 1983 for their legislative activities." *Oakes Farms Food & Distribution Servs., LLC v. Sch. Dist. Of Lee Cnty., Florida*, 541 F. Supp. 3d 1334, 1348 (M.D. Fla. 2021) (internal quotations omitted) (citations omitted). The Eleventh Circuit has drawn the line between legislative and administrative actions for purposes of immunity. "Absolute legislative immunity extends only to actions taken within the sphere of legitimate legislative activity." *Id.* (citations omitted).

A legislative act involves policy-making rather than the "mere administrative application of existing policies." *Fuller v. Carollo*, No. 21-cv-11746, 2022 WL 333234, at *3 (11th Cir. Feb. 4, 2022), *cert. denied*, 143 S. Ct. 203 (2022) (citation omitted). If facts used in "making a decision are specific, rather than general, in nature, then the decision is more likely administrative." *Crymes v. DeKalb Cnty., Georgia*, 923 F.2d 1482, 1485 (11th Cir. 1991). "If the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature." *Id.* (citation omitted). "Employment decisions generally are administrative except when they are accomplished through traditional legislative functions such as policymaking and budgetary restructuring that strike at the heart of the legislative process." *Bryant v. Janes*, 575 F.3d 1281, 1306 (11th Cir. 2009) (internal quotations omitted) (citation omitted); *see also Smith v. Lomax*, 45 F.3d 402, 405 (11th Cir. 1995) ("Smith contends that employment and personnel decisions are administrative in nature and do not involve the deliberative legislative processes encouraged and protected by the legislative immunity doctrine. We find that

Smith's interpretation of the law governing legislative immunity is correct and, moreover, is supported by Eleventh Circuit precedent.")

The Court finds that neither Defendant Reyes nor Defendant Carollo are entitled to legislative immunity in this case. The retaliatory acts that Plaintiff challenges are his suspension and termination and the hearings regarding those matters. These actions were directed specifically at Plaintiff. They were employment decisions that were not accomplished through legislative functions such as policymaking or budgetary restructuring and therefore were administrative acts, not legislative acts.

### E. Final Decisionmaker

Defendant Noriega argues that he was not a final decisionmaker and therefore cannot be held individually liable for Plaintiff's Section 1983 First Amendment retaliation claim. "A decisionmaker is someone who has the power to make official decisions and, thus, be held *individually* liable. A decisionmaker may often be identified by a rule or by examining the statutory authority of the official alleged to have made the decision." *Kamensky v. Dean*, 148 F. App'x 878, 879 (11th Cir. 2005) (quotations omitted) (citation omitted) (emphasis original). Section 26 of the City of Miami Charter states in relevant part, "The city manager [Defendant Noriega] shall have the exclusive right to suspend the chief of police . . ." Clearly, Defendant Noriega had the exclusive authority to suspend Plaintiff and when he did so was the final decisionmaker with respect to the suspension.

Defendant Noriega's argument that he was not the final decisionmaker because he did not have the authority to terminate Plaintiff fails at this juncture because Plaintiff alleged that Defendant Noriega retaliated against him by suspending him. Defendant Noriega cites *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1379 (11th Cir. 2021) in a

footnote in the joint reply brief apparently with regard to this issue. (DE 54 at 28 n. 4.) However, the mere citation is insufficient, and in any event, *Bell* is readily distinguishable from the facts of this case.[8]  Defendant Noriega's argument centers on the proposition that he should be dismissed from the case because he was not a final decisionmaker in any capacity, whether regarding Plaintiff's suspension or termination.  Nowhere in Defendant Noriega's motion to dismiss does he make the argument that Plaintiff fails to sufficiently plead an adverse employment action.  Moreover, in deciding whether employment actions are adverse, the Court must "consider the [City's] acts both individually and collectively."  A*kins*, 420 F.3d at 1301; *see also Shannon v. Bellsouth Telecommunications., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) ("While the other actions of which [the plaintiff] complains might not have individually risen to the level of adverse employment action . . . , when those actions are considered collectively, the total weight of them [can] constitute an adverse employment action.").  Accordingly, and for the reasons articulated above, Defendant Noriega's motion is denied.

---

[8] In *Bell*, the plaintiff was a deputy sheriff with the Broward County Sheriff's Office who, at the time of the complaint, was released from his traditional law enforcement duties so that he could serve as the full-time president of the local deputies and sergeants union.  *See generally Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1379 (11th Cir. 2021).  The only adverse action in *Bell* was a five-day suspension with pay pending investigation into the plaintiff's conduct.  The suspension had no impact on his role as union president, was imposed in accordance with a collective bargaining agreement, and had no other negative employment consequence.  *See generally id*.  Here, Plaintiff alleges that he was suspended; that he received a suspension memorandum setting forth pretextual reasons for his suspension; that it was simultaneously intimated to him by Defendant Noriega that the real reason for the suspension was because of his whistleblowing memorandum; and that he was shortly thereafter terminated.

## V.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motions to Dismiss (DE 17; DE 23; DE 24; DE 25; DE 27) are **DENIED**.

2. Defendants shall answer Plaintiff's Complaint within fourteen days of the date of this Order.

3. The stay of this case (DE 34) is **LIFTED**.

4. Within thirty days of the date of this Order, the Parties shall file a joint conference report and a joint proposed scheduling order, as required by S.D. Fla. Local Rule 16.1(b).  As part of that filing, the Parties shall complete and submit the form proposing deadlines.  (*See* DE 21 at 3–5.)

5. Moving forward, and in light of the multiple Defendants named in this action, all Defendants shall file motions jointly.  If conflicts exist precluding a joint motion, the Defendant(s) must file a motion for leave to file separately, describing those conflicts.

**DONE  AND  ORDERED** in  Chambers  in  Miami,  Florida,  this  <u>29th</u>  day of July, 2024.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE