**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-20224-Civ-WILLIAMS/TORRES**

HUBERT ARTURO ACEVEDO,

            Plaintiff(s),

      vs.

CITY OF MIAMI,
JOE CAROLLO, individually
ALEX DIAZ DE LA PORTILLA,
individually
ARTHUR NORIEGA, individually
MANOLO REYES, individually,

            Defendant(s).

_____/

**STIPULATED DISCOVERY ORDER**
**ON ESI DISCOVERY**

    **THIS MATTER,** having come before the Court upon the joint motion for entry of a protective order filed by the Plaintiff HUBERT ARTURO ACEVEDO and Defendant CITY OF MIAMI,

    **IT IS ORDERED:**

    **I.**    **GENERAL PROVISIONS**

    A.    <u>Scope</u>

    This Order governs the production of documents and electronically stored information (ESI) in this action. Unless more specifically addressed by the terms of this Order, this action remains subject to the relevant provisions of the Federal Rules of Civil Procedure and the Local Rules governing the production of documents and

ESI. The terms of this Order neither enhance, nor diminish, the scope of discovery as contemplated by the Rules.

### Cooperation and Discovery Dispute Resolution by the Parties or the Court

The Parties shall conduct discovery in a cooperative and collaborative manner. There is established a continuing duty to meet and confer in good faith on disputed issues that may arise during the conduct of discovery. When a request for conference and collaboration about an issue in dispute is made by one party to another, the conference and collaboration should occur without unreasonable delay. To the greatest extent possible, the conference participants should include those persons with authority to make ultimate decisions concerning disposition of the matter. At the conclusion of any unsuccessful attempt to resolve a disputed discovery issue, and prior to its submission to the Court for resolution, the parties should have identified the scope of the issues as narrowly and accurately as possible, along with any factual premises which inform the basis of the dispute. When a party relies on one or more of the proportionality factors set forth in Rule 26(b)(1) in a discovery dispute submitted to the Court for resolution, supporting record evidence should normally be presented.

B.    Interpretation to Avoid Waste and Unnecessary Expense

The fundamental purpose served by this Order is to promote the exchange of discoverable information in an efficient and economical manner, employing methods that preserve, to the greatest practicable degree, the information's content, structure, functionality, and usefulness.

In the course of discovery, the parties my encounter information sources that are not contemplated by this order, or which may require reasonable accommodations that deviate from the more specific terms of this order. This order does not preclude agreements between the parties that make such reasonable accommodations, which are encouraged.

When circumstances arise that are not contemplated by the terms of this order, or if uncertainty arises concerning the intended application of its terms, a producing party should initiate the meet and confer process prior to expending material resources on a unilaterally conceived discovery protocol. A producing party shall avoid production protocols that unnecessarily diminish a requesting party's ability to search, retrieve, classify, organize, or use ESI.

## II.    DEFINITIONS

A.    The term "**Action**" means the above captioned matter.

B.    The term "**Electronically Stored Information**," (hereinafter, "**ESI**") has the same meaning as contemplated by Rule 34 of the Federal Rules of Civil Procedure.

C.    The term "**Document**" has the same meaning as contemplated by Rule 34 of the Federal Rules of Civil Procedure, and such meaning includes, in context, a discrete file of ESI that corresponds to such a writing.

D.    "**Hard Copy Document**" means a document that does not exist as ESI.

E.    "**Metadata**" means information about information, or data about data, and includes, without limitation: (i) information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system; or (iii) information about a file, whether created by a user or generated by the system itself.

F.    "**Native**," "**Native format**," or "**Native data format**" means the format of ESI in which the ESI was originally created or the format used by the producing party in the usual course of the producing party's business activities.

G.      "**Extracted Text**" means the information created by segregating the textual content of an ESI native source into a separate electronic text file.

H.      "**Optical Character Recognition**" or "**OCR**" means the process of recognizing the visible text contained within a hard copy document or contained within the digital image of a document, and rendering the recognized text into an electronic text file.

I.      "**Searchable Text**" means extracted text or electronic text created by OCR.

J.      "**Processing**" means the preparation of collected ESI for ingestion into an evidence management platform. It includes the automated ingestion of collected ESI into a program for the purpose of extracting metadata and text (and in some cases, the creation of a static image of the source ESI) according to a predetermined set of specifications.

K.      "**Culling**" means the *exclusion or elimination* of ESI from a collection of potentially responsive information by the application of filtering criteria. In a given document production workflow, culling eliminates a class of ESI from any subsequent consideration for responsiveness. An example of culling would be the elimination of system generated files types included in the database maintained by the National Institute of Standards and Technology (the "NIST List").

L.      "**And**" and "**or**" shall be construed conjunctively or disjunctively as necessary to make their use inclusive rather than exclusive, e.g., "and" shall be construed to mean "**and/or**." "**Include**" and "**Including**" shall be construed to mean "include but not be limited to" and "including, but not limited to." Reference to the singular shall also be deemed to refer to the plural, and vice-versa.

M.      All other unique terms have the meaning described in *The Sedona Conference Glossary: E-Discovery and Information Management* (4th ed. April 2014).

### III.    INFORMATION GOVERNANCE DISCOVERY

A.    Framing intelligent, efficient, and proportional requests for electronically stored information may require information about another party's information systems and other information resources. As is contemplated by the commentary to the Rule 26, a party may conduct discovery concerning the existence, description, nature, custody, condition, and location of any ESI, documents, or other tangible things, including the identity and location of persons who know of any discoverable matter.

### IV.    IDENTIFICATION AND PRESERVATION OF LIKELY SOURCES OF ESI

The Parties shall confer regarding the identification and collection of sources of relevant ESI. The Parties shall meet and confer regarding: (a) the identity and role of custodians possessing relevant information from whom Documents will collected and produced; (b) search methodology and search terms, if any, to be applied, and use of technology assisted review, or similar technologies, if any; (c) relevant data sources, including custodial, non-custodial, and third-party Documents; and (d) any applicable and appropriate timeframes for the collection, review, and production of Documents.

### V.    PROCESSING, CULLING, AND DE-DUPLICATION OF ESI

A.    <u>Processing Protocols</u>

1.    When processing ESI, Coordinated Universal Time (UTC) shall be selected as the time zone.

2.    Files containing dynamic fields such as file names, dates, and times should be processed for production showing the field code (e.g. "[FILENAME]" or "[AUTODATE]"), rather than the values for such fields existing at the time the file is processed.

3.      Compressed file types (e.g. .CAB, .GZ, .TAR. .ZIP) shall be decompressed in a reiterative manner to ensure that a compressed file within a compressed file is decompressed into the lowest possible compression resulting in individual files.

4.      Some file types may contain embedded objects, typically created by the following types of productivity applications: MS Excel, MS Word, MS PowerPoint, MS Project, MS Outlook, and MS Access, Adobe Acrobat, etc. The list is not exclusive. During processing, file types with embedded objects (including objects imbedded with the "display as icon" feature) should be identified and the embedded objects extracted as separate files. The separate embedded object files shall be produced as attachments to the file in which they were embedded, unless such original Document is produced in native format with the embedded information contained within it. The embedded files will be marked with a "YES" in the load file under the "Is Embedded" metadata field.

5.      The producing party will take all reasonable steps to unencrypt any discoverable ESI that exists in encrypted format (e.g., because password-protected) and that can be reasonably unencrypted. If a producing party cannot unencrypt discoverable electronically stored information that exists in encrypted format, the parties agree to meet and confer regarding how such information should be handled.

6.      The producing party shall make reasonable efforts to limit the extent of documents that cannot be processed. For documents and ESI that convert with errors to TIFF (e.g. oversized drawings, CAD renderings, picture files, etc.), the parties will meet and confer regarding a reasonable alternative form of production.

B.      Culling of Identified Data Sets

1.      System Files may be culled by de-NISTing. An electronic file collection may be "de-NISTed" at the producing party's option, by removing commercially available, non-user created operating system and application files contained on the

National Institute of Standards and Technology ("NIST") file list. Identification of NIST list matches will be through MD5 or SHA-1 Hash values.

2.      The Parties may elect to use keyword searching as part of an overall methodology to identify ESI that is reasonably likely to have discoverable information.  If, however, any Party proposes to use keyword searching as a culling methodology to identify or exclude potentially relevant ESI, that Party shall offer to meet and confer regarding the search terms to be used and the sources of ESI to be searched.  If the Parties disagree on the applicable keywords to be used or sources of ESI to be searched, any Party may seek a determination of the same by the Court. The use of keywords in the identification of potentially responsive information is discussed further in Section VI, below.

3.      With the exception of the de-NISTing process described above, before a producing party (or its vendor/agent) uses a software or technology protocol to identify a subset of ESI for presumptive elimination from a collected data set prior to review, the producing party shall provide the requesting party a description of the method(s) proposed to conduct such identification and elimination. Software or technology protocols contemplated in this section include, but are not limited to, those based upon; date ranges, file types, metadata, search terms; Boolean search strings; predictive coding or similar technology; concept searching; conceptual clustering; e-mail threading, and near-deduplication.

C.             De-duplication

1.      ESI will be considered duplicative if it has matching MD5 or SHA-1 hash values. For this purpose, file contents only may be used for MD5 or SHA1 Hash value calculation and will not require inclusion of operating system metadata (e.g., filename, file dates) values.  Messaging files associated with a discrete custodian may be de-duplicated based upon MD5 or SHA1 Hash values for the entire message family, including parent object and attachments.

2.      A producing party may employ electronic mail thread suppression in the manner specified in this protocol. As used in this protocol, email thread suppression means reducing duplicative production of email conversation threads by producing only the most recent or most complete email containing the prior thread of emails, as well as all attachments appended at any point within the history of the thread, and excluding emails constituting exact duplicates of prior email text within the produced string.

3.      To qualify as a single email conversation thread, all lesser included individual messages must have identical (and email identifiable) message conversation participants (including "bcc:" blind copy participants) and attachment history. The inclusion or deletion of a message participant shall terminate a conversation thread for this purpose, but such an occurrence ("conversation branching") may create the beginning of a separate and distinct conversation thread containing some or all of the lesser included messages.

4.      The first occurrence of information introduced into a conversation thread upon which a claim of privilege is asserted shall terminate a conversation thread for this purpose.

## VI.   SEARCH METHODOLOGY AND REVIEW PROTOCOLS

The Parties have an affirmative duty to avoid unnecessary waste in the conduct of discovery. All parties share a mutual interest in the efficient and accurate retrieval of responsive information. Experience demonstrates that the most successful and cost-effective search methodologies result from an ongoing, close, and iterative collaboration between the parties.

The parties shall cooperate in good faith regarding the formulation of search methodologies and best practices that may be employed to identify, retrieve, and produce responsive information from a larger collected data set. The liberal exchange

of information derived from data set analysis for the purpose of crafting or refining search methodologies is appropriate.

As part of an overall search methodology, the use of search terms may provide benefit. When the evidence management technology employed by a producing party has the ability to generate search term occurrence reports, sharing those results is strongly encouraged and support an iterative and collaborative process to craft narrowly tailored and proportional collections of responsive documents. A producing party should normally anticipate providing search term occurrence reports to a requesting party in support of any contention that a proposed search term is under-inclusive, over-inclusive, or inaccurate.

Regardless of the document search and retrieval methodology employed, a producing party should employ reasonable methods to assess its accuracy, such as elusion testing and null set sampling.

## VII.   PRODUCTION FORMAT

A.   **Presumptive Format of Production for Non-structured Information Sources**

1.   Document Images, with Metadata, Text, and Native Files: Subject to the specifications or exceptions set forth below, the presumptive format for production of an ESI document is as a group of single page .TIFF image files accompanied by metadata, a document level searchable text file, and the underlying native file for spreadsheet applications (e.g., Microsoft Excel), presentation applications (e.g., Microsoft Powerpoint), PDFs, audio/visual media files, and image files. When a producing party has applied permissible redactions to an image file, the underlying native file may be withheld. Files produced solely in native format (such as media files, *e.g.*, *.wav*, *.mpeg-4*, *.mov*, *.jpeg*, etc.) will be produced with a .TIFF image slip sheet indicating the production number of the native file and the confidentiality designation, and stating "Produced in Native Format." The native file name

nomenclature will correspond to the same Bates number nomenclature of the corresponding .TIFF image slip sheet, as more specifically described in Appendix 5.

2.      The parties may encounter information sources for which the traditional notion of a "document" is not meaningful.  A producing party may initiate a meet and confer conference to address the format of production for any such information source, but in any event will make good faith efforts to produce the information in a format that is otherwise as reasonably consistent to the greatest degree possible with the production format specified in this order. Text messages from mobile devices may be an example of such an information source.

3.      Ancillary Content Disclosed: TIFF images will be rendered in such a way as to show, as may be applicable, all disclosable reviewer's comments, tracked changes, speaker's notes, and other similar content.

4.      Parent-Child Relationships Preserved: The parent-child relationship between attachments, enclosures, embedded files, and/or exhibits to any parent document shall be preserved. The child-document should be consecutively produced immediately after the parent-document. All parent and child documents shall be produced if any of the parent or child documents are relevant. If the parent or child is privileged, a slip sheet shall be inserted in the production.  Child documents will be mapped to their parent document by attachment range within the applicable load file.

5.      Color When Necessary: When a document that contains color content is produced without its native file because of applied redactions, and the absence of color in the document's TIFF rendering compromises the requesting party's ability to discern the remaining information it contains, the producing party will honor reasonable requests to supplement the production with color images.

6.      Imbedded Links: If a document in its native state references another document or other data source by use of an imbedded hyperlink, a producing party

will make reasonable efforts to include the hyper-linked information in its production. If the linked information cannot be retrieved by reasonable methods, or the original version of the content cannot be retrieved by reasonable methods, the parties shall undertake a meaningful meet and confer conference.

7.     Appendices: Additional technical specifications for production format are set forth in the attached appendices (Appendix 1: *TIFF Image File Specifications*; Appendix 2: *Data Load File Specifications*; Appendix 3: *Searchable Text File Specifications*, Appendix 4: *Image Load File Specifications*; Appendix 5: *Native File Specifications*.) A producing party should supplement the metadata fields set forth in Appendix 2 whenever the nature of the ESI file makes such supplementation appropriate for a complete production.

B.     Presumptive Sources of Extracted Text

The presumptive source of searchable text shall be extracted text from the native file. Where a document image has been redacted and produced in a .TIFF format, OCR of the redacted image may be used to generate the source of searchable text. Similarly, where the native file does not contain a source of extractable text (*e.g.* a non-searchable PDF image file,) OCR may be used to generate the source of searchable text.

C.     Production Format for Hard Copy Documents

In scanning and producing Hard Copy Documents, such documents shall be unitized and organized as they are kept in the normal course of business. For Hard Copy Documents found in file folders and other physical containers that have labels or tabs or other identifying information, such labels and all sides of such file folders and tabs shall be scanned. In the case of an organized compilation of separate Hard Copy Documents – for example, a binder containing several separate Hard Copy Documents behind numbered tabs – the document behind each tab should be scanned separately, but the relationship among the documents in the binder should be

reflected in proper coding of the beginning and ending document and attachment fields. For Hard Copy Documents that contain fixed notes, the pages will be scanned both with and without the notes and those pages will be treated as part of the same document.  Hard Copy Documents will be unitized at the lowest possible level and attachment information preserved. For example, if a folder contains two Hard Copy Documents, the folder and each document will constitute a separate document, but they will have the same attachment start and end. If more than one level of parent-child relationship exists, documents will be kept in order, but all will be treated as children of the initial parent document.

      D.    <u>Redactions and Production of Redacted Documents</u>

To the extent that a responsive document contains information that is Protected Health Information (PHI), information protected by the Health Insurance Portability and Accountability Act (HIPAA), privileged information, or is otherwise specifically protected against disclosure by separate order of the Court, the producing Party may apply redactions to the TIFF image file and produce the document in redacted form.  Any redactions shall be clearly indicated on the face of the document and each page of the document from which information is redacted shall bear a designation that it has been redacted.  The corresponding native file of the document may be withheld from production.

If a redaction is made because of Protected Health Information, and the basis of such redaction is annotated (e.g., "PHI" or "Protected Health Information") on the redaction itself, such redaction need not be included in a party's privilege log.

      E.    <u>Evidentiary Use of Native Files</u>

Any party intending to use native format ESI in an evidentiary proceeding, (depositions, expert witness opinion formulation, evidentiary hearings, etc.) or at trial may initiate a meet and confer conference prior to the ESI's use to establish agreement as to its authenticity, genuineness, and integrity.

F.      Enterprise Databases

If responsive information is identified in a party's enterprise or relational database (e.g. Oracle, SQL Server, DB2), a producing party will have presumptive discretion to craft a format of production to achieve the purpose of the requested discovery. Depending upon the circumstances, such protocols might include, but are not limited to, exporting content from the database in the form of a specified delimited text file, or constructing appropriate queries and reports necessary to extract discoverable ESI in a format most consistent with the specifications of this agreement. When appropriate, collaboration with the requesting party may inform the producing party's format of production.

## VIII.  CONVEYANCE AND DELIVERY

A.      ESI productions shall be conveyed by a secure File Transfer Protocol ("SFTP") service, or on physical media such as a CD-ROM, DVD, external hard drive (with standard PC compatible interface), or readily accessible computer or electronic media as the parties may hereafter agree upon (the "Production Media"). Each item of Production Media should include: (1) the name of the producing party; (2) the production date; (3) a unique production volume name; (4) the Bates number range of the materials contained on such Production Media item;   (5) the name and contact information of a technical contact, preferably the person who generated the media item, so that in case of extraction issues the receiving party has a collaboration contact; and (6) any additional description of the items the producing party deems appropriate. The Production Media shall be accompanied by a transmittal letter identifying the above described information.

B.      Producing parties shall maintain a running production log in spreadsheet format containing the above described information, plus any necessary encryption key associated with each Production Media. Upon the occasion of a physical conveyance of a production, an updated version of the production log shall

be contemporaneously forwarded by electronic mail to persons designated by the requesting party.  Encryption key information will not be contained in the physical conveyance of the Production Media.

### IX.    PRIOR PRODUCTIONS IN OTHER RELATED MATTERS

The parties to this action may, by separate agreement, elect to coordinate discovery with other related litigation matters. In the course of such coordination, a producing party may include a cross-reference to a document's Bates number (or numbers) that have been embossed on the document in the productions occurring in other litigation matters. When this is done, an additional load file field should be created for each separate matter and populated with the corresponding Bates numbers assigned. *See* Appendix 2.

### X.    PROCESSING OF NON-PARTY DOCUMENTS

A.    A Party that issues a non-Party subpoena ("Issuing Party") shall include a copy of this ESI Protocol with the subpoena and request that the non-Party produce documents in accordance with the specifications set forth herein.

B.    The Issuing Party is responsible for producing to all other Parties any documents obtained pursuant to a subpoena to any non-Party in the form in which they were produced by the non-Party. To the extent practical given the data volume, productions by a non-Party should be produced by the Issuing Party to all other Parties within seven days of the non-Party's production to the Issuing Party.

C.    Nothing in this ESI Protocol is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or non-Parties to object to a subpoena.

**DONE AND ORDERED** in Miami, Florida, the 4th day of February, 2025.

_____
EDWIN G. TORRES
United States Magistrate Judge

## Appendix 1: TIFF Image File Specifications

TIFF image files created for this litigation pursuant to this Order shall comport with the following specifications:

• The TIFF image file shall be a Group IV compression, black-and-white, single-page TIFF image file using a 300 x 300 dots-per-inch (DPI) optical scan resolution and an 8.5-inch page size, except for documents that in the producing party's reasonable judgment require a different resolution or page size.

• Original document orientation should be maintained (*i.e.* an original landscape document should be produced in landscape format).

• Each TIFF image file shall be branded with a legible, unique Bates number in the lower right corner, positioned so as not to interfere with reading the document. The Bates number shall: (1) be unique across the entire document production; (2) be a combination of an alphabetic prefix along with an 8-digit number (*e.g.* ABC00012345), wherein the numeric portion shall be zero-padded leftwards as needed to comprise 8 digits, (3) contain no special characters or embedded spaces, and (4) be numerically sequential within a given document. If a production number or set of production numbers is skipped, the skipped number or set of numbers will be communicated to the receiving party.

• Confidentiality designations, if any, will be branded on the lower left corner of the applicable image, also positioned so as not to interfere with reading.

• The resulting TIFF image file shall be named according to the naming convention *number.TIF*, where "*number*" is the Bates number of the corresponding page. File names for these files shall not contain any special characters or embedded spaces.

• Image files shall be grouped in folders on the production media of no more than 1,000 TIFF files each unless necessary to prevent a file from splitting across folders. Files will not be split across folders, and separate folders will not be created for each file.

## Appendix 2: Data Load File Specifications

The data load file is a delimited text file containing data about each document needed for use with standard litigation support software.

The file name of the data load file should contain the volume name of the production media, although additional description information may be provided after the volume name. For example, both "ABC001.dat" and "ABC001_metadata.dat" would be acceptable names for a data load file having a production volume named "ABC001." File names shall not contain any special characters or embedded spaces.

Unless other delimiters are specified, the data in each field should be separated using Concordance default delimiters. A semicolon should be used as a multi-entry separator. A carriage-return line- feed should be used to indicate the start of the next record.

The first line of the data load file must contain each field name, separated by a delimiter, corresponding to the order in which the data appears in the file.

Load files should not span across media (*e.g.* CDs, DVDs, hard drives, etc.); a separate volume should be created for each piece of media delivered.

Data for documents shall normally be produced in only one data load file throughout the productions, unless that document is noted as being a replacement document in the Replacement field of the data load file. When it may become necessary to either alter or supplement the metadata associated with previously produced documents, a producing party will notify the requesting party and initiate a meet and confer to coordinate such an exchange. The producing party will clearly and unambiguously identify data which is supplemental (made with an APPENDING load file) versus data which is intended to replace existing metadata (made with an OVERLAY load file.)

### Metadata Fields to be Included in the Data Load File

For all documents or electronic files produced, the following metadata fields for each document or electronic file, if available at the time of collection and processing and unless such metadata fields are protected from disclosure by attorney-client privilege or work-product immunity or otherwise prohibited from disclosure by law or regulation, including the European Data Privacy Regulation, will be provided in the data load file.

The term "Scanned Docs" refers to documents that are in paper form at the time of collection and have been scanned into *.tif images (i.e., "Hard Copy Documents" as defined above.) The term "Email and E-Docs" refers to files that are in electronic form at the time of their collection.

The following fields are not exclusive and should be supplemented by a producing party with available metadata whenever appropriate or when otherwise consistent with this protocol, including data fields exported from a database or Document Management System.

| Field Name | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| PRODBEG | ABC00000001 | Yes | Yes | Beginning production number |
| PRODEND | ABC00000008 | Yes | Yes | Ending production number |
| PRODBEGATT | ABC00000009 | Yes | Yes | Beginning production number of parent in a family |
| PRODENDATT | ABC00001005 | Yes | Yes | Ending production number of last page of the last attachment in a family |
| CUSTODIAN | Smith, John | Yes | Yes | Custodian(s) that possessed the document or electronic file |
| OTHERCUSTODIANS | Jones, David; Williams, Robert | N/A | Yes | Additional Custodian(s) that possessed de-duplicated document or electronic file—multiple custodians separated by semicolon |
| FILEDESC | Microsoft Office 2007 Document | N/A | Yes | Description of the type file for the produced record. |
| FOLDER | \My Documents\Document1.doc | N/A | Yes | Original source folder for the record produced. |
| FILENAME | Document1.doc | N/A | Yes | Name of original electronic file as collected. |
| DOCEXT | DOC | N/A | Yes | File extension for email or e-doc |
| PAGES | 2 | Yes | Yes | Number of pages in the produced document |

| Field Name | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| | | | | or electronic file. |
| AUTHOR | John Smith | N/A | Yes | Author information as derived from the properties of the document. |
| DATECREATED | 10/09/2005 | N/A | Yes | Date that non-email file was created as extracted from file system metadata |
| DATELASTMOD | 10/09/2005 | N/A | Yes | Date that non-email file was modified as extracted from file system metadata |
| SUBJECT | Changes to Access Database | N/A | Yes | "Subject" field extracted from email message or metadata properties of the document |
| FROM | John Beech | N/A | Yes | "From" field extracted from email message |
| TO | Janice Birch | N/A | Yes | "To" field extracted from email message |
| CC | Frank Maple | N/A | Yes | "Cc" or "carbon copy" field extracted from email message |
| BCC | John Oakwood | N/A | Yes | "Bcc" or "blind carbon copy" field extracted from email message |
| DATESENT | 10/10/2005 | N/A | Yes | Sent date of email message (mm/dd/yyyy format) |
| TIMESENT | 10:33 am | N/A | Yes | Sent time of email message, time zone set to GMT |
| DATERCVD | 10/10/2005 | N/A | Yes | Received date of email message (mm/dd/yyyy format) |
| TIMERCVD | 10:33 am | N/A | Yes | Received time of email message, time zone set to GMT |

| Field Name | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| CONFIDENTIALITY | CONFIDENTIAL | Yes | Yes | Text of confidentiality designation, if any |
| REDACTION | REDACTED | Yes | Yes | User-generated field indicating whether a document was redacted. |
| TEXTPATH | Text\001\001\ABC00000001.txt | Yes | Yes | Path to *.txt file containing extracted or OCR text |
| NATIVEPATH | Natives\001\001\ABC00000001.xlsx | N\A | Yes | Path to files supplied in native format. |
| MD5 HASH | 30999747f4e6d7b ef786e614ff2c f4b0 | N/A | Yes | MD5 Hash for electronic document |
| REPLACEMENT | REPLACEMENT | Yes | Yes | "Replacement" indicates the image is a replacement for a previously produced image; otherwise blank. |
| PRODVOL | VOL001 | Yes | Yes | Name of the Production Volume |
| PRIORPRODBEG01, PRIORPRODBEG02, PRIORPRODBEG03, etc. | DEF00000001 | Yes | Yes | Other identifying production numbers that have been assigned to the record in previous productions pursuant to Section X. |

## Appendix 3: Searchable Text File Specifications

- The document level searchable text file will contain any text in the respective document, omitting any text redacted from the produced document.

- The file naming convention for the text file shall be in the form number.TXT, where "number" is the same Bates number as the Beginning Production Number for the first page of the respective document images. File names shall not contain any special characters or embedded spaces.

- The full path and file name of the text file must be provided in the data load file as specified in Appendix 2.

- OCR text for scanned images of paper documents should be generated by applying optical character recognition processes to the image of the document. The parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology. OCR shall be performed on a document level and provided in document-level text files. OCR text should not be delivered in the data load file or any other delimited file.

- For electronic files, searchable text shall be extracted from the native file and included in the text file. If the electronic file has no extractable text (*e.g.* a non-searchable PDF image file), the document will be OCR'd, and file-level OCR text will be provided in lieu of extracted text. Extracted text shall likewise be produced in document-level text files.

## Appendix 4: Image Load File Specifications

- The image load file should be a Standard Opticon formatted load file (.opt text file) with ANSI/Western European encoding that references the Control ID on a page level consistent with ingestion into the kCura Relativity® review platform. The name of the image load file should mirror the name of the delivery volume, and should have an .OPT extension (*e.g.* ABC001.OPT). File names shall not contain any special characters or embedded spaces.

- The volume names should be consecutive (*e.g.* ABC001, ABC002, etc.).

- Every image in the delivery volume should be contained in the image load file, one row in the load file per TIFF image. The total number of documents referenced in the image load file should match the total number of designated documents in the data load file for that production.

- Load files should not span across media (*e.g.* CDs, DVDs, Hard Drives, Etc.), *i.e.*, a separate volume should be created for each piece of media delivered.

## Appendix 5: Native File Specifications

•     The file naming convention for the native file shall be in the form number.EXT, where "number" is the first page Bates number for the corresponding TIFF image and "EXT" is the original native file extension (i.e., *.doc, .xls*, *.ppt*, etc.) File names shall not contain any special characters or embedded spaces.

•     The full path and file name of the native file must be provided in the data load file as specified in Appendix 2.

.